UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JIMMY JENKINS and CANDICE ROBERTS, individually and on behalf of all persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WHITE CASTLE MANAGEMENT CO., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 12 CV 7273 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Jimmy Jenkins and Candice Roberts bring this action on behalf of themselves and all similarly situated individuals against White Castle Management Company ("White Castle"), alleging, among other things, that White Castle violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq* ("IWPCA"). Plaintiffs now move to certify a class action consisting of "[a]ll persons employed at White Castle's Dolton Illinois location from September 2002 to present, who worked and were paid less than the agreed-to wage rate under their IWPCA Agreement by the practice of compelled payments." (Pls.' Mem. at 10, ECF No. 101.) For the reasons set forth herein, Plaintiffs' motion for class certification [98] is denied.

**I. BACKGROUND**

    **a. White Castle**

White Castle owns and operates "quick-service" restaurants throughout the United States, including a location in Dolton, Illinois (the "Dolton White Castle"). (Darrin Cotton Decl. ¶ 3, ECF No. 109-1.) At any given time, the Dolton White Castle employs approximately forty individuals. (Jimmy Jenkins, 3d Decl. ¶ 59, ECF No. 100-2.) Staff is comprised of a General

Manager and several Assistant General Managers, Crew Managers, and Team Members. (Cotton Decl. ¶¶ 4-6, Exs. A1-A3.)

As is the case with most corporate entities, the various positions at the Dolton White Castle come with different duties and responsibilities. Team Members are tasked with guest service, quality control, sanitation, cash handling, and safety. (Def.'s Opp. Br. at 2.) They report to Crew Managers, Assistant General Managers, and the General Manager. Crew Managers, in turn, are responsible for, *inter alia*, "follow[ing] prescribed procedures in directing . . . personnel on shift." (*Id*.) Crew members also must "[f]ollow established procedures for handling company money." (*Id*.) Crew members report to the Assistant General Managers and the General Manager. Assistant General Managers oversee all activities at a White Castle, including "Team Members' cash handling . . . procedures for compliance to policies." (*Id*.)

All employees must adhere to the White Castle Team Member Handbook in carrying out their professional duties. (Cotton Decl. ¶8.) "White Castle tries to ensure that all Team Members at the Dolton White Castle receive a copy of the Team Member Handbook at the outset of their employment." (*Id*.) The handbook describes Four Quality Standards, one of which is the company's Cash Handling policy. (*Id.* Ex. A4.) This policy prohibits employees from personally repaying their own drawer shortages or safe shortages.[1] (Jenkins Dep. at 212:7-213:3; Roberts Dep. at 116:18-21; Colbert Decl. Ex. A4.)

### b. Plaintiffs' Employment at the Dolton White Castle

Jenkins joined the Dolton White Castle as a Team Member on October 24, 2006. (Cotton Decl. ¶12.) He held this position until January 9, 2008, when he was promoted to Crew

---

[1] A drawer shortage occurs when a cash register contains less money at the end of an employee's shift than expected based on the transactions consummated during the shift. (*See* Def.'s Opp. Br. at 1.) A safe shortage is a similar discrepancy except applied to a store safe after collections are made from the drawers. (*Id.*)

2

Manager. Jenkins was suspended in August 2012, after General Manager Sylvia Anderson suspected him of theft. During a shift Jenkins supervised, a customer tendered a $20 bill for an order costing $1.69 but did not receive any change. (*Id.* ¶¶ 13-14, Ex. A6.) Jenkins maintains that he did not steal the change but was nonetheless ordered by General Manager Anderson to pay $20 back to the store. (*See* Jenkins 3d Decl. ¶¶ 49-50.) Jenkins cites this incident as an example of General Manager Anderson compelling him to make a payment for a drawer shortfall. (*Id.* ¶ 36.) On September 22, 2012, Jenkins was transferred to another White Castle location. (Cotton Decl. ¶12.)

Roberts began work at the Dolton White Castle on July 5, 2008 as an Assistant General Manager. (Roberts Dep. at 14:11-15:1.) She remained in that position until her termination on December 23, 2013. (Def.'s Opp. Br. at 3.)

Plaintiffs allege that they and other employees made payments to offset drawer and safe shortages. (1st Am. Compl. ¶¶ 2-3, 43, 58-59.) Plaintiffs further allege that White Castle required employees to make these payments as a matter of policy. (*Id.* ¶¶ 23, 91.)

No records exist of any employee payments for drawer or safe shortages. (Jenkins Dep. at 94:18-22, 347:16-350:13; Cotton Decl. ¶ 11.) White Castle does not make payroll deductions to cover the cost of drawer shortages or safe shortages. (Cotton Decl. ¶11.) Nor do White Castle payroll records reflect any such deductions. (*Id.*) All alleged payments to restore drawer or safe shortages were made in cash. (Jenkins Dep. at 85:15-17, 347:19-348:2.)

Plaintiffs acknowledge that official White Castle policy—specifically the Cash Handling Policy—bars employees from paying for drawer and safe shortages. (Jenkins Dep. 215:4-23; Roberts Dep. 264:9-265:0.) Even so, Plaintiffs contend that General Manager Anderson held employees at the Dolton location personally accountable for and required them to cover drawer

3

and safe shortages. (*Id.*) Certain White Castle employees—Duan Colbert, Kattie Loveberry, Roger Barnes, Rakitta Boylan, and Donyell Barnes—have submitted affidavits indicating that they reported to General Manager Anderson at some point during their employment, were never asked to pay back a drawer or safe shortage, and "are not aware of anyone at the Dolton White Castle who has paid back a drawer shortage or safe shortage from their own pocket." (*See* Duan Colbert Decl. ¶¶ 4, 8, ECF No. 109-4; Katie Loveberry Decl. ¶¶ 6, 9, ECF No. 109-5; Roger Barnes Decl. ¶¶ 5, 9, ECF No. 109-6; Rakitta Boylan Decl. ¶¶ 6, 12, ECF No. 109-7; Patricia Liddel Decl. ¶¶ 6, 10, ECF No. 109-9.)

## II. LEGAL STANDARD FOR CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 allows class certification when the proposed class satisfies all of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011). The court need not accept the allegations in the complaint as true. *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). Under *Wal-Mart*, the party seeking class certification must demonstrate with proof that the requirements of Rule 23 are satisfied. The court must engage in a "rigorous analysis" and, if necessary, delve into "the merits of the plaintiff's underlying claim." *Id*. at 2551-52.

Rule 23(a) lists as prerequisites for certification "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Wal-Mart*, 131 S. Ct. at 2548. These four requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart*, 131 S. Ct. at 2550 (internal quotation marks omitted).

Plaintiffs request certification pursuant to Rule 23(b)(3), which applies when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and [when] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Although similar to commonality, 'the predominance criterion is far more demanding.'" *Starr v. Chicago Cut Steakhouse, LLC*, No. 12-cv-4416, 2014 U.S. Dist. LEXIS 172645, at *33 (N.D. Ill. Dec. 15, 2014) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012)). "Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815.

## III. DISCUSSION

### a. The Ascertainability Requirement

One of the "implicit" requirements under Rule 23 is that a plaintiff moving for class certification must show that the proposed class is "sufficiently definite that its members are ascertainable." *See Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 502 (7th Cir. 2012). "An identifiable class exists if its members can be ascertained by reference to objective criteria." *Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620, 624 (N.D. Ill. 2007) (citation and quotation marks omitted).

Confirming the ascertainability of a putative class serves several objectives. In the interest of docket management, a district court must understand at the class certification stage "the burdens that [identification of the class] might entail." *Simer v. Rios*, 661 F.2d 655, 670 (7th Cir. 1981). Only by being informed on the definiteness of a class can the court appropriately decide whether the "class-action device" would be an efficient "way of trying the

5

lawsuit. . . ." *Id.*; *see also Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("If a class cannot be ascertained in an economical and administratively feasible manner, significant benefits of a class action are lost.") (quotation marks and citation omitted).

Additionally, proceeding with an ascertainable class safeguards the rights of both the parties and absent class members. With objective criteria to discern class membership, the parties can "insure[] that those actually harmed by defendants' wrongful conduct will be the recipients of the relief eventually provided." *Simer*, 661 F.2d at 670. The ascertainability requirement protects defendants as well, as it "ensur[es] that those who will be bound by the judgment are clearly identifiable." *Driver v. Appleillinois, LLC*, No. 06-cv-6149, 2013 U.S. Dist. LEXIS 154773, at *28 (N.D. Ill. Oct. 29, 2013). Further, having a verifiable method to ascertain class membership "protects absent class members by facilitating the 'best notice practicable' under Rule 23(c)(2) in a Rule 23(b)(3) action." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012); *see also Carrera*, 727 F.3d at 307. ("[A]t the commencement of a class action, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class.").

To satisfy the ascertainability requirement, a plaintiff must (1) define the class "with reference to objective criteria," and (2) propose "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013) (internal quotation marks and citations omitted). Although "[t]he identities of the class members need not be known at [the class certification stage,] there must be some objective criteria by which the identities can be determined." *Langendorf v. Skinnygirl Cocktails, LLC*, No. 11-cv-7060, 2014 U.S. Dist. LEXIS 154444, at *4 (N.D. Ill. Oct. 30, 2014 ) (citing Manual of Complex Litigation, Fourth § 21.222)).

6

In a case before another court in this district, indefiniteness in class membership was fatal to a motion for class certification of a state law claim brought to recoup employer deductions to employees' pay. *See Franks v. MKM Oil, Inc.*, No. 10-cv-13, 2012 U.S. Dist. LEXIS 128205, at *19-21 (N.D. Ill. Sept. 7, 2012). The plaintiffs in *Franks* were former employees of MKM Oil, Inc. ("MKM"), a corporation that operates retail gas stations in Illinois. *Id.* at *2. The former employees sued MKM based on "three distinct factual allegations," one of which involved deductions to an employee's pay "to make up for business losses suffered during the employee's shift." *Id.* at *4. One of the named plaintiffs allegedly had to pay her manager cash after a customer filled up on gas and drove off without paying; the other named plaintiff was ordered to pay MKM back for a customer theft that occurred during her shift. *Id.* at *5. The plaintiffs also "claim[ed] that other employees were [ ] required to pay their managers for a variety of other cash shortfalls, such as when the cash register reported a shortage." *Id.* To substantiate their allegations, the plaintiffs produced "evidence that cash payments were a common policy"— namely, a copy of a document titled, "MKM Drive-Off Policy," along with more than 250 copies of documents bearing the same title, each signed by a manager and employee of a specific retail location. *Id.* at *21-22.

Notwithstanding proof that a company-wide policy existed, the court found that the putative class was not ascertainable. *Id.* at 20. Central to the court's finding was that the term "pay deduction" was a "misnomer," as MKM never deducted the cost of drive-offs or thefts from employee paychecks. *Id.* "Instead, employees made cash payments to the managers." *Id.* Consequently, for the court to determine class membership, it would have had to identify which employees made cash payments. *Id.* Although one of the named plaintiffs kept and produced receipts of her cash payments, the receipts did not identify her as the employee "being

7

penalized," and there was no "evidence that MKM printed [the] receipts as a matter of policy." *Id.* at *20-21. Nor was there any reason to believe that any other members of the proposed class kept records of their payments. These deficiencies in the plaintiffs' proof meant that "identifying [members of the] proposed class would [have been] tremendously burdensome." *Id*.

Similar to the putative class in *Franks*, the proposed class here is not ascertainable. No objective criterion exists to ascertain class membership. Plaintiffs allege that they and other employees made payments to offset drawer and safe shortages at the conclusion of their shifts. (1st Am. Compl. ¶¶ 2-3, 43, 58-59.) But there are no records of any of these payments. Payments were not deducted from paychecks. *See Torres v. Nation One Landscaping, Inc.*, No. 12-cv-9723, 2014 U.S. Dist. LEXIS 149251, at *7 (N.D. Ill. Oct. 21, 2014) (certifying IWPCA class for unauthorized deductions, where "every employee appear[ed] to have been subject to automatic deductions for [the costs of their] uniforms"). Rather, all payments were allegedly made in cash. Whereas the plaintiffs in *Franks* submitted receipts of some payments, *Franks*, 2012 U.S. Dist. LEXIS 128205, at *20-21, the plaintiffs here possess not one receipt to verify whether any class member paid a certain amount on any given date.

Moreover, the *Franks* plaintiffs at least presented "evidence that cash payments were a common policy." *Id.* at *6. The plaintiffs submitted a company document, titled "MKM Drive-Off Policy," that informed employees that they would be "responsible for payment of [a] drive-off" and that "additional corrective action could/will result" following a drive-off. *Id.* Employees had to sign a separate version of this document in which they acknowledged personal responsibility for a drive-off occurring while they operated the cash register. *Id.* The document that the employees signed informed them that their "payment must be received by the next pay date following the drive-off." *Id.*

8

The plaintiffs in this case, by comparison, have presented no evidence of a White Castle company policy requiring cash payments for drawer shortages. In fact, the company's Cash Handling Policy prohibits employees from paying for drawer and safe shortages. To prove the existence of a storewide practice, Plaintiffs point to Jenkins's testimony, in which he claims that "[e]veryone" at the Dolton location had to make cash payments for drawer or safe shortfalls. (*See* Jenkins Dep. 223:12-224:20.) But Jenkins only recalls a few specific instances when he witnessed coworkers making payments for drawer shortages. Furthermore, some White Castle employees have indicated by affidavit that they never paid for a drawer or safe shortage. Jenkins's assertion that "[e]veryone" paid for drawer and safe shortages is simply unsupported by the record and gives the court no basis to ascertain class membership. *See Torres v. Nation One Landscaping, Inc.*, No. 12-cv-9723, 2014 U.S. Dist. LEXIS 149251, at \*9 n.1 (N.D. Ill. Oct. 21, 2014) (finding plaintiff's declaration recollecting observations of unpaid labor performed by coworkers insufficient to "reflect a common pattern that stretches through the class period"). Given the lack of objective criteria, "identifying the class would be tremendously burdensome" in this case, since the court would have to hear and assess testimony from each individual employee to ascertain class membership. *Id.* at \*21.

Plaintiffs urge the court to look past the lack of objective criteria and rely on the putative class members' responses to class notice to ascertain membership. As Plaintiffs argue in their reply brief, "Defendants claim that the class is not known [sic] this is also incorrect, [sic] the class is those making payments, which nearly all employees of the Dolton White Castle. [sic] This is simply determined by providing notice to all employees, those opting out obviously made payments. [sic]"[2] (Pls.' Reply at 9, ECF No. 108.)

---

[2] Plaintiffs' legal memoranda read like stream of consciousness at times, containing many run-on sentences and typographical and grammatical errors. In *Franks*, the court observed that class

9

Plaintiffs basically make two arguments as to how the proposed class is ascertainable. First, Plaintiffs assert that the class is definite because all White Castle employees are members, since all of them allegedly made compelled payments. However, the record contradicts this allegation. Several employees who reported to General Manager Anderson have sworn that they never made payments for drawer or safe shortages. And, more to the point, Plaintiffs have presented the court with no method for ascertaining class membership other than holding individual hearings to consider the testimony of each purported class member. To establish their individual claims for compelled payments, Plaintiffs rely on their deposition testimony and declarations, wherein they identify a handful of incidents when they paid drawer and safe shortages. There is no way the court can use Plaintiffs' anecdotal evidence to identify any other individual's membership in the class. As a result, class action treatment would not be an efficient means to resolve this case, since the court would have to hear individualized, incident-specific testimony to establish each allegedly compelled payment for every class member.

Second, Plaintiffs contend that they can identify class members by excluding those who opt out after receiving class notice from the rest of the class. But Plaintiffs offer no authority to support the idea that the class can self-define itself in this manner. Using a putative class member's "decision" to opt out is no proxy for class membership; the court still has to determine whether an individual who chooses not to opt out belongs to the class. And when that time comes, the absence of objective proof will transform the class proceeding into a series of hearings of individuals without objective proof to support their anecdotal testimony.

---

counsel, who also represents Plaintiffs in this matter, "made several meritless arguments in the briefs." *Franks*, 2012 U.S. Dist. LEXIS 128205, at *27. "Although the[] errors [did] not rise to the level of a finding of inadequacy of counsel," the court cautioned that it "could take them into account if the class prevails and counsel moves for attorney fees." *Id.* at *27-28. Plaintiffs' counsel is advised to review his papers for typographical and grammatical errors, as they detract from and muddle the arguments he makes.

### b. The Predominance Requirement

A plaintiff seeking class certification under Rule 23(b)(3) must show that common questions predominate over those questions affecting only individual members and that a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Rule 23(b)(3) "is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)). "There is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814. Rule 23(b)(3) simply asks whether the putative class claim "*is capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Id.* (quotation marks and citations omitted) (emphasis in original).

Here, the court recognizes that Plaintiffs have presented a common question of law: whether General Manager Anderson's alleged practice of compelling employees to pay for drawer and safe shortages violated the IWPCA. However, Plaintiffs have failed to show that this common question of law predominates over individual questions of liability and damages. The primary evidence Plaintiffs submit to support their motion for class certification consists of their own testimony and declarations. This evidence does not show that Plaintiffs' IWPCA claim arising from allegedly compelled payments is subject to generalized proof. To the contrary, the circumstances surrounding each of the drawer and safe shortage payments Plaintiffs allegedly made underscore how individualized any inquiry would be into another putative class member's claim.

11

Jenkins, for example, declares that he "likely made 400 compelled payments to White Castle" between 2008 and 2012. (Jenkins 3d Decl. ¶ 31.) Yet, at his deposition, he could only recall making a drawer payment on two occasions. The first involved the incident that led to his suspension, when White Castle suspected him of stealing the remainder of a customer's change on a transaction; the second occurred when General Manager Anderson "called [him] and told [him] to bring her $20," even though he was on vacation at the time. (Jenkins Dep. 96:10-19, 97:21-24.) Jenkins cannot recall any other time when he paid a drawer shortage. (*Id.* 97:21-24.) As for safe shortages, Jenkins estimates that he made 20-25 payments at General Manager Anderson's direction. (*Id.* 90:14-91:11, 93:2-3.) But Jenkins could not recall any particular instance when he repaid a safe shortage.

In addition to not remembering specific instances or having records of compelled payments, Jenkins does not know how much he paid for drawer or safe shortages. Jenkins testified that the amount he paid in drawer shortages "always varie[d]" between a range of $2 and $30. (Jenkins Dep. 89:12-16.) Jenkins does not recall the amounts he paid to offset safe shortages, as these payments fluctuated as well. (*Id.* 91:17-21.) Jenkins admits that there is no record of his having paid either a drawer shortage or a safe shortage. (*Id.* 94:18-22.)

Roberts's testimony similarly demonstrates that proof of liability and damages issues will be highly individualized and variable. Roberts also claims that General Manager Anderson required her to pay for drawer and safe shortages. Roberts testified that she paid out of her own pocket to offset safe shortages and accepted cash from team members to pay for drawer shortages. She avers that she personally covered (i) safe shortages on four occasions for a total of $70, and (ii) a drawer shortage for a team member who was missing "[p]robably about $5." (Roberts Dep. 128:12-23, ECF No. 109-2.)

As to other employees, however, there is no way to tell whether they were injured at all, and if so, to what extent, other than by taking individual testimony. Every member of the class would have to testify regarding the date, amount, and circumstances of each alleged shortage payment. Given the necessity of extensive individual testimony to determine who sustained an injury similar to that of the named plaintiffs, Plaintiffs have not demonstrated that issues common to class members predominate over questions affecting individual members.

## IV.  CONCLUSION

For the reasons stated herein, Plaintiffs' motion for class certification [98] is denied.

ENTER:

/s/ _____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  February 25, 2015