IN THE UNITED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jimmy Jenkins
And Candice Roberts
individually                              )
and on behalf of all persons             )
similarly situated                       ) CASE NO 12 CV 07273
as class representative under            )
Illinois Wage Laws and/or as             ) The Honorable **Joan B. Gottschall**
Collective representative                )
of the Collective as permitted           )
under the Fair Labor Standards Act;      )
                                         )
                        Plaintiff,       )
                                         )
            vs.                          )
                                         )
White Castle Management Company,         )
D/B/A                                    )          **JURY TRIAL DEMANDED**
**White Castle System Inc.**             )          **ON ALL COUNTS**
                                         )
                        Defendant.       )


**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGEMENT
IN ACCORDANCE WITH LOCAL RULE 56
And THIS COURT'S STANDING ORDERS ON SUMMARY JUDGMENT**


**INITIAL STATEMENT OF PROCEDURE FOR PLAINTIFFS' STATEMENT OF
ADDITIONAL FACTS AND CITATION TO OTHER STATEMENT OF FACTS**

Plaintiffs note that this document is Plaintiffs' Rule 56 Statement of Additional Facts in

response to Defendant's Motion for Summary Judgment. Plaintiffs also notes that Plaintiffs

brought their own Motion for Summary Judgment and filed their own statement of Facts in

support of Plaintiffs' motion.

Plaintiffs will be using and relying on the ALL the facts found in ALL the filed Statement

of Facts presented in these Cross-Motions. Thus Plaintiffs will be citing to Plaintiffs' initial

1

Facts, (Docket Document #183) Defendant's Facts as well as the -- facts pled in this document and facts pled in the Plaintiffs' Response to the Individual Defendants Motion.

Plaintiff provides the following index to these facts

<u>PLAINTIFFS' INDEX OF STATEMENTS OF FACTS AND ABBREVIATION INDEX</u>

Plaintiffs Motion for Summary Judgment Statement of Facts (PSOF) (dd #183)

Plaintiffs' Statement of Additional Facts (PASOF)

Defendant Statement of Facts (DSOF)

### PLAINTIFFS WILL ALSO RELY ON PLAINTIFFS EXHIBITS PREVIOUSLY FILED

Plaintiffs also note that Plaintiffs in their Motion for Summary Judgment submitted to the Court full deposition transcripts for many of the witnesses, Plaintiffs will be not resubmitting those, to be efficient, rather Plaintiffs will reference those documents. Plaintiff will also be submitting additional evidence including full transcripts of Plaintiff Jenkins, Plaintiff Roberts (depositions one and two).

1.  The lowest member of the retail store is called a Team Member. (Ex. 10, Pg. 98 ; L. 22-23). Team Member reports to the Crew Manager. (Ex. 10, Pg. 100; L. 1-3). The Assistant General Manager is above the Crew Manager and reports to the General Manager and both report to the District Manager. (Ex. 10, Pg.100; L. 5-13). In 2012 the District Manager for Dolton store was Darrin Cotton. (Ex. 10, Pg.101 ; L.19-21

### **<u>PLAINTIFF JENKINS RETALIATION FACTS</u>**

<u>JENKINS COMPLAINTS (on September 1 and 4th) ABOUT WAGE ISSUES</u>

<u>CAUSES HIS FIVE DAY UNPAID SUSPENSION (on September 4)</u>

2. On September 1, 2012 at 2:42 PM Jimmy Jenkins complained about the Defendant's policy and procedure of compelled payments for shortages which had been ongoing for 6 years. (See Document Bates marked WC-0000130-131 attached to this Statement of Additional Facts as Exhibit 15;). (See also Plaintiff Jenkins Full Deposition attached to this Motion as Exhibit 10, Pg. 203; L. 13-16; Pg.249; L.1-4; Pg. 272; L. 10-13). (see also Ex 3. Pg. 116; L. 2-23). Plaintiff complained about the compelled payments before he was disciplined. (Ex. 10, Pg. 203; L. 22-23).

3. Jenkins reported that for six years Anderson "allowed" employees to make payments for shortages. (Ex 3. Pg. 118; L. 22-24; Pg. 119; L. 1-3). Plaintiff Jenkins was disciplined for complaining about the wage issues and compelled payments. (Ex 10. Pg.289; L.10-19) Roberts testified that calling the White Castle 800 number and complaining against your Manager will result in retaliation by the Managers. (Ex 11, Pg. 44, L. 1-7)

4. Plaintiff also complained to District Manager Darrin Cotton in a phone call about being forced to pay for shortages in the safe and drawers and the off-the-clock work. (Ex. 10, Pg.102; L. 13-20) (Ex. 10, Pg.249; L.15-24). Plaintiff Jenkins also complained about the compelled payments to the Area Manager Phil B. before the September 2012 meeting. (Ex. 10, Pg.103; L. 2-10). The complaint to Phil B. was after Plaintiff talked to Darrin Cotton. (Ex. 10, Pg. 104; L. 13-15).

5. The complaint to the 800 Number went to the District Manager. (Ex. 10 Pg. 366: L.7-19). Reports to the 800 are sent immediately to those responsible for responding to them and Cotton is one that received this document. (Ex 3. Pg. 117; L. 1-9; Pg. 128; L. 2-4). Cotton, when he received the 800 Complaint, began an investigation,

which began by telling Jenkins General Manager Sylvia Anderson that Jenkins had

complained about her and the payments. (Ex 3. Pg. 128; L.4-18). Jenkins accused

Anderson of violations of White Castle policy and those claims are serious. (Ex 3.

Pg. 137; L.1-5).

6. Plaintiff Jenkins complaint was taken by a telephone-operator and typed up, but the

Jenkins disputes that the complaint was a completely accurate version of his

complaint. (Ex. 10 Pg. 271; L.1-24; Pg. 272; L. 19-24). The operator incorrectly

wrote that Jenkins drawer was short, and Plaintiff did not have drawer, rather the

safe was short. (Ex. 10 Pg.273; L.1-13; Pg. 277; L. 18-20). The third sentence of the

800 number complaint is also wrong. (Ex. 10 Pg. 273 L. 15-18)

<u>ALLEGED "INVESTIGATION" OF SIX YEARS OF WAGE THEFT IS A JOKE</u>

7. Cotton was more concerned with the missing $20.00 than the claims that employees

had repaid shortages for six years. (Ex 3. Pg. 139; L.15-24; Pg. 140; L. 1-5) Several

managers confirmed the compelled payments, but Cotton did not talk to any non-

manager employees [cashiers]. (Ex 3. Pg. 152; L. 12-18; Pg. 159; L. 7-15). Cotton

claims that for Wage and Hour complaints would be investigated by speaking to all

employees that have a claim for unpaid wages. (Ex 3 Pg. 54; L. 1-12).

8. Anderson said that Cotton told her that 3 out of 4 managers confirmed that Anderson

compelled payments from employees. (Ex 2 Pg. 159; L.7-8).  Cotton did not offer to

repay the managers for those forced payments. (Ex 3. Pg. 153; L.1-13).

9. Anderson claimed complete ignorance of the alleged payments by Jenkins and other

employees for the last six years. (Ex 3. Pg. 129; L.11-20). Anderson was disciplined

for forcing employees to make payments. (Ex 3. Pg. 152; L. 21-24; Pg. 153; L 1-4,

21-24)(Ex. 2 Pg. 165; L. 5-9; Pg. 169; L. 15-24). Jenkins was forced to pay for shortages. (Ex 3. Pg. 160; L. 7-11)  Anderson was only given a discipline, not a suspension. (Ex 3. Pg. 153; L. 3-5).

10. The repayments by employees had been complained about previously and was Plaintiff was previously punished for that complaint. (Ex. 10, Pg.144; L. 1-4). (Ex. 10, Pg.201; L.1-5) Plaintiff had previously attempted to complain about the working conditions, and Plaintiff was punished for that complaint too. (Ex. 10, Pg.145; L.9-24). Plaintiff saw other employees complain about S. Anderson and those employees were punished for those complaints. (Ex. 10, Pg.146; L. 7-16).

11. Plaintiff also complained of the compelled payments to Cotton during the September meeting, and Cotton conceded that his investigation had confirmed that Anderson was compelling payments. (Ex. 10, Pg.247; L.7-12; Pg. 250; L.11-14).

12. The White Castle Handbook states that an employee can complain to the employee's supervisor, General Counsel, Assistant Vice President, Executive Director and Director of Team Services. (Ex. 11 Pg. 254; L. 13-24; Pg. 255 L. 1-24; Pg. 256; L. 1-24). But that the contact information for the General Counsel, Assistant Vice President, Executive Director, and Director of Team Services are not listed in the Handbook nor at the Dolton Location, therefor the only person to complain to is the employee's supervisor. (Ex. 11 Pg. 254; L. 13-24; Pg. 255; L. 1-24; Pg. 256; L. 1-24). The General Counsel, Assistant Vice President, Executive Director, and Director of Team Services never called Roberts to investigate the claims. (Ex. 11 Pg. 258; L. 4-8)

13. The only investigation of the alleged claims of violations of the FLSA and IMWL and IWPCA that Roberts has witnessed is a single call from a single person [Darrin Cotton] before the suit was filed. (Ex. 11 Pg. 257; L. 13-24). Roberts did what she had to do to keep her job as the management of White Castle does not investigate the complaints of employees, rather backs-up the General Manager. (Ex.11 Pg. 34 L. 8-22; Pg. 35 L. 1-11; Pg. 49; L. 17-18)

14. Sylvia Anderson and Kattie Loveberry told Roberts to lie to Cotton about the compelled payments if asked by Cotton. (Ex. 11 Pg. 257; L. 13-24; Pg. 258; L. 1-2). Anderson ordered other managers to tell lies and not inform the District Manager about the payments she ordered employees to make to eliminate shortages. (Ex. 10, Pg. 95 ; L.20-24) Roberts was ordered to not talk to Jenkins after he complained about wages, Sylvia Anderson described Jenkins complaints as "nonsense". (Ex. 11 Pg. 260; L. 5-15).


<u>COTTON AND ANDERSON TELL VERY DIFFERENT STORIES</u>

15. Cotton claims that Jenkins was repaid the money he repaid to the safe. (Ex 3. Pg. 131; L.1-10) Cotton claims that he ordered Anderson to repay the money to Jenkins during the September 4, 2012 meeting, in front of Jenkins. (Ex 3. Pg. 131; L.9-10; Pg. 133; L. 2-10) Cotton claims that Anderson told Cotton that she repaid the money to Jenkins. (Ex 3. Pg. 131; L.  11-13, Pg. 132 18-21). Anderson testified she never paid Jenkins back any money. (Ex 2 Pg. 163; L. 7-14)

16. Cotton claims that at no time during the meeting on September 4 2012 did Jenkins mention that he paid the shortage with the overage and that Jenkins never even

mentioned a shortage in the safe. (Ex 3. Pg. 115; L. 2-24). Anderson testified that Jenkins said that the drawer was over, and the safe was short in the September meeting, with Cotton. (Ex 2. Pg.133; L. 9-11; Pg. 135: L. 19-21; Pg. 148; L. 18-22)

17. During the September 4, 2012 meeting with Cotton Jenkins stated that he and other employees paid for shortages. (Ex 3. Pg. 106; L. 16-23). When confronted by the accusation of compelled repayment of shorts, Anderson's response in the meeting was "they are responsible for the safe". (Ex 3. Pg. 108; L. 3-16) Cotton thought Anderson was being "misleading and too open" in her statement during the meeting. (Ex 3. Pg. 109; L. 2-3)

### RETALIATION ALSO SHOWN BY FALSE REASONS FOR DISCIPLINE

#### Plaintiff Disciplined for Violation of a Policy, which he did Violate

18. Darrin Cotton claims that Jenkins was disciplined for stealing money. (Ex 3 Pg. 61; L. 8-9). But Cotton testified, at the time, he suspended Jenkins for "cash discrepancies". (Ex 3. Pg. 109; L. 22-23) but the September 4, 2012discipline notice does not mention theft nor contain the word "steal" and only mentions cash handling policies and cash discrepancies,. (Ex 3 Pg. 65; L. 13-22; Pg 67; L.13-24, 19-21; Pg. 68; L. 1-5). The report written by Anderson on August 28, 2012 does not mention "theft" by Jenkins. (Ex 2. Pg.69; L.13-15). (Ex 3. Pg. 101; L. 12-15)

19. Plaintiff Jenkins was suspended for "missing" money, but no money was missing. (Ex. 10, Pg.104 ; L. 21-24; Pg. 105; L 1-5). Plaintiff did not mishandle funds as no funds were missing. (Ex. 10, Pg.247; L.14-24). Plaintiff was disciplined (suspended five days) for mishandling funds, but Plaintiff did not mishandle funds because

Plaintiff did exactly what S. Anderson Ordered him to do, pay the shortage back. (Ex. 10, Pg.105; L. 8-23; 106; L. 6-23). Shortages can occur from other reasons besides theft. (Ex 3. Pg. 126; L.19-21)

20.  Anderson could not name any specific provision of the cash handling policy and procedure which Jenkins violated. (Ex 2. Pgs. 38-44).

21. On August 27, 2012 Anderson wrote in response to the complaint that the customer did not get all his changed that she had resolved the complaint and that she had told Chris to give all change to customer (Ex 3. Pg. 93; L. 14-20). Anderson does not mention that Jenkins "stole" the customers change in this email of August 27, 2012. (Ex 3. Pg. 93; L.21-24 ) Anderson agreed that she could have been untruthful when she responded to the customer complaint. (Ex 2. Pg. 163; L 15-24; Pg.164; L.1) The complaint also reports that Jenkins paid the money back to the safe. (Ex 3. Pg. 122; L. 1-4)

## JENKINS WAS DISCIPLINED FOR SOMETHING, BUT HE FOLLOWED THE POLICY OF PAYING A SHORTAGE, WITH AN UNACCOUNTED OVERAGE

22. Plaintiff Jenkins did not violate any policy, because the policy was that Plaintiff was to pay for shortages. (Ex 10. Pg.281; L.7-10) (Ex. 10 Pg. 263 L. 1-24; Pg 264; L 1-24, Pg. 265; L. 1-24). Plaintiff Jenkins had followed this policy and procedure since he as promoted to Manager. (Ex. 10 Pg.268; L.1-5). Roberts testified that if she is following the Orders of her Supervisor/General Manager, that that Order is the "policy" of White Castle. (Ex. 11 Pg. 251; L. 10-18). Roberts confirmed that the normal procedure for having an overage and a short is to pay the short from the overage. (Ex. 11 Pg. 186; L. 12-18; Pg. 191; L. 7-11)

23. Jenkins 800-number complaint reported that he paid the shortage from the overage. (Ex 3. Pg. 118; L. 10-12). Anderson confirmed that paying shortages with overages is policy and procedure. (Ex 2. Pg.136; L.14-16). There would be no overage or shortage, if Jenkins paid the shortage with the overage. (Ex 2. Pg.145; L.8-13).

24. The Defendant Manager meeting notes of September 24, 2013 indicates that it is policy and procedure to fill a short in safe from a drawer overage. (Ex 7 pg. 27; L.5-24; Pg. 28; L. 1-12)

25. There was no overage because the "overage" was in the safe. (Ex. 10 Pg.266 L.1-4). The drawer could be over due to a "pull" being short. (Ex. 10 Pg. 266; L.8-17; Pg.268  L. 18-24).(Ex. 7 Pg. 23: L. 20-24)

26. Roberts was trained as a Manager initially to move an overage to fill a shortage. (Ex. 11 Pg. 194; L. 10-17). General Managers move overages to fill a shortage, including Staci Belton. (Ex. 11 Pg. 194; L. 14-21). The policy of filling a shortage from an overage was taught to Roberts at Roberts' "other store". (Ex. 11 Pg. 195; L. 6-13

27. It was the policy and procedure of Defendant to pay shortages from overages. (Ex. 10, Pg.107; L. 1-10, 20-24; Pg. 108. L. 9-12; Pg. 263; L. 7-22). It is the policy and procedure of Defendant to pay shorts from overages, and that is one reason Plaintiff was so shocked when he was disciplined, as he was following policy and procedure. (Ex. 10 Pg. 263; L.16-22).


<u>EVENTS LEADING TO THE OVERAGE, SHORTAGE</u>

<u>AND COMPELLED $20.00 PAYMENT AUGUST 2012</u>


9

28. Plaintiff Jenkins was told by crew member that his drawer was over by $20.00 on August 25, 2012. (Ex. 10, Pg.261; L.16-22). Chris told Anderson he was $20.00 over in his drawer. (Ex 2. Pg.29; L. 2-10)

29. Plaintiff received a call from General Manager S. Anderson (Ex. 10 Pg. 261; L23-24 Pg. 262; L 1). Anderson informed a customer was missing $18.80. (Ex. 10 Pg.269; L.12-13). Plaintiff informed Anderson that his safe was short $20.00, (Ex. 10 Pg. 262; L 19-20). Plaintiff had no idea a customer was missing change until Anderson called him. (Ex. 10 Pg. 270; L.12-16; Pg. 276; L 15-19)

30. In the phone call Jenkins told Anderson that the safe was short and the Chris's drawer was over. (Ex. 10 Pg. 270; L.3-11). Anderson claims that Jenkins did not mention the safe shortage in the August phone call. (Ex 2. Pg.30; L. 2-10)

31. In the phone call, Anderson said to Jenkins either you or Team Member Chris have to bring me the money or the $20.00. (Ex. 10 Pg. 269; L.16-17; Pg.275; L. 6-7; Pg. 277; L. 1-6). Plaintiff said he would bring in the $20.00. (Ex. 10 Pg.269; L.19-24). .

32. Jenkins brought in the $20.00 demanded by Anderson and later that same day called the 800 number complaint line and District Manager D. Cotton to complain about the compelled payments. (Ex 10. Pg.277; L. 9-13).

33. Before S. Anderson called Plaintiff, Plaintiff was aware of an overage in a crew member drawer of $20.00 and the safe in the office was short $20.00. (Ex. 10, Pg.106; L. 9-12). Had Chris informed Plaintiff that the $20.00 overage was from a customers change, Jenkins would follow that procedure and put the overage in an envelope for that customer. (Ex. 10 Pg.267; L.22-24; Pg. 268: L. 6-10).

<u>INVESTIGATION OF THE ALLEGED "THEFT" IS ALSO A JOKE</u>

34. Cotton assumed that the only place the customer's money could possibly have gone into the pocket of Jenkins. (Ex 3. Pg. 94; L. 20-23; Pg. 98 L. 4-7) Anderson asked Chris for a statement, but no one asked Jenkins for as statement. (Ex 3. Pg. 96; L. 1-20; Pg. 97; L 1-19)(Ex 3. Pg. 104; L. 17-20). Anderson also prepared a statement dated 8/28/12 (Ex 3. Pg. 100; L. 1-22) Cotton claims that Jenkins admitted theft during the September 4, 2012 meeting. (Ex 3. Pg. 103; L. 6-7) and White Castle did not place that alleged "confusion of theft" by Jenkins on any document whatsoever. (Ex 3. Pg. 104; L. 10-12)

35. Roberts told General Manager Anderson that Jimmy Jenkins version of events was correct. (Ex. 11 Pg. 187; L. 9-19). Roberts also confirmed to District Manager Darrin Cotton that Anderson forced employees to pay for shortages from their own pockets. (Ex. 11 Pg. 183; L.11-24; Pg. 184; L. 1-5; Pg. 187; L. 9-24).

<u>DISCIPLINE POLICY ALSO NOT FOLLOWED</u>

36. The handbook states that discipline from six months prior are not usable for progressive discipline. (Ex. 10, Pg.252; L. 20-24; Pg. 287; L. 10-12; Pg. 289; L. 1-8). (Ex 3 Pg. 68 ; L. 13-16). None of the disciplines in the Jenkin's file was from six months prior, rather were from 2007, 2009, 2010. (Ex 10. Pg. 284-286 L. 1-24; Pg. 287; L. 13-24; Pg. 288; L. 8-22).

37. There are four levels of discipline Oral, Written, three day suspension and five day suspension. (Ex. 6 Pg. 128: L. 20-24) Plaintiff was given the second highest level of discipline, five day suspension, he did not receive an Oral Warning, a Written Warning, A three day Suspension. (Ex. 10, Pg. 248; L.5-18). Defendant skipped

three levels of discipline, Oral, written and three day suspension. (Ex. 10, Pg.253; L.1-5).

38. The discipline claimed that Jenkins had several cash discrepancies since 3/31/12, (Ex 3 Pg. 69; L. 1-7; Ex 10. Pg.282; L.2-10). Plaintiff during the meeting explained to Cotton that he had no discipline in the last six months, by reviewing his Job Record. (Ex. 10, Pg.259; L. 21-24; Pg. 260; L. 1-5). Jenkins job record has only two recorded cash discrepancies from 3/31/12 to September 4, 2012. (Ex 3 Pg. 78; L. 12-23; Pg. 79; L 1-24; Pg. 81; L.1-20).

39. Plaintiff refused to sign the discipline, Cotton told him failure to sign would result in his termination, Plaintiff said he would be leaving, Cotton reversed himself and said Jenkins was not fired. (Ex. 10, Pg.254; L. 12-18; pg.358; L. 9-20). Plaintiff was disciplined by Anderson and Cotton. (Ex. 10, Pg.256; L.17-24; Pg. 257; L 1-7; Pg. 356; L.1-24). Jenkins was suspended without pay beginning on September 4, 2012. (Ex 10. Pg. 284; L.2-9).

40. It was entirely possible the in addition to the $20.00 overage and shortage, that other cash handling errors could have been made. (Ex 2 Pg. 242; L.2-11; Pg. 246; L. 21-24; Pg 247; L.1-9; Pg. 248; L. 5-15) Anderson did not investigate any other cash errors. (Ex 2 Pg. 250; L.2-6)

## Plaintiff Jenkins Work Schedule Rotation Claim

41. Plaintiff Jenkins was not rotated at his new work site, 111th and Halsted. (Ex. 10, Pg. 41 ; L. 2-4). Plaintiff Jenkins only worked the night shift for months and years. (Ex. 10, Pg. 292; L. 1-8) Anderson testified the normal rotation of schedules is days,

evenings and nights. (Ex 2 Pg. 206; L.10-15). And its normal to rotate shifts. (Ex 2 Pg. 207; L.2)

42. The only time Anderson ever had someone only on night shift for long time was based on that employees request to work only nights. (Ex 2 Pg. 208; L.12-17). Working nights only for two months in a row would be uncommon. (Ex 2 Pg. 208; L.20-24). Plaintiff's retaliatory scheduling caused Plaintiff to rescheduled his brother's funeral. When the Plaintiff's brother was killed, Jenkins had to change the date of the funeral, because White Castle would not give him the date off. (Ex 10. Pg. 292; L.8-12; Pg. 293; L 20-24 Pg. 294; L 1-7 )

## PLAINTIFF JENKINS WAGE CLAIM FACTS

43. Jenkins off the clock claims were typically overtime work which Jenkins is aware that  he did not get paid because he did not receive overtime pay during those weeks. (Ex. 10, Pg. 42 ; L. 11-12, 18-20). Plaintiff Jenkins, at the time of the deposition, had one instance of owed overtime work from his new location at 111th and Halsted. (Ex. 10, Pg. 41; L. 5-18). Plaintiff believes he was paid around 39.64 but should have been paid 40.10, or 40.20, or 40.30. (Ex. 10, Pg. 44; L. 19-23).

## Jenkins After the Shift Off-The-Clock Claims
### Staying Over and Shaving Hours Claims

44. One of Plaintiff Jenkins Off-The-Clock claims was based on the orders of his Manager S. Anderson to work after punching out, and the failure of Anderson to correct the time worked. (Ex. 10, Pg. 29; L. 22, Pg. 30; L 6). Plaintiff Jenkins was

called back three to four times out of five work days and worked off the clock after his shift ended. (Ex. 10, Pg. 34 L. 8-19).

45. The amount of time was typically 15-20-30 minutes of work time each day. (Ex. 10, Pg. 31; L. 3-7). (Ex. 10, Pg.35; L. 12-14)The total time worked each of these weeks was approximately 80 minutes. (Ex. 10, Pg. 36; L. 19-24) Plaintiff was ordered to return to work and complete some task, so he followed that order. (Ex. 10, Pg. 202; L. 4-8)

46. Some times Plaintiff worked over his scheduled shift time, caused by the next manager being late, and S. Anderson would roll the time back to prevent Plaintiff from receiving overtime pay he had worked. (Ex. 10, Pg.182 ; L.21-24; Pg. 183; L.1-6). Some mornings after Plaintiff had worked the 1100 PM to 7:00 AM  shift, Plaintiff worked till 7:30 or 7:35 or even 8:00 AM and S. Anderson would roll the time back to 7:00 or 7:10 or 7:15. (Ex. 10, Pg.194; L. 13-23).

47. Plaintiff worked many weeks, near to 40 hours (39.31, 39.10, 39.37, 39.39, 39.40, 39.10, 39.52, 39.29, 39.82, 39.33 and 39.60) which would result in owed overtime wages. (See Jenkins selected time sheets, attached to this Motion as Exhibit 18) Plaintiff explains that his hours were sufficient for overtime wages, as he worked 5 days a week, and worked 8 hour shifts, and Plaintiff would be staying over after his shift 15-30 minutes a day, and when Anderson was not working he received overtime, but when Anderson worked that overtime was not paid. (Ex. 10, Pg.243; L.1-16)

48. Plaintiff recalls a particular "shaved" time occurring once when a new manager was late and Plaintiff had to wait for the accounts to be balanced and S. Anderson

changed the time to take his overtime. (Ex. 10, Pg.232; L.19-21). The drawer

balancing took 20-30 minutes, and Plaintiff was paid only for five minutes. (Ex. 10,

Pg.232; L.19-21). Plaintiff was owed 20-25 minutes. (Ex. 10, Pg.236; L.1-3).

49. Plaintiff is confident that the times were changed by Anderson, as one occasion he

was missing time and specifically asked the other Managers [but not Anderson] if

they took his time, and they all denied having taken his time. (Ex. 10, Pg.244; L.1-

11). All the managers use the same code to go into the time keeping system to make

time entry edits. (Ex. 6 Pg.67: L.1-13). Edits of time changes have no notation of

who made the change. (Ex 7 pg. 38; L.23-24; Pg 39: L. 1-3)

50. Plaintiff complained that his time was rolled, and Anderson would promise to pay

the rolled time the next week, but that Jenkins pay was not corrected the next week.

(Ex. 10, Pg. 209; L. 3-23).

51. Plaintiff Jenkins also has a claim for shaving time from his wages/work time, in

which the Plaintiff's time is reduced by changing time punches. (Ex. 10, Pg.229;

L.20-24; Pg. 230; L. 9-12 ). The changed times are reflected on time sheets, which

differ from those produced by Defendant. (Ex. 10, Pg.231; L.3-11).

52. Plaintiff was told by Manager Kattie Loveberry that she was ordered to shave

Jenkins hours to remove 30 minutes of overtime wages. (Ex. 10, Pg.240; L.1-16).

53. White Castle sent out accolades for stores that had "no overtime" by email. (Ex. 11

Pg. 168; L. 210, L. 17-22). Dolton Store had no overtime, because they did not pay

overtime, not due to not working overtime. (Ex. 11 Pg. 211; L. 3-9).


Plaintiff Jenkins Off-the-Clock Inspection Work claims


15

54. Plaintiff Jenkins also has an off-the-clock claim for work done in advance of inspections, to prep the restaurant for the inspection. (Ex. 10, Pg. 37; L. 17-20). Inspections occurred up to three times per year. (Ex. 10, Pg. 37; L. 9-12; Pg. 192; L. 8-10) Belton testified that there is a two week advance notice of the inspection to allow the store to "get everything completed". (Ex. 6 Pg. 113: L.4-6)

55. Jenkins Job Record shows work for an inspection on 4/11/09. (Ex 3. Pg. 168; L. 21-24; Pg. 169; L. 1-5). The amount of Off-The-Clock work time was 3-4 hours each inspection. (Ex. 10, Pg. 37; L. 16). Roberts confirmed that Jenkins worked off the clock during inspections (Ex. 11 Pg. 197; L. 17-22).

## PLAINTIFF JENKINS HAD AN IWPCA AGREEMENT TO BE PAID WAGES AT A SET RATE

56. Plaintiff's Agreed Wage Rate was 10.09 per hour on January 9, 2009. (Ex. 10, Pg. 50; L. 17-19).This Agreed Upon Wage Rate was signed by both the Manager and the district manager. (Ex. 10, Pg. 50 ; L. 20-24; Pg. 51; L. 1). Plaintiff Agreed Wage Rate on the day of the deposition is $11.53 per hour. (Ex. 10 Pg. 298; L. 1-23).

57. Plaintiff Jenkins and White Castle had an Agreement in accordance with Illinois Wage Payment and Collection Act. (See Plaintiff Jenkins Third Affidavit; attached to this Statement of Facts as Exhibit 17; hereinafter referred  to as Ex. 17; ¶ 5-7). This Agreement was that Jenkins was to be paid a set rate of pay for each and every hour or part of hour of work.  (Ex. 17 ¶ 7). This IWPCA Agreement terms are evidenced and demonstrated by the papers from Jenkins employee/personnel file.

(Ex. 17 ¶ 8) The IWPCA Agreement between Jenkins and White Castle for wages in March of 2007 was $7.07 per hour. (Ex 17 ¶ 10)

58. Jenkins' and White Castle's IWPCA agreement was modified, via mutual consent, several times when White Castle "Offered" Jenkins new pay rates and Jenkins "accepted" those pay changes (Ex 17 ¶10-14-(1-4). Cotton testified that employees pay has never been retroactively reduced; once an employee has worked hours under that agreed to rate of pay. (Ex 3 Pg. 72; L. 22-24; Pg. 73 L. 1).

59. Defendant in the deposition attempted to ask if Plaintiff had a "contract or agreement" several times and Plaintiff did not understand the question. (Ex. 10, Pg. 51 ; L. 2-18; Pg. 52; L. 10-21; Pg. 54; L. 1-3, 8-10). But Jenkins testified that Plaintiff and White Castle had many Agreements. (Ex. 10, Pg. 51; L. 19-24; Pg. 54; L. 1-3)

60. Plaintiff does not understand the difference between a legal contract and an Agreement. (Ex. 10 Pg.342; L.12-15). However Plaintiff does understand that an employee cannot enter into a "contract" to commit Murder, nor to work for no compensation. (Ex. 10 Pg.342: L.20-22; Pg. 343; L. 3-5). Plaintiff also understands that he and Defendant cannot reach an agreement to change the laws of the State of Illinois or Federal Law. (Ex. 10 Pg. 343; L.6-14).The handbook promised that Plaintiff would be paid for all hours worked. (Ex. 10, Pg. 114; L. 19-24)

<u>PLAINTIFF JENKINS COMPELLED PAYMENTS CLAIMS</u>

61. Plaintiff Jenkins and other employees had to pay for shortages in the drawers and safes. (Ex. 10, Pg. 76; L.10-18; Pg. 77: L. 14-21). If the shortage was not paid the

employee was subject to discipline. (Ex. 10, Pg. 76 ; L. 20-24). General Manager S. Anderson ordered the Plaintiff and other employees to repay the shortages. (Ex. 10, Pg. 77; L 14-21; Pg.80, L.17-19; Pg. 81, L. 3-5; Pg. 82, L. 5-20). The policy of payments is the normal practice and has occurred for 5-6 years. (Ex 10. Pg.276; L.4-16)

62. Jenkins was paid 0.00 hours for the pay period #37 of 2012. (Ex 2 Pg. 216; L.4-14) Jenkins paid $20.00 for a shortage during pay period #37. (Ex 2 Pg. 203; L 8-10) Plaintiff worked for S. Anderson in Dolton for five years, and paid so many shortages over those five years that Plaintiff was unable to count the number of times he paid shortages. (Ex. 10, Pg. 78 ; L.7-12). Plaintiff paid shortages for drawers prior to being promoted, as a crew member. (Ex. 10, Pg. 78 ; L. 7-12). Plaintiff paid as a crew member and as Manager. (Ex. 10, Pg.80; L. 2)

63. Belton confirmed that on the same day that she took over the Dolton store an employee tried to pay her for shortages and the employee told Belton that "everyone does it" referring to repaying of drawer shortages. (Ex. 6 Pg. 54; L.1-11, 15-24) Plaintiff paid for shortages three times a week. (Ex. 10, Pg. 84 ; L. 19). When Plaintiff was a team member he paid shortages 2-3 times per week. (Ex. 10, Pg. 85; L. 2-3)

64. When Plaintiff became a crew manager the payments increased to four times a week, and Plaintiff was paying for other employees too. (Ex. 10, Pg. 85; L.6-17). Plaintiff paid one or two times per week as crew manager. (Ex. 10, Pg. 88; L. 17-23).

65. The amounts of the payments for shortages varied greatly, one to two dollars to thirty dollars. (Ex. 10, Pg. 87; L.7-11; pg. 89; L. 14-24). The Plaintiff estimates he paid between 20-30 shortages for the safe. (Ex. 10, Pg. 90 ; L. 19-22; Pg. 93; L. 1-9).

66. Plaintiff paid a $30.00 shortage the week before the September 2012 discipline. (Ex. 10, Pg. 93; L. 16-19; Pg.269: L.20-24). Plaintiff Jenkins paid a $20.00 shortage in August of 2012 also. (Ex. 10, Pg. 97; L. 12-17).   Roberts confirmed that Jenkins paid the shortage in September of 2012. (Ex. 11 Pg. 183; L. 1-5; Pg. 251; L. 3-6).

67. Plaintiff followed the orders of General Manager S. Anderson to keep his job. (Ex. 10, Pg. 78 ; L. 23; Pg. 79. L. 5; Pg.154; L.13-19; Pg. 155; L. 15-20; Pg.156; L. 4-17). Plaintiff was too afraid to complain to S. Anderson. (Ex. 10, PG.237; L.18-23).

68. There is no record to reflect that a shortage would have been repaid by Plaintiff. (Ex. 10, Pg. 94 ; L.19-22; Pg. 96, L 2).  The records of S. Anderson are not trustworthy because Anderson altered the records making them unreliable and enforced an illegal policy of compelled payments. (Ex 10. Pg. 288; L. 1-7). Plaintiff doubts that his Job Records are accurate because Anderson never kept accurate records. (Ex. 10 Pg. 330: L. 1-16).

## PLAINTIFF ROBERTS WAGE FACTS

### Rolled Time and Shaved Time Facts

69. Roberts IS owed 45 minutes of overtime from September of 2013. (Ex. 12 pg. 40, L. 2-3) (Ex 12 Pgs. 38 Lines 15-24, Pg. 39 L. 1-7; pg. 43 L 3). (Ex. 11. Pg. 71; L. 12-15).  Roberts testified that in September 2013 Belton changed her times to take her overtime work hours. (Ex 12 Pg. 43, L 11-14). Roberts "rolled time" was never

repaid. (Ex. 11 Pg. 261; L. 9-11)

70. Roberts took a picture of the shaved time with her phone, which was submitted in this litigation, in September of 2013. (Ex.11 Pg. 70 L. 12-17; Pg. 71; L. 1-8) Roberts would not get paid all her hours, the time was rolled to the next week. (Ex.11 Pg. 106; L. 23-24; Pg. 106 L. 1-3). Roberts time would be rolled when she was near overtime hours, to avoid paying overtime wages, for inspection work or just normal work week. (Ex.11 Pg. 106; L. 4-11)

71. In the week of February 5th 2013 Plaintiff testified that she worked overtime and was not paid overtime. (Ex 12. Pg.40; L 6-12). In Week 7 of 2013 and Plaintiff worked the night shift each night, and went into overtime because she was not relieved the next morning on time. (Ex. 12 Pg. 41 L. 12-16; Pg. 42 L. 1-8). Plaintiff was promised to have her time corrected to reflect the actual time worked, but that did not occur. (Ex 12 pg. 42 L. 9-12)

72. Roberts was ordered to reduce all employees time, including her own, if those employees hours were over 40. (Ex.11 Pg. 59; L.10-20; Pg. 60 L. 1-11: Pg. 61; L. 5-10; Pg. 65; L. 18-22). Roberts reduced her own time one time under Sylvia Anderson and Plaintiff reduced her overtime by .75 hours. (Ex.11 Pg. 67; L. 1-6).

73. Another White Castle employee, Linda M. also complained about theft of wages. (Ex. 12 pg.55 L. 12-15; Pg. 56 L. 7-13). (Ex. 6 Pg.48; L. 2-11). Staci Belton said to Roberts, when she "came in the door" that she "don't pay overtime" (Ex.11 Pg. 38 L. 7-12). Roberts believes she worked overtime and has been paid for "none of it" since Belton became Manager. (Ex.11 Pg. 38 L. 13-17) Roberts worked through her breaks doing inventory, and the Manger simply said "don't tell me", she did not

correct Roberts work hours, and did not tell her to stop working off the clock. (Ex.11 Pg. 52; L.20-24; Pg. 53 L. 4-6; Pg.77; L. 20-22).

74. Roberts estimates she worked through her breaks once to twice in month, for a total of 30 minutes. (Ex.11 Pg. 77; L. 1-3, 19-21). Roberts was also required to attend a meeting with her Manager Staci Belton in September of 2013 and was not paid for that 20 minutes of work. (Ex.11 Pg. 82 L.16-23). Sylvia Anderson rolled Roberts time from one week to a second week to avoid paying overtime wages. (Ex. 11 pg. 225; L. 13-16).

ROBERTS INSPECTION WAGE CLAIM

75. Inspection work is where White Castle management comes to the store and they check to see if the store is clean, and inspection work the entire store is cleaned, floor to ceiling. (Ex.11 Pg. 79 L. 5-9; Pg. 80 L. 5-9) Employees (including Roberts) would come in the day before the inspection. (Ex.11 Pg. 80, L. 8-23)

76. Plaintiff Roberts did not get paid for inspection preparation work and cleaning in advance of the inspections. (See Plaintiff Roberts Deposition One – December 16, 2013, attached as Exhibit 11; Page 19, L. 10-13) Roberts was told to work off the clock by her Managers, despite the corporate policy against working off the clock. (Ex.11 Pg. 30 L.22-24; Pg.31; L. 1-3).

77. Plaintiff Roberts never clocked in for cleaning work done in advance of inspections. (Ex. 12 pg. 45; L 11-16) Plaintiff worked between 3 and 6 hours each time. (Ex.11 Pg. 82, L. 9-10). Roberts was paid for the inspection week, on several occasions, in the week following the week the work was done during. (Ex.11 Pg. 84 L. 3-9). The payment was made the following weeks because Roberts was nearly working in

overtime and the payment was the following week to avoid the overtime. (Ex.11 Pg. 84 L. 16-18)

## ROBERTS COMPELLED PAYMENTS CLAIMS

78. Roberts was ordered to pay safe shortages by Anderson. (Ex.11 Pg. 19 L. 14-23; Pg. 126; L 10-18). Roberts paid $10.00 for a safe shortage. (Ex.11 Pg. 126; L. 2-4). Roberts paid $20.00 on three occasions because Anderson came to her three times for repayment of $20.00 and one time for $10.00 [for safe shortages]. (Ex.11 Pg. 127; L. 14-16; pg. 128 L. 4-11). A different occasion, Plaintiff paid a short of $5.00 for a different employee. (Ex.11 Pg. 128; L. 15-23)

79. Roberts heard S. Anderson saying to her and other employees "where is my money at?" and "give me my money for my drawer". (Ex.11 Pg. 110 L. 17-24; Pg. 120; L. 1-2; Pg. 124; L. 5-23) when Roberts was a manager, Anderson would tell her to pay for safe shortages. (Ex.11 Pg. 111 L. 1-6; Pg. 112; L. 11-16; Pg. 124; L. 5-23)

80. Roberts testified that employees paid for shortages in Dolton the whole time she worked there, until Staci Belton replaced Anderson. (Ex.11 Pg. 119; L. 6-14). Plaintiff paid shortages and took employees short drawer payments, to keep her job. (Ex.11 Pg. 121 L. 24, Pg. 122 L. 1-2)

81. Anderson left Dolton in January of 2013 and was replaced by Staci Belton. (Ex. 11 Pg. 265; L. 2-8) Belton stopped the compelled payments, but has not stopped taking of overtime. (Ex. 11 Pg. 265; L. 2-14)

## ROBERT'S RETALIATION FACTS

## TERMINATION RETALIATION

82. Roberts was terminated the first workday she returned to work after her deposition. (Ex. 12 Pg. 46; L 9-13). Plaintiff was fired because White Castle not like her complaining about her wages. (Ex. 12 pg. 55; L 11-12, 16-20; Pg. 56 L. 7-13). Belton learned of this lawsuit and Roberts joining the suit in December or November of 2013. (Ex. 6 Pg.50 L.14-18; Pg. 51; L. 3-18; Pg. 52; L. 3-23)

## ROBERTS WAS A SUCCESSFUL EMPLOYEE FOR YEARS BEFORE COMPLAINING ABOUT HER WAGES

83. Job record is recording of employees performance issues, good bad or otherwise. (Ex 6 Pg.146; L.7-12) Roberts had good reviews in her 15 years of performance evaluations. (Ex 7 pgs. 160-172; L.1-24). Roberts received a raise in August of 2013 and received a "meets expectation" in this performance review. (Ex 6 Pg. 147: L.15-22; Pg.154; L.6-8).

84. Roberts received pay increases on the following dates September of 2004 (Ex. 11. Pg. 160; L. 20-23; Pg. 161 L. 1-3), September 5, 2005 (Ex. 11 Pg. 161; L. 13-21). June 8, 2008 (Ex. 11 Pg. 165, L. 10-24). August 27, 2008 (Ex. 11 Pg. 168; L. 8-18) September 5, 2009. (Ex. 11 Pg. 169; L. 6-19). December 8, 2010 (Ex. 11 Pg. 170; L.6-17). August 26, 2011. (Ex. 11 Pg. 171; L. 4-15). August 30, 2012 (Ex. 11 Pg. 172; L. 2-13). June 20, 2013 (Ex. 11 Pg. 174; L. 20-24; Pg. 175 L. 1-8), October 11, 2013. (Ex. 11 Pg. 175; L. 10-15)

85. June 12, 2008 Roberts was promoted to Assistant General Manager. (Ex 11 Pg. 167; L. 7-11). On June 2012 Roberts was demoted, due to restructuring not performance. (Ex. 11 Pg. 173; L. 1-24; Pg. 58; L. 10-24).

## ROBERTS TERMINATION DID NOT FOLLOW NORMAL PROCEDURE

86. The policy and procedure for investigating complaints is normally the complaint is sent to the store, and the managers investigate the complaint and say something to the employee if its warranted. (Ex. 12 pg. 60 L. 3-10). Normal procedure for complaint investigation is to conduct the investigation the same day the complaint arrives. (ex 12 Pg. 60 L. 14-15). Darrin Cotton testified that normal procedure for investigating complaints against managers or any employee is to make them aware of the complaint as first step, and have a "dialogue". (Ex 3 Pg. 39; L. 17-22; Pg. 42; L. 1-6). Exline wants to hear the employee's side of the story, before issuing discipline. (Ex 7 pg. 112; L. 17-24).

87. Roberts was never shown the customer complaint allegedly leading to her termination. (Ex. 12 pg. 47; L 3-4). Plaintiff was not interviewed about the complaint from 11/30/13 to 12/22/13. (Ex. 13; Request #9. Pg. 3)(Ex 6 Pg. 175; L. 3-9). Roberts termination meeting was nine minutes long. (Ex 7 Pg.278; L. 6-24).

88. Plaintiff had never seen a complaint that was investigated a month after the complaint. (Ex. 12. Pg. 60; L. 14-19). When Plaintiff saw the complaint for the first time, she said "no wonder they did not show it to me", because it was full of untruths. (Ex. 12 Pg. 62; L. 1-14).

89. . The complaint was received by White Castle on November 30, 2013 at 3:17 AM. (Ex. 12 pg. 78; L. 1-6) (Ex 6 Pg. 185; L. 20-24). Plaintiff worked on December 1, 3, 8, 9, 10, 11th, 2013. (Ex. 13; Request # 10. Pg. 3)(Ex. 5 pg.176 L.22-24; Pg. 177; L. 1). Belton claims she could not interview Roberts about the November 30, 2013 incident because she thought Roberts was on vacation. (Ex 6 Pg.173; L.14-19). Exline did not interview Roberts either and Exline's vacation did not start until

24

December 21, 2013. (Ex. 7 Pg. 278; L. 1-5; Pg 277; L. 8-10) Exline helped arrange the deposition schedule (Ex 7 Pg. 271; L. 22-24; Pg. 272; L 1-6)..

90. Exline claims that she received the complaint at least one week after it was received. (Ex 7 pg. 234; L. 18-24; Pg. 248 L. 6-13). The terminating complaint against Roberts was received by Defendant on 11/30/13. (See Plaintiff Exhibit 13, Defendant's Second Amended Answers to Plaintiffs' Requests to Admit, Request # 3, Pg. 2). Plaintiff was deposed by Defendant on 12/16/13. (Ex. 13; Request # 5, Pg. 2). Plaintiff's termination was communicated by email on 12/23/13 and occurred at 8:00 AM on that date. (Ex. 13; Request #6 pg. 3).

91. Plaintiff was not terminated from 11/30/13 until 12/23/13. (Ex 13; Request #8; Pg.3). Roberts complained to Exline that she could not receive her vacation request for the Thanksgiving holiday. (Ex. 11 Pg. 155; L. 4-9).

92. Roberts was promised the time off, that promise was revoked. (Ex. 11 Pg. 155; L 3-23; Pg. 156; L. 15-24). Roberts believes that the termination was a "set-up", that Staci Belton sent the customer in to incite Roberts, on a day that she had been promised off. (Ex. 13 Pg. 63; L. 23-24; Pg. 64; L. 1-6, 14-16)

93. White Castle waited to see what Plaintiff would say at the deposition. (Ex. 12 pg. 78 L. 10-11) Roberts followed White Castle policy and procedure for food order errors, and verified that all the items on the receipt were received. (Ex. 12 pg. 49 L. 1-5, 16-24).

## CUSTOMER COMPLAINT FULL OF UNTRUTHS

94. The complaint claimed Plaintiff had used profanities at the customer and "just walked away" from him. (Ex. 13; Request # 11, Pg. 3). Plaintiff did not use profanity

but the customer was being belligerent (Ex 12 pg. 49 L 16-24, Pg 50 L 16-18) The security guard walked up to the customer and told him to calm down, telling him she's going to get your food over again, she telling "you got your food on the receipt". (Ex. 12 Pg. 63 L. 5-9)

95. The customer falsely claimed that Plaintiff used profanity. (Ex. 12 Pg. 61; L. 13-14; pg. 63; L. 3-4). The customer falsely claimed that Plaintiff had walked away from him. (Ex. 12 pg. 62; L 10-14; Pg. 63; L. 3-4). Plaintiff was not fired for using profanity, rather poor customer service. (Ex. 12 Pg. 62; L 19-20) A false statement in a complaint against an employee is one mitigating factor in deciding discipline. (Ex 3 Pg. 49; L. 4-13)

### ROBERTS OCTOBER SUSPENSION

### Also Suspicious Timing

96. Plaintiff Roberts complained to Defendant Manger Staci Belton in September of 2013 that she was having her overtime taken from her. (Ex 12 Pgs. 38 Lines 15-24, Pg. 39 L. 1-7). Roberts testified that she said to Belton "I know you've been taking my overtime.  I want my overtime this week.  Otherwise, I'm going to get me an attorney." (Ex. 12 Pg. 39 Lines 1-7).

97. Plaintiff was suspended in October after customers threw a credit card scanner, a sales computer, and a case of hot cholate at the employees. (Ex. 13; Request #19, Pg. 5; Pg. 137; L. 13-18; Pg 138; L. 2-23). The customers wanted to fight Roberts, inciting her to anger. (Ex.11 Pg.135; L. 16-24).

98. Roberts used the security system to alert the security company of the attack, and also alerts the Dolton Illinois police. (Ex 6 Pg. 140: L.5-24; Pg. 141; L.1-24). The

customers argued with the employees and throwing things at Roberts and other employees. (Ex 6 Pg.142; L. 19-24; Pg 143: L. 1-9). (Ex. 7 Pg. 103: L. 16-24). Belton testified that she had no idea why Roberts used profanity. (Ex 6 Pg.145; L.1). The police were sent to the Dolton White Castle. (Ex 6 Pg.145; L.6-8). The customers wanted a larger refund than they paid for the meals. (Ex 7 pg. 190; L.1-8)

## REASONS FOR THE OCTOBER DISCIPLINE ARE MISREPRESENTED TO SHIFT THE COMPLAINT TO "CUSTOMER SERVICE"

99. Defendant claimed in an email that Plaintiff had been suspended in October for "customer service", and in Interrogatories Defendant claimed Plaintiff was previously suspended for customer service and the termination notice stated Plaintiff was suspended for "customer service". (Ex. 13; Request #16, Pg. 5). The discipline from October was not for "customer service". (Ex. 13; Request #17; Pg. 5). Belton agrees the discipline for October was not for customer service, rather "unprofessional behavior". (Ex 6 Pg.130: L.1-19). The termination notice states the termination was for "poor customer service". (Ex 6 Pg.190; L.21-24)

100. Mr. Smith, who acted in the same manner as Roberts was not disciplined for "customer service", rather violation of the "no violence policy". (Ex 6 Pg. 167-169). (Ex 7 pg. 134; L.11-24) Mr. Smith used profanity, but was not disciplined for that. (Ex 7 pg. 133; L.24; Pg. 134; L. 1-24: pg. 139: L. 12-21) T. Smith was disciplined for violation of no violence and harassment policy, not customer service. (Ex. 13. Request 28 Pg.11).

101. Roberts had exactly ONE customer service complaint in her 15 years of work, prior to her termination. (Ex 7 pg. 153; L.1-16; Pg 155: L. 1-20). Discipline for

different reasons are not counted against each other, such as attendance vs. customer service. (Ex 6 Pg. 165; L.5-12).

102.   Belton claims that the September/October discipline was based on a customer complaint via email. (Ex 6 Pg.135; L. 1-15).  Exline testified that the summary customer complaint reports for September and October do not include any customer complaints. (Ex 7 pg.114; L. 5-9; Pg. 116; L. 16-23)

103.   Roberts believed that Belton was retaliating against her "for the lawsuit". (Ex.11 Pg. 136; L. 6-16). Roberts October suspension was unpaid, she lost three days pay based on the retaliation. (Ex. 11 Pg. 252; L. 4-11). Roberts was also suspended for ten (10) days in October of 2013. (Ex. 11 Pg. 253; L. 13-22). Roberts testified that no one has EVER been suspended for ten (10) days. (Ex. 11 Pg. 253; L. 16-18).

**100s of Similarly situated employees treated very differently than Plaintiff Roberts**

**SIMILARLY SITUATED FOR PLAINTIFF ROBERTS**

104.   White Castle Mangers also work as customer service employees. (Ex 6 Pgs. 11-14; L.1-24; Pg. 18: L. 20-21). Plaintiff said that customer was "acting ignorant",. (Ex. 12 pg. 52; L 16-19) but this comment is far less objectionable then other employees that used profanity at customers and nothing was done to the other employees. (Ex. 12 pg. 52 L 20-23; Pg 53 L 11-16). Another employee, L. Brown, used profanity directly at an customer, and the only action taken was to demote her. (Ex 12 Pg. 54; L 1-5, L. 13).

105.   Plaintiff was disciplined in October 2013 for using profanity in front of employees, but her anger was based on the customer throwing cash registers at her. (Ex. 12 pg. 65 L. 20-22; Pg. 67; L. 17-19). Every single manger used profanity in front of other employees and no other manager was disciplined for the use of profanity. (Ex. 12 pg. 6 L. 6-17).

106.   Fellow employee "Brelin" was also using profanity, but she was not suspended. (Ex. 12 pg. 79 L. 18-24; pg. 80; L. 1-8). Fellow manager L. Harper was only suspended for use of profanity. (Ex. 12 pg. 68 L. 11-13). L. Harper was suspended multiple times but never terminated. (Ex. 12 pg. 68 L. 11-13).

107.   In May of 2007 a Dolton employee, Mr. Hannah, said to a customer that he "didn't have a shitty attitude", and Mr. Hannah received the second level of discipline, but was not suspended nor terminated. (Ex 2 Pg. 178; L. 22-24; Pg.180; L.17-20). Mr. Hannah is disciplined seven times from July 2007 till November 10, 2009, seven (7) times in two years and four months, and he is not terminated. (Ex 2 Pg. 181; L. 16-24, Pg. 182 L. 1-15) In November of 2010, Hannah is disciplined for not greeting a customer. (Ex 2 Pg. 182; L. 16-21) In November of 2011 he is disciplined for not following directions and a "smartmouth". (Ex 2 Pg. 182; L 22-24; Pg. 183; L.1-2) In 2013 Hannah is suspended, for not stopping his personal discussions, when customers were waiting. (Ex 2 Pg. 184; L.21-24; Pg. 185; L. 1-7)

108.   Belton had multiple customer complaints in her job record and received no discipline. (Ex 7 Pgs. 323-331) Belton received customer complaints on 11/21/11, (Ex. 7 Pg. 324; L. 16-19) on a later date (Ex 7 Pg. 327; L. 1-8) in March of 2012 she received "another customer complaint" and received no discipline (Ex 7 Pg. 327: L

14-22). Thus Belton received two customer complaints in less than six months and she received no discipline. (Ex 7 Pg. 329: L. 8-22). Then on August of 2012 Belton received another customer complaint. (Ex 7 Pg. 331: L. 2-6), which is again two complaints in less than six months, and again Belton receives no discipline. (Ex 7 Pg. 331; L. 17-22)

### MANAGER TOM IS NOT FIRED, UNTIL HE COMPLAINS ABOUT WAGES

109.  Manager Tom at location #79 had many many complaints and despite those complaints, including multiple written disciplines, Tom was not fired until he complained about wage issues. (Ex. 14 Requests 10-13, Pgs. 9-11). Manager Tom had four separate complaints in less than two months and Tom was not fired based on these four incidents. (Ex. 14 Requests 13, Pg. 11)

110.  White Castle admits that Tom, a manager at White Castle #79 received three customer complaints on October 10, 2011, November 20, 2011 and November 30, 2011 and another complaint on October 18, 2011 which Defendant claims did not involve "Manager Tom." And White Castle admits that Tom received a reprimand for the October 10, 2011 complaint but that Tom was not suspended for the November 20 complaint and was not suspended until December 9, 2011 for "[p]oor customer service, including 3 negative customer comments…" and then terminated on April 25, 2012 but only after he complained about wage issues (Ex. 14 Requests 15, Pg. 12). BACK UP for wage issues. Manager Tom Jelenich had numerous negative comments in his job record and MS. Exline "worked with" him for two years before firing him. (Ex 7 Pg. 354: L. 10-23)

111. Manager Tom complained about pay issues related to repayment of tolls. (See Plaintiff Exhibit 23)

112. On April 3, 2012 White Castle admits that it received a complaint that a "male manager told her he had a 70 burger order and refused to wait on them." at White Castle #79 (same location as Tom worked), again no discipline issued based on this complaint (Ex. 14 Request 40, Pgs. 31-32)

113. On June 1, 2014 Hector Martinez is suspended for a customer service complaint, (Ex. 7 Pg. 359; L. 21-24) and two months later he receives another customer service complaint, poor customer service (Ex 7 Pg. 360; L.3-7) and despite having a suspension two months before, Mr. Martinez receives a written warning not a termination. (Ex 7 Pg. 360; L.20-24; Pg. 361; L 1-3).


114. On January 12, 2014 White Castle admits that it received a complaint that a female manager of White Castle's Dolton restaurant was "unhelpful" as documented at WC-0003361-3362 and no employee was disciplined as a result of this customer complaint. (See Defendant's Answers to Plaintiffs' Second Requests to Admit attached to this Statement as Exhibit 14. Request 1, Pgs. 1-2).

115. On January 20, 2014White Castle admits that on it received a complaint that a female manager of White Castle's Dolton restaurant was "unconcerned" as documented at WC-0003362-3363 and no employee was disciplined as a result of this customer complaint. (Ex 14. Request 2, Pg. 3)

116. On January 26, 2014White Castle admits that it received a complaint that a female cashier of White Castle's Dolton location had a "rude attitude" as documented at

WC-003363-64 and no employee was disciplined as a result of this customer complaint. (Ex 14. Request 3, Pgs. 3-4)

117.    On January 28, 2014White Castle admits that it received a complaint that a female employee of White Castle's Dolton restaurant "raised her voice, had a rude tone, and did not apologize" for a customer's five minute wait, as documented at WC-0003364-3365 and no employee was disciplined as a result of this customer complaint. (Ex 14. Request 4, Pgs. 4-5)

118.    On March 28, 2014 White Castle admits that it received a complaint (the complaint found at WC-0003366-3367) that a "manager Stacey refused to provide her last name or provide a solution to his concerns" and "refused to provide him with the number to her superior as well." at White Castle #67 (ex 14. Requests 5-6, Pg. 5-6)

119.    On August 19, 2011 White Castle admits that it received a complaint that a "cashier was very rude" and rushed a customer to order at White Castle #66 and no employee was disciplined as a result of this customer complaint. (ex 14. Request 9, Pgs. 7-8)

120.    In September of 2013 Manager "Stacy" received a complaint that Stacy was rude to an employee in front of customers, made employees cry, and spoke rudely to a customer without care or discretion, Defendant did not discipline Stacy for this customer complaint. (Ex 13, Request # 32-34; Pgs. 12-14).

121.    On 11/27/13 White Castle admits that it received a claiming that a customer "never received her debit card back from cashier, and when she made cashier aware

she said the male employee was rude. Caller stated she went inside the location to speak to manager and manager would not speak to her, but called the police." And no employee was disciplined as a result of this customer complaint. (ex 13. Request 35-37, Pgs. 14-16)

122. On 11/21/13 White Castle admits that it received a complaint on 11/21/2013 that a female African-American employee at the Dolton restaurant had ignored a customer and was unresponsive and the customer found that behavior to be rude and no employee received discipline for this complaint. (Ex 13. Request #38-39, pgs. 16-17).

123. On 10/10/2013 White Castle admits that it received a complaint that a female crew member of White Castle's Dolton restaurant with employee number 9713 had a poor attitude and White Castle categorized this complaint as "Rude Employee – Unfriendly" as documented on Document Number WC 00003334, and no employee was disciplined as a result of this complaint. (Ex 13. Request #40-41, Pgs. 17-18).

124. On or around 10/26/13 white castle received a customer complaint that a female drive thru attendant of White Castle's Dolton location response to the customer's complaint was made "with attitude", which the customer considered rude and White Castle categorized this complaint as "rude employee" as documented at WC 0000033333, and no employee was disciplined as a result of this complaint. (Ex 13. Requests 41-42, Pg. 18)

125. On 8/12/13 White Castle admits that on 8/12/2013 it received a complaint that employees of White Castle's Dolton restaurant were using profanity and arguing

with other employees. White Castle admits that it categorized this complaint as "Rude Employee-Unfriendly" and "Profanity Used By Employee" as documented at WC-0003323 and no employee was discipline for this complaint. (Ex 13 Request 43, pg. 19).

126.    On 8/7/13 White Castle admits that it received a complaint that an employee at the Dolton restaurant "was talking" about a customer and called out her name. White Castle admits that it categorized this complaint as "profanity used by employee" as documented at WC-0003322 and no employee was discipline for this complaint. (Ex 13. Request #44 Pgs. 19-20).

127.    On 7/29/13 White Castle admits that it received a complaint that a female manager of the Dolton restaurant ignored a follow-up question and White Castle categorized this complaint as "unresponsive" as documented at WC-0003321 and no employee was disciplined for this complaint. (Ex. 13 Request # 45 pgs. 20-21).

128.    On 6/3/13 White Castle admits that it received a complaint that a female employee of the Dolton restaurant threw a bag of fries on the counter. White Castle admits that it categorized this complaint as "other rude employee" as documented at WC-003317 and that no employee was disciplined as a result of this complaint. (Ex 13 Request #47; Pg.21)

129.    On 5/27/13 White Castle admits that it received a complaint that a female crew member named "Britany" of White Castle's Dolton restaurant laughed when she realized that the customer was a female, which the customer found to be rude and unprofessional. White Castle admits that it categorized this complaint as "Unprofessional Behavior" as

documented at WC-0003316, and no employee, including the one "Britany" working at Dolton, received any discipline for the complaint. (Ex 13. Request # 48, Pg. 22)

130. On 5/27/13 White Castle admits that it received a complaint that a female crew member of White Castle's Dolton restaurant laughed when she realized that the customer was a female, which the customer found to be rude and unprofessional. White Castle further admits that the customer stated that the male manager who took over the situation "seemed to be defending" the crew member. White Castle admits that it categorized this complaint as "Poor Service" and "Rude Employee-Unprofessional Behavior" as document on WC-0003316 and no employee was disciplined based on this complaint. (Ex 13 Request 49, Pg. 23).

131. On 5/24/13 White Castle admits that it received a complaint that a male manager of White Castle's Dolton location was talking on the phone while preparing food and White Castle categorized this complaint about the manager as "Unprofessional" as documented at WC-003316 and no employee was disciplined as result of this compliant. (Ex 13, Request #50, Pg. 24)

132. On 5/15/2013 White Castle admits that it received a complaint that a cashier of White Castle's Dolton location was rude, rushed her order, spoke unprofessionally, and suggested the customer was trying to get free food, and White Castle categorized this complaint about the employee as "Rude Employee" as documented at WC-0003314-3315 and no employee was disciplined as result of this compliant. (Ex 13 Requests #51-52, Pgs. 24-26).

133.   On 5/12/2013White Castle admits that it received a complaint that manager Lorraine Rozzeli of White Castle's Dolton restaurant was not apologetic or helpful and that it categorized this complaint as "Manager Unresponsive" as documented at WC-0003313-3314 and no employee was disciplined as result of this compliant. (Ex 13 Requests #53, Pg. 26).

134.   On 3/13/2013 White Castle admits that it received a complaint that a female employee of White Castle's Dolton restaurant treated the customer with a rude attitude in response to a complaint that employees were scooping hot chocolate mix with bare hands and no employee was disciplined as result of this compliant. (Ex 13 Requests #54, Pg. 27).

135.   On 2/26/2013 White Castle admits that it received a complaint that a female manager of White Castle's Dolton restaurant did not speak to the customer and the customer felt this was rude and White Castle admits that it categorized this complaint as "Rude Manager" as documented at WC-0003306 and no employee was disciplined as result of this compliant. (Ex 13 Requests #55, Pg. 28).

136.   On 1/22/2013White Castle admits that it received a complaint that manager "Sheila" of White Castle's Dolton restaurant spoke to him in a rude manner during a phone call, and White Castle categorized this complaint about the manager as "Rude Manager" as documented at WC-0003303 and no employee was disciplined as result of this compliant. (Ex 13 Requests #56, Pg. 29)

137.   On 12/28/2012 White Castle admits that it received a complaint that an employee of White Castle's Dolton restaurant spoke rudely while being provided service in the

drive-thru as documented at WC-0003301 and no employee was disciplined as result of this compliant. (Ex 13 Requests #57, Pgs. 29-30)

138.   On 12/28/2012White Castle admits that it received a complaint that an employee of White Castle's Dolton restaurant spoke rudely while being provided service in the drive-thru, that the customer also complained that the female manager refused to provide her name, was argumentative, and slammed the drive-thru window, and that the customer felt the manager was rude. White Castle admits that it documented these complaints as evidenced by WC-0003301 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Requests #58-59, Pgs. 30-31).

139.   on 9/22/2012 White Castle admits that it received a complaint that crew members at White Castle's Dolton restaurant had bad attitudes and did not greet her, White Castle admits that the customer also complained that the manager interrupted continuously while the employee was taking orders, and that White Castle categorized these complaints as "Rude Employee" and "Manager Poor Service" as documented at WC-0003295 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Requests #60, Pgs. 31-32).

140.   On 8/24/2012White Castle admits that it received a customer complaint that employees of its Dolton restaurant were unhelpful and that Defendant categorized this complaint as "Rude Employee" as documented at WC-0003300-3301 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Requests #61, Pgs. 32-33).

141.   On 4/22/2012White Castle admits that it received a complaint that a manager of its Dolton restaurant talked to her co-workers and on a cell phone, and when the

customer addressed the long wait for food, the manager did not apologize. White
Castle admits that it categorized this complaint as "Manager Unprofessional" and
"Manager Unresponsive" as documented at WC-0003720-3721 and no employee nor
manager was disciplined as result of this compliant. (Ex 13 Request #62, Pgs. 33).

142.   On 8/16/2012White Castle admits that it received a complaint that manager
Candace spoke to a customer in a rude manner and that White Castle categorized this
complaint as "Manager Rude" as documented at WC-0003290-3291 and no
employee nor manager was disciplined as result of this compliant. (Ex 13 Request
#63, Pg. 34).

143.   On August 16, 2012White Castle admits that when it received the complaint
against Plaintiff Roberts, Plaintiff Roberts had not filed an FLSA consent, joined the
Jenkins v. White Castle litigation, or been deposed in Jenkins v. White Castle. (Ex
13 Request #64, Pgs. 34-35).

144.   On 7/28/2012 White Castle admits that it received a complaint that a female
drive-thru employee at White Castle's Dolton restaurant was rude, that employees
were "playing around" and that a male employee was not wearing a uniform. White
Castle admits that it categorized this complaint as "Rude Employee" as documented
at WC-0003285 and no employee nor manager was disciplined as result of this
compliant. (Ex 13 Request #65, Pg. 35).

145.   On 7/7/2012White Castle admits that it received a customer complaint that an
employee at White Castle's Dolton restaurant was very rude and that White Castle
categorized the complaint as "Rude Employee" as documented at WC-0003281-

3282 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #66, Pgs. 35-36).

146. On 7/4/2012 White Castle admits that it received a complaint that a manager at White Castle's Dolton restaurant was rude following the customer's complaint that waiting 30 minutes was too long. White Castle admits that it categorized this complaint as "Manager Rude" as documented at WC-0003281 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #67, Pg. 36).

147. On 5/14/2012 White Castle admits that it received a complaint that an employee of the Dolton restaurant had thrown food all in one take out bag and the customer stated the employee was rude and unhelpful when this was brought to his attention, and that White Castle categorized the complaint as "Rude Employee" as documented at WC- 0003278 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #68, Pg. 37)..

148. On 5/12/2012 White Castle admits that it received a complaint that employee number 9617 at the Dolton restaurant was unhelpful, and that manager Leslie was also unhelpful because she told the customer that she could not compensate the customer unless the customer returned to the Dolton restaurant. White Castle admits that it categorized this complaint as "Manager Poor Service" as documented at WC-0003277 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #70, Pg. 38).

149. On 6/10/2012 White Castle admits that it received a complaint stating that a male employee of the Dolton location was not pleasant and "was not apologetic" when the customer's burgers had no pickles. White Castle admits that it categorized this

complaint as "Rude Employee" as documented at WC-0003274- 3275 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #71, Pg. 39).

150.    On 3/5/2012 White Castle admits that it received a complaint that food was missing from a customer's take out order at the Dolton restaurant and that manager Leslie informed the customer that he or she had to return to the restaurant in order to get her missing food. White Castle admits that it categorized this complaint as "Manager –Poor Service" as documented at WC-0003267 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #72, Pgs. 39-40).

151.    On 3/3/2012 White Castle admits that it received a complaint that a food cashier using employee number 4513 at the Dolton restaurant rushed her order, was unprofessional, and was rude. White Castle admits that it categorized this complaint as "Rude Employee" as documented at WC-0003266-32657 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #73, Pgs. 40-41).

152.    On 2/15/2012White Castle admits that it received a complaint that an African-American manager at the Dolton restaurant did not attempt to resolve a situation and was unprofessional in relation to a follow-up visit resulting from an earlier complaint. White Castle admits that it categorized this complaint as "Rude Employee" as documented at WC-0003265 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #74, Pg. 41).

153.    On 2/15/2012White Castle admits that it received a complaint that an employee named Linda at the Dolton restaurant had a bad attitude and that it categorized this

complaint as "Rude Employee" as documented at WC-0003265 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #75, Pg. 42).

154. On 8/25/2012White Castle admits that it received a complaint that manager Sylvia spoke to a customer in a rude manner and was defensive concerning an issue with another manager, Jasmine, as documented at WC-0003222 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #76, Pg. 43)

155. On 1/7/2012White Castle admits that it received a complaint that a female employee at the Dolton restaurant yelled at a customer, that the customer could not hear the employee, that the employee slammed the drive thru window, and that the employee did not say anything to the customer. White Castle admits that it categorized this complaint as "Rude Employee" as documented at WC-0003261 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #77, Pgs. 43-44)

156. On 12/21/2011 White Castle admits that it received a complaint that manager Lorraine, at its Dolton restaurant refused to fulfill a promise made by manager Sylvia to replace an order and that it categorized this complaint as "Poor Service" as documented at WC-0003259. Defendant admits that Sylvia Anderson and Lorraine Rozelle did not receive any written discipline, suspension, or termination for the referenced complaint. (Ex 13 Request #78, Pg. 44)

157. On 12/3/11White Castle admits that it received a complaint that employees at its Dolton restaurant were talking on their phones and ignoring customers White Castle admits that it categorized the complaint as "Rude Employee" as documented at WC-

0003258 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #79, Pgs. 45)

158.   On 12/1/2011White Castle admits that it received a complaint that a female crew member at the Dolton restaurant with employee number 9629 had a very poor attitude, as documented at WC-0003257 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #81, Pgs. 46-47)

159.   On 10/31/2011White Castle admits that it received a complaint stating that an employee and manager at its Dolton restaurant were arguing, which the customer felt was unprofessional. White Castle admits that it categorized this complaint as "Rude Employee" and "Unprofessional Behavior" as documented at WC-0003253-3254 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #82, Pg. 47)

160.   On 10/28/2011 White Castle admits that it received a customer complaint stating that Linda, an employee at its Dolton restaurant, was very rude and argumentative, and that White Castle categorized this complaint as "Rude Employee" as documented at WC-0003253 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #83, Pg. 48)

161.   On 10/15/2011White Castle admits that it received a customer complaint that Candace, a manager at its Dolton restaurant, was rude and argumentative and that White Castle categorized this complaint as "Rude Manager" as documented at WC-0003251. Defendant admits that Candice Roberts did not receive any written discipline, suspension, or termination for the referenced complaint (Ex 13 Request #84, Pgs. 48-49)

162.   on 9/3/2011White Castle admits that it received a complaint that a female cashier provided poor service because she walked away while taking the customer's order, and that crew members were not friendly or helpful, he was not greeted, he had to have portions of his order corrected, and the crew members did not apologize for the wait or their mistakes. White Castle admits that it categorized this complaint as "Rude Employee" as documented at WC-0003248 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #84, Pg. 49)

163.   On 8/12/11White Castle admits that it received a complaint that a manager at its Dolton restaurant became argumentative and refused to replace burgers or give a full refund after a customer attempted to return only seven sliders of a 10 slider order. White Castle admits that it categorized the complaint as "Rude Manager" as documented at WC-0003246-3247 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #85, Pg. 50)

164.   On 6/17/2011White Castle admits that it receive a complaint that Brittany, an employee at its Dolton restaurant, told a customer that the manager was busy. White Castle admits that it categorized this complaint as "Rude Employee" as documented at WC-0003239 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #86, Pg. 51)

165.   on 5/1/2011White Castle admits that it received a complaint that a customer was not properly greeted by a male employee at its Dolton restaurant. White Castle admits that it categorized this complaint as "Poor Service" as documented at WC-0003232-3233 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #87, Pgs. 51-52)

166.   On 2/13/2011 White Castle admits that it received a customer complaint that employees at its Dolton restaurant did not speak to her and she believed the employees' actions to be rude. White Castle admits that it categorized this complaint as "Rude Employee" as documented at WC-0003226 and no employee nor manager was disciplined as result of this compliant. (Ex 13 Request #88, Pgs. 52-53)

167.   On November 19, 2011 White Castle admits that it received a complaint that "manager, Rosa, was very rude [and] ignored him when he spoke" at White Castle #79, (same store as Tom), and Rosa only received a verbal discipline (Ex. 14 Requests 18, Pg. 14)

168.   On November 17, 2012 White Castle admits that it received a complaint that "the dining room was filthy…manager Hector…was very unhelpful…Hector has too much hair on his arms and she felt this was unsanitary [and] manager Maria refused to speak with her" at White Castle #79 and Rosa again received no discipline (WC-0003405-3510) (Ex. 14 Requests 19, Pg. 15)

169.   On July 5, 2011 White Castle admits that it received a complaint that a "manager had a very bad attitude and was very rude…he was not thanked for his order by the manager…the crew members and the manager were not wearing name tages…[and] [h]e described the manager as an African American female short hair medium built" at White Castle #83 and no employee nor manager was disciplined as result of this compliant. (Ex 14 Request #20, Pgs. 15-16)

170.   On May 13, 2011 White Castle admits that it received a complaint that a "short Caucasian female employee rudely yelled at the crew about the problem, she felt she acted unprofessionally by slamming drink cups down on the front counter and the

guest had to wait an additional 10 minutes to receive the correct order" at White Castle #107 and no employee nor manager was disciplined as result of this compliant. (Ex 14 Request #22, Pg. 17)

171.   On December 6, 2012 White Castle admits that it received a complaint that a customer "spoke to the female manager about several individuals sleeping in the booths since this has been an ongoing issue during the past 2 weeks. Guest was insulted by her flippant, unprofessional response" at White Castle #19. and no employee nor manager was disciplined as result of this compliant. (Ex 14 Request #23, Pg. 17-18)

172.   On August 10, 2012White Castle admits that it received a complaint that "a female employee told him there were no refills on tea…stated the male manager came out of an office and told him the same thing in an extremely rude and hostile way [and] stated he avoided this location in the past because of this manager and suggested someone from upper management reaches out to him regarding giving better customer service" at White Castle #21 and no employee nor manager was disciplined as result of this compliant. (Ex 14 Request #24, Pg. 19)

173.   On November 27, 2012White Castle admits that it received a complaint that "a female manager spoke to her in a rude manner when she placed her order" at White Castle #21 and no employee nor manager was disciplined as result of this compliant. (Ex 14 Request #25, Pg. 20)

174.   On December 2, 2012White Castle admits that it received a complaint that "the employees and managers were rude by acting if he was bothering them" at white

Castle #21 and no employee nor manager was disciplined as result of this compliant. (Ex 14 Request #26, Pg. 20)

175.   On June 17, 2012 White Castle admits that it received a complaint that an "older African American female cashier was rude and rushed her to order" at White Castle #21 and no employee nor manager was disciplined as result of this compliant. (Ex 14 Request #27, Pgs. 20-21)

176.   On March 12, 2012White Castle admits that it received a complaint that "the male cashier was not friendly…and he dropped her change" then when the "[g]uest talked to the female manager, Kiah…the guest felt she did not care" at White Castle #29, and no employee nor manager nor employee Kiah was disciplined as result of this compliant. (Ex 14 Request #28, Pg. 22)

177.   On November 26, 2012White Castle admits that it received a complaint that "the location was understaffed…stated the dining room floor and tables were dirty [and] when she addressed the issue with the manager on duty she did not apologize for the inconvenience" at White Castle #25 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #29, Pg. 23)

178.   On May 26, 2012 White Castle admits that it received a complaint that "the female crew manager spoke to him rudely and snatched his money out of his hand" at White Castle #25 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #30, Pgs. 23-24)

179.   On January 10, 2012White Castle admits that it received a complaint that "there was plastic in the sandwich…she had given the sandwich to her grandchild…she returned the sandwich to the manager and she did not apologize…the manager,

Gwendolyn, was rude and laughed about the issue" at White Castle #25 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #31, Pgs.24-25)

180.   On October 4, 2012White Castle admits that it received a complaint that "the male drive thru attendant slammed the window in her face, which she felt was rude" at White Castle #36 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #32, Pg. 25).

181.   On October 15, 2012White Castle admits that on it received a complaint that a "female manager yelled at the employees in front of the customers" at White Castle #36 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #33, Pg. 26).

182.   On May 9, 2012White Castle admits that it received a complaint that "GAIL WAS RUDE WHEN HE ASKED FOR NO SALT IN HIS ORDER" at White Castle #36 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #34, Pgs. 26-27).

183.   On August 22, 2012White Castle admits that it received a complaint that "the unit gave her son a counterfeit $10.00 bill with his change" and when "her son went back to the unit and spoke to the manager who was rude and unhelpful [and] the manager denied the bill came from the unit" at White Castle #36 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #35, Pgs.27-28).

184.   On September 14, 2012 White Castle admits that it received a complaint that a "female cashier had a rude attitude when she informed her that she already paid for

her order" at White Castle #36 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #36, Pg. 28).

185.  On May 4, 2012White Castle admits that it received a complaint that a "male manager Ken was rude and unhelpful as she ordered…he made a rude comment to her when she requested the price twice…she called the location and addressed the issue with female manager Vita [who] was unresponsive to the problem and stood up for the actions of Ken. Guest stated she gave Ken the phone and he refused to apologize for his actions" at White Castle #66 and no employee nor manager nor employee was disciplined as result of this compliant. (Ex 14 Request #37, Pgs. 29-30).

186.  In October of 2011 Candice Roberts herself is not disciplined, before complaining about wage issues, for being rude and argumentative. (Ex 7 Pg. 335: L. 2-13)

187.  In December of 2011 Jimmy Jenkins had a customer complaint for which he was not disciplined, before complaining about wage issues,. (Ex 7 Pg. 337; L. 1-14)


HUNDREDS OF COMPLAINTS AND HANDFUL DISCIPLINES

188.  In the calendar year of 2012 White Castle admits that it received 5 complaints as rude manager, 1 complaint as store manager unresponsive, 2 complaints as store manager unprofessional, and 4 complaints as store manager poor service, 10 complaints were categorized as rude employee in calendar year, and only two employees were disciplined as a result of these complaints. (Ex 13; Requests 22-23; Pgs. 8-9).

189.   In the calendar year 2011, White Castle admits that it categorized 2 complaints as store manager unprofessional and 5 complaints as store manager poor service, 4 complaints as rude manager, 8 complaints as rude employee, and 4 complaints as store manager unprofessional in calendar year 2011 and employee was disciplined as a result of these complaints. (Ex 13. Requests 23-24).

190.   In the calendar year of 2013 White Castle admits that it receive 3 complaints store manager unprofessional, 2 complaints as employee use of profanity, 4 complaints as rude manager, 14 complaints as rude employee, 7 complaints as store manager unresponsive, and 6 complaints as store manager poor service in calendar year 2013, excluding the complaint against Plaintiff Roberts on 11/30/2013 and Defendant disciplined five employees. (Ex. 13. Request 21; Pgs. 6-7).

191.   From 2011 to 2013 no manager was ever disciplined for a complaint of "rudeness". (Ex. 13. Request 25; Pg. 10)

### PRESERVATION OF DOCUMENTS FACTS

192.   Defendant admits that on September 4, 2012 a meeting including Jimmy Jenkins, Sylvia Anderson, and Darrin Cotton was held in the customer dining area of the Dolton White Castle restaurant (ex. 1 ¶ 165)

193.   There are two audio microphones in Dolton, one at drive-up and one that the cash registers, for recording with the digital recording device. (Ex 3. Pg. 181; L. 2-12) (Ex. 6 Pg. 121; L. 7-16). The audio track recorded and preserved of the September 4 2012 meeting was the drive-up audio recording, not the cash register recording. (Ex 3. Pg. 183; L.8-12)

194.   There is audio microphone by the cash registers to hear discussions between the customers and employees. (Ex. 6 Pg. 121: L. 1-9; Pg. 122: L. 7-12)

195.   Anderson chose to preserve "an audio" of the meeting of September 4, 2012, but she would not say which, other than to agree if that was what was produced that was what she chose to save. (Ex 2 Pgs. 210-212 Ls. 1-24)

196.   Defendant admits that on September 7, 2012, John Ireland, counsel for Plaintiffs, sent White Castle a letter requesting "preservation of the audio and video recordings made of his disciplinary meeting held at Mr. Jenkins work location on or around 9/4/2012. (Ex 1 ¶ 170)

197.   Defendant admits that on September 10, 2012, John Ireland, counsel for Plaintiffs, sent White Castle a letter requesting "preservation of all documents and recordings." Defendants admit that Plaintiffs attached a true and correct copy of the 9/10/2012 correspondence as Exhibit B to the Complaint. (Ex 1 ¶ 172)

198.   Defendant admits that Plaintiffs' Counsel, requested "that ALL recordings made at the Complainant's work location of 1400 E. Sibley BLVD. Dolton ILL 60419 be preserved for a 24 hour period before and after the meeting occurring on 9/4/2012." (Ex. 1 ¶ 181)

199.   Defendant admits that the surveillance images and audio recordings at the  Dolton restaurant are not held for an endless period of time, but under most circumstances the recordings are preserved for 30 days. Defendant admits that General Manager Stacy Belton testified that she believes the recordings may be preserved for as long as 90 days. (Ex 1 ¶ 169)

Dated:  January 27, 2015

Respectfully submitted,

By: _____ /S/ John C. Ireland _____
John C. Ireland

Attorney for the Plaintiff
and the Plaintiff Class and Collective

John C. Ireland
The Law Office of John C. Ireland
636 Spruce Street
South Elgin ILL
60177
  630-464-9675
Facsimile 630-206-0889        attorneyireland@gmail.com