Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4   JIMMY JENKINS and CANDICE    )
5   R. ROBERTS individually      )
6   and on behalf of all         )
7   persons similarly            )
8   situated as class            )
9   representative under         )
10  Illinois Wage Laws and/or    )
11  as Collective                )
12  representative of the        )
13  collective as permitted      )
14  under the Fair Labor         )
15  Standards Act,               )
16             Plaintiffs,  )
17       -vs-                ) Case No.
18  White Castle Management ) 12 CV 07273
19  Company, d/b/a White    )
20  Castle System, Inc.,    )
21             Defendant.   )
22       The deposition of CANDICE RENEE ROBERTS,
23  called for examination, taken pursuant to the
24  Federal Rules of Civil Procedure of the United
```

Page 2

```
1   States District Courts pertaining to the taking of
2   depositions, taken before NANCY A. GUIDOLIN, CSR
3   No. 84-2531, a Notary Public within and for the
4   County of DuPage, State of Illinois, and a
5   Certified Shorthand Reporter of said state, at
6   Suite 3500, 77 West Monroe Street, Chicago,
7   Illinois, on the 16th day of December, 2013,
8   commencing at 9:00 a.m.
9   PRESENT:
10       THE LAW OFFICE OF JOHN C. IRELAND,
11       (1921 Charles Lane,
12       Aurora, Illinois 60505,
13       630-206-0889), by:
14       MR. JOHN C. IRELAND,
15       attorneyireland@gmail.com,
16           appeared on behalf of the Plaintiffs;
17   JONES DAY,
18       (77 West Wacker Drive, Suite 3500,
19       Chicago, Illinois 60601,
20       312-782-3939), by:
21       MR. DAVID L. CULBERG,
22       DCULBERG@JONESDAY.COM,
23           appeared on behalf of the Defendant.
24   REPORTED BY:  NANCY A. GUIDOLIN, CSR NO. 84-2531.
```

Page 3

1          (WHEREUPON, the witness was duly
2      sworn.)
3          CANDICE RENEE ROBERTS,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6              EXAMINATION
7  BY MR. CULBERG:
8      Q.   Good morning, Ms. Roberts.  We met off
9  the record.  My name is David Culberg.  I am an
10  attorney representing White Castle in a lawsuit
11  that you have brought against White Castle.
12          Can you please state your name for the
13  record?
14      A.   Candice Renee Roberts.
15      Q.   Can you spell that, please?
16      A.   Candice, C-a-n-d-i-c-e, middle name is
17  R-e-n-e-e, R-o-b-e-r-t-s.
18      Q.   Just a few preliminary things to go over
19  before we get started.  Our purpose for being here
20  today is for me to ask you a series of questions
21  regarding your claims in a litigation against White
22  Castle.  Do you understand that?
23      A.   Yes.
24      Q.   And the oath that you just took is the

Page 4

1  same as if you were taking an oath in a court of
2  law.  Do you understand that?
3      A.   Yes.
4      Q.   Nancy is the court reporter.  She does a
5  really good job of writing down everything that we
6  say, but there's a few things we can do to help her
7  out.
8          First of all, if I can have you just
9  give a verbal response to all of my questions.
10  Just a yes or a no.  No head nods or head shakes.
11  No uh-huhs or huh-uhs.
12          Also, this is going to be on me as well
13  as you, but we will both have to do our best not to
14  interrupt each other.  This is going to be a
15  conversation, but the better that we can be about
16  talking one at a time, the better she can record
17  what we're saying.
18      A.   No problem.
19      Q.   Okay.  This is really my only chance to
20  talk to you about your claims in the litigation
21  before we get to trial.  So it's important that
22  every question that I ask you really think about it
23  and give as complete and truthful of an answer as
24  you can.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013

5–8

Page 5

1    A.   Yes.
2    Q.   And if what I have asked is at all
3 confusing, just tell me to clarify and I can do my
4 best to ask a question as many times until we both
5 understand each other.  Does that make sense?
6    A.   Yes.
7    Q.   I just wouldn't want you to guess.
8    A.   Yes.
9    Q.   What we are doing here is not a
10 marathon.  We have lots of time to do this.  If you
11 ever need a break at any time, just let me know.
12 We have water and soda and coffee over there.  We
13 have bathrooms on the floor of course.  Just let me
14 know.
15    A.   Okay.
16    Q.   All that I would ask is that if I ask a
17 question, that you answer the question before we
18 take a break.  Does that make sense?
19    A.   That makes sense.
20    Q.   Is there any reason today that you are
21 not able to give complete and truthful answers to
22 my questions?
23    A.   No.  Not at all.
24    Q.   Have you taken any illegal drugs today?

Page 6

1    A.   No, sir.
2    Q.   Have you drank any alcohol today?
3    A.   No, sir.
4    Q.   Have you taken any prescription
5 medications that would affect your ability to tell
6 the truth?
7    A.   No, sir.
8    Q.   Okay.  You said earlier that your name
9 is Candice Renee Roberts.  Have you ever been known
10 by any other names?
11    A.   No, sir.
12    Q.   What is your current address?
13    A.   13094 South Evans, Chicago, Illinois
14 60827.
15    Q.   Is that a house or an apartment?
16    A.   It's row homes.
17    Q.   Okay.  How long have you lived at that
18 address?
19    A.   I would say for the last five or six
20 years.
21    Q.   Okay.  Are you currently married?
22    A.   No.
23    Q.   Have you ever been married?
24    A.   No.

Page 7

1    Q.   Do you have any children?
2    A.   Yes.  I have three.
3    Q.   And what are their names?
4    A.   Candell, and he's 15.
5    Q.   Okay.
6    A.   And Mardell, who is 10, and Jade who is
7 12.  She just turned 12.
8    Q.   Do they all live with you?
9    A.   Yes.
10    Q.   Do you have any other relatives who live
11 in the Chicago area?
12    A.   Yes.  My mother, she stays in Chicago.
13 She stays where I stay at.  My father, he stays at
14 108th and Vernon.  I have a sister that stays down
15 the street from me on 130th and Champaign.
16    Q.   Okay.
17    A.   I have an auntie who stays on 116th and
18 Princeton.  I have an auntie that stays around the
19 corner from me, which I don't know her address
20 exactly, and I have cousins.
21    Q.   So you guys are well represented in
22 Chicago?
23    A.   Yeah.
24    Q.   And if I could just have the name of

Page 8

1 your mother, your father and your sister.
2    A.   My mother's maiden name -- her name is
3 Ramona Roberts, but her maiden name is Ramona
4 Moore, and my father's name is Leslie Roberts.  My
5 sister is Shanta Moore.
6    Q.   Have you ever been involved in any other
7 lawsuit besides this one?
8    A.   No.
9    Q.   Have you ever been sued?
10    A.   No.
11    Q.   Have you ever testified in court?
12    A.   No.
13    Q.   Have you ever been part of a deposition
14 like this one?
15    A.   A deposition?  No.
16    Q.   Okay.  Aside from your complaints in
17 this case, which we will get into, have you ever
18 filed any type of complaints against another
19 employer?
20    A.   No.
21    Q.   Have you ever been convicted of any
22 crimes?
23    A.   No.
24    Q.   Have you ever been arrested?



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
9–12

Page 9

1    A.   Other than driving with no license,
2  that's about it.
3    Q.   And what happened with driving with no
4  license?
5    A.   They took me to the station, gave me
6  some tickets, and let me go.
7    Q.   When was that?
8    A.   This was like two years ago.
9    Q.   Okay.  Have you before applied for
10 disability or unemployment?
11   A.   No.
12   Q.   Have you ever filed for bankruptcy?
13   A.   No.
14   Q.   Did you complete high school?
15   A.   Yes.
16   Q.   Where and when was that?
17   A.   Carver Area High School in 1999.
18   Q.   Have you had any education beyond high
19 school?
20   A.   No.
21   Q.   Ever served in the military?
22   A.   No.
23   Q.   How long have you been working at White
24 Castle?

Page 10

1    A.   I just made ten years October the 11th.
2    Q.   How many years?
3    A.   Ten.
4    Q.   Ten years.  Have you had any other jobs
5  since you started working at White Castle?
6    A.   No.
7    Q.   Tell me about the jobs that you have had
8  before White Castle.
9    A.   Before White Castle I used to do child
10 care for my sister.  I was doing that for some
11 years, and then I started working for McDonald's.
12 I worked there for like a couple of months.  Once I
13 quit there, I went right to White Castle.
14   Q.   You were doing child care for your
15 sister?
16   A.   Uh-huh.
17   Q.   So you were taking care of her kids?
18   A.   Yeah.
19   Q.   How many kids does she have?
20   A.   At the time she only had two.
21   Q.   How much money was she paying you?
22   A.   The state was paying me.  They was
23 giving me a check every month.  I think it was
24 about 5 or 6 at the most.

Page 11

1    Q.   Five, six?
2    A.   Hundred.
3    Q.   Dollars a month?
4    A.   Uh-huh.
5    Q.   About how long did you have that job?
6    A.   About two years I'd say.
7    Q.   And I know that some of the stuff that
8  we're talking about is a long time ago, and all
9  that I can ask you to do is give me your best
10 memory sitting here today.
11   A.   Okay.
12   Q.   About what years were those?
13   A.   I know '99 I was working, because I was
14 working for a little while while I was still in
15 high school, and I would say from 2000 or 2001 at
16 the most.
17   Q.   Okay.  And then you worked at
18 McDonald's?
19   A.   Yes, and I worked there right before
20 White Castle in 2003.
21   Q.   Why did you leave the job at McDonald's?
22   A.   I left McDonald's because my cousin was
23 working for White Castle at the time, and she told
24 me that White Castle paid more money and they give

Page 12

1  benefits.  So I took a shot, and I put an
2  application in, and they called me for an
3  interview.
4        (WHEREUPON, a certain document was
5         marked Roberts Deposition Exhibit
6         No. 1, for identification, as of
7         12-16-13.)
8  BY MR. CULBERG:
9    Q.   Sure.  Ms. Roberts, I'm handing you what
10 has been marked as Exhibit 1.  Do you recognize
11 this document?
12   A.   Uh-huh.
13   Q.   Can you tell me what it is?
14   A.   My application for White Castle.
15   Q.   Does this appear to be a true and
16 accurate copy of the application that you gave
17 White Castle?
18   A.   Yes.
19   MR. IRELAND:  Objection.  Form.  Go ahead.
20   MR. CULBERG:  What was the objection?
21   MR. IRELAND:  Form.
22 BY MR. CULBERG:
23   Q.   I will direct your attention to -- it's
24 in the middle of the page where you're listing your



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                    13–16

Page 13

1  former employees.  Do you see that?
2     A.   Uh-huh.
3     Q.   Next to McDonald's under reason for
4  leaving it looks to me like it says, "They kept
5  cheating me out of my hours."
6          Did I read that right?
7     A.   Uh-huh.
8     Q.   What did you mean by that?
9     A.   I think they wasn't giving me the right
10 hours that they were supposed to.  I'm not sure.  I
11 can't recall that.
12    Q.   And the dates that you listed there, May
13 '03 to October '03, do those seem right to you
14 sitting here today?
15    A.   Yeah.
16    Q.   If I could just have you turn to the
17 second page where it says, "Signature of
18 Applicant."  Is that your signature?
19    A.   Uh-huh.  Yes.
20    Q.   How much money were you making at
21 McDonald's?
22    A.   I think 5.15.
23    Q.   That's $515 --
24    A.   No.  That's $5.15 an hour.

Page 14

1     Q.   And that was the minimum wage at the
2  time?
3     A.   Yes.
4     Q.   Do you remember your supervisor's name
5  at McDonald's?
6     A.   I don't remember her name, but on the
7  paper it says Carli Wilson.
8     Q.   Then after McDonald's you were hired by
9  White Castle?
10    A.   Uh-huh.
11    Q.   What was the first location that you
12 worked at White Castle?
13    A.   On 103rd and Michigan.
14    Q.   What town or city is that in?
15    A.   Chicago, Illinois.  You want the zip
16 code?  I don't think I know it.
17    Q.   That's all right.
18         Is that the only location that you've
19 worked at?
20    A.   And they transferred me to Sibley.  So
21 those are just the only two that I've been at.
22    Q.   When were you transferred?
23    A.   I don't recall what year it was, but it
24 was right after I got the promotion to be an

Page 15

1  assistant.
2          (WHEREUPON, a certain document was
3          marked Roberts Deposition Exhibit
4          No. 2, for identification, as of
5          12-16-13.)
6  BY MR. CULBERG:
7     Q.   Ms. Roberts, you have just been handed
8  what has been marked as Exhibit 2.  Do you
9  recognize this document?
10    A.   Uh-huh.
11    Q.   Can you tell me what it is?
12    A.   It's a job record.
13    Q.   What is a job record?
14    A.   It goes by what you have been doing for
15 like weeks and stuff like that; like if you save
16 hours or you call off.  Everything they document
17 that you do.
18    Q.   Whose handwriting is this to the best of
19 your knowledge?
20    A.   Sylvia?
21    Q.   Sylvia?
22    A.   Anderson.
23    Q.   And who is she?
24    A.   She was my old GM.

Page 16

1     Q.   Okay.  If I can direct your attention to
2  the top of the second page where it says, "July
3  2008."  Do you see that?
4     A.   Uh-huh.
5     Q.   I believe it says, "Welcome to Castle 67
6  as a new AGM."  Did I read that right?
7     A.   Yes.
8     Q.   Does that refresh your recollection as
9  to when you were transferred to the Sibley
10 location?
11    A.   Yes.
12    Q.   So do you believe it's July --
13    A.   July sometime.  Uh-huh.
14    Q.   Okay.  And that Sibley location, that's
15 in Dolton, Illinois; is that correct?
16    A.   Yes.
17    Q.   Is that where you work today?
18    A.   Yes.
19    Q.   Besides the two White Castle locations
20 that we talked about, have you ever worked at any
21 other White Castle location?
22    A.   I went -- when they open the new stores,
23 they send you out, or like when the stores need
24 help, they send you to the big stores.  I worked in



CANDICE RENEE ROBERTS           December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE          17—20

Page 17

1  the one in Indiana, which is Council 32, and I
2  worked at one of the stores that opened in Waukegan
3  before. I don't know which number was that, and I
4  think that I worked at 103 before.
5     Q.  Where is 103?
6     A.  I'm not sure. I wasn't driving at the
7  time. So I'm not sure.
8     Q.  How long would you work at these other
9  stores?
10    A.  I only went there like once.
11    Q.  Just one day?
12    A.  Yeah, I never worked like a whole week
13  there or anything.
14    Q.  So there were maybe three other stores
15  where you worked between a day and a week? Is that
16  a fair characterization?
17    A.  Can you explain that a little bit?
18    Q.  Sure. You worked at the first location
19  on 103rd for a period of several years?
20    A.  Uh-huh.
21    Q.  You worked at the Dolton location for a
22  period of several years?
23    A.  Right.
24    Q.  There's three other stores that you

Page 18

1  mentioned.
2    A.  Those is like -- those was like -- I
3  want to say like you going to help out when they
4  have new stores open and you go help out, or like
5  if a manager -- they don't have manager -- at 32
6  they didn't have a manager. So that's why I went
7  over there to work.
8    Q.  And how long were you at 32?
9    A.  Just for one day.
10    Q.  Okay.
11    A.  Everything is one day.
12    Q.  Okay. Why are you suing White Castle?
13    A.  I'm suing actually for my overtime that
14  I did not receive.
15    Q.  Do you believe White Castle owes you
16  money for anything else besides overtime that you
17  did not receive?
18    MR. IRELAND: Form.
19  BY MR. CULBERG:
20    Q.  You can answer.
21    A.  You say that I can?
22    Q.  You can.
23    A.  Well, I really didn't think -- it was
24  going back to when Sylvia was there, because I

Page 19

1  wasn't thinking of going through none of that, but
2  we used to work off of the clock. Like when
3  inspection time comes, we will come in there and
4  help out cleaning, and then we would come back the
5  next time, and the time that we said that we
6  clocked in is a different time, because every time
7  somebody changes their time, they get -- a receipt
8  comes out saying adjusted to this time, adjusted to
9  that time.
10    So like when we do have inspections, she
11  don't pay you for it, or like when you're staying
12  over just to help out for anything, they don't pay
13  you for that either.
14    And we used to put -- well, when I was
15  her assistant, I used to put money back in her
16  safe. Like if her safe was short, she would have
17  us put the money back in. You know, like, you
18  know, my safe is short.
19    Like me and the other assistant, we just
20  counted it, and we just put our initials on it, and
21  then she'll come say that, "Well, my safe is
22  short." So then we would have to go out of our own
23  pockets and put money back in there.
24    Q.  Is there anything else?

Page 20

1    A.  And as far as them making the team
2  members put the money back in their drawers, that's
3  just about it.
4    Q.  Making team members put money back in
5  their drawers?
6    A.  Uh-huh.
7    Q.  Of the White Castle locations that you
8  worked at, did the behavior that you just alleged
9  occur at all of them?
10    A.  No, because when I got to the Sibley
11  store, that's when I said you all are doing a lot
12  of stuff that I never used to do before. I used to
13  always say that, but they say that's what they have
14  been doing.
15    Q.  Do you belive White Castle violated the
16  law against you in any way when you worked at the
17  store at 103rd Street?
18    A.  No.
19    Q.  Do you believe that White Castle
20  violated the law against you when you worked at
21  No. 32 in Indiana?
22    A.  No.
23    Q.  Do you believe that White Castle
24  violated the law against you when you worked in



CANDICE RENEE ROBERTS                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                   21–24

Page 21

1   Waukegan?
2      A.   No.
3      Q.   There was one other store that you
4   couldn't remember where it was.
5      A.   No.
6      Q.   There were no violations of the law
7   there?
8      A.   No.
9      Q.   I'm sorry if it seems like I am
10  repeating myself.  It's just to be sure.
11         The only unlawful actions that you're
12  alleging by White Castle occurred at the Dolton,
13  Illinois, location?
14     A.   Yes.
15     Q.   As best as you know, why were you
16  transferred to the Dolton location?
17     A.   To be an assistant general manager.
18     Q.   How were you told about this?
19     A.   They called me on the phone after my
20  interview.
21     Q.   It's a position that you interviewed
22  for?
23     A.   Uh-huh.  Yes.
24     Q.   How did you know the position was

Page 22

1   available?
2      A.   They put a paper up, kind of stapled it
3   on the wall so anybody can go up for it.
4      Q.   Why did you apply?
5      A.   I like White Castle, and they was like a
6   family, and they helped -- they let you move up
7   fast.  I thought that it was a good career choice.
8      Q.   What was your position before assistant
9   general manager?
10     A.   A crew manager.
11     Q.   I'm sorry.  You said a crew --
12     A.   Manager.
13     Q.   A crew manager.  Did you have a job
14  before a crew manager?
15     A.   I was a team member.
16     Q.   What were your responsibilities as a
17  team member?
18     A.   Just working drive through, make sure
19  that I cleaned up, stock up, take care of the
20  customers, make burgers.  Pretty much everything in
21  a White Castle.
22     Q.   Was your job the same every day?
23     A.   Uh-huh.  Yes.
24     Q.   Thank you for that.  How would you know,

Page 23

1   for example, when it was time to work drive
2   through, when it was time to clean up, when it was
3   time to make burgers?
4      A.   The manager on the shift, they would
5   come and tell you when you was going on drive
6   through.  Like if you're going to come off break or
7   go on break, you're going over here to relieve this
8   person.
9          And me, I used to clean on my own,
10  because I already knew that's what they want us to
11  do.  We got to clean before you lean.  That's White
12  Castle's motive.  So that's what we used to go by.
13     Q.   Okay.  So did you have some discretion
14  over how you were performing your job as a team
15  member?
16     MR. IRELAND:  Form.
17  BY THE WITNESS:
18     A.   No.
19     MR. IRELAND:  Go ahead.
20  BY THE WITNESS:
21     A.   No.
22  BY MR. CULBERG:
23     Q.   After you were a team member, you were a
24  crew manager; is that right?

Page 24

1      A.   Yes.
2      Q.   What were your responsibilities as a
3   crew manager?
4      MR. IRELAND:  Form.  Go ahead.
5   BY THE WITNESS:
6      A.   Run shifts, oversee the crew members,
7   make sure that the place is cleaned, stocked for
8   the next shift, and just really the key holder.
9   Make sure that everything is moving progressively,
10  everybody is doing what they're supposed to do.
11  BY MR. CULBERG:
12     Q.   How was your job different as a crew
13  manager from when you were a team manager?
14     MR. IRELAND:  Form.
15  BY THE WITNESS:
16     A.   The difference is I just had to run the
17  shift and do more paperwork.  That was the only
18  difference.
19  BY MR. CULBERG:
20     Q.   What kind of paperwork were you doing?
21     A.   We have to put the money in the system,
22  and like if we got voids, you have to write out the
23  voids, the food tickets and stuff like that.  Put
24  everything in and make sure all of the stuff is



CANDICE RENEE ROBERTS                                   December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              25—28

Page 25

1   accounted for.
2       Q.   Did you have the ability as a crew
3   manager to edit the time punch reports of team
4   members?
5       A.   Can you rephrase that?
6       Q.   When you were a crew manager, did you
7   have the ability or the power to edit the time
8   punch reports of the team members?
9       A.   Yes.
10      Q.   Would you ever edit those reports?
11      A.   If I had to, yeah.  If I had to, yeah.
12      Q.   When would you have to?
13      A.   When the GM told us that we don't do
14  overtime.
15      Q.   I'm afraid that I don't understand.
16  "When the GM told us that we don't do overtime,"
17  what do you mean?
18      A.   Yeah, the GM say that she don't pay
19  overtime.  So we got to do what we got to do to get
20  out of overtime.
21      Q.   I just want to make sure that I am
22  understanding exactly what you're saying.  So the
23  GM -- which I assume stands for general manager?
24      A.   Uh-huh.

Page 26

1       Q.   That's a yes?
2       A.   Yes.
3       Q.   (Continuing) -- would tell you as a crew
4   manager --
5       A.   You got to do what you got to do to get
6   out of overtime, but at 103rd they never let you
7   work overtime.  Never.
8       Q.   And to be clear, we are still talking
9   about your time at 103rd.
10      A.   Oh, okay.  Well, we never did overtime,
11  and I never had to fix nobody's time because
12  everybody's time was clocked in and out on time,
13  but we could fix their time if we had to.
14      Q.   Okay.  I just want to make sure we are
15  not getting confused.  So we're talking right now
16  about your time as a crew manager?
17      A.   Right.  I could fix their time if I had
18  to, but on 103rd we didn't have to, because we
19  didn't -- everybody was clocking in and out on the
20  time that they're supposed to, but every manager
21  has the opportunity to change time if they want to.
22      Q.   And just to be clear, you were never a
23  crew manager at Dolton; is that right?
24      A.   No.

Page 27

1       Q.   Okay.  When you were a team manager --
2       A.   A crew member.
3       Q.   Strike that.  When you were a team
4   member at 103rd, did you have the ability to edit
5   your own time punch reports?
6       A.   No.
7       MR. IRELAND:  Candice, pause.
8   BY MR. CULBERG:
9       Q.   When you interviewed for the position of
10  assistant general manager, who did you interview
11  with?
12      A.   Cathy Shearer and I want to say Sylvia.
13  I don't really recall who I was in the interview
14  with, but I know that it was Cathy Shearer.
15      Q.   And who is Cathy?
16      A.   She used to be my old district
17  supervisor.
18      Q.   Explain to me, if you would, because we
19  have been talking about a lot of different job
20  positions, how you understand the organization of
21  White Castle; in other words, who reports to who if
22  you go all of the way up the ladder?
23      A.   Okay.  I know the team members report to
24  the managers.  The managers --

Page 28

1       Q.   Meaning the crew managers?
2       A.   The crew managers.  And the crew
3   managers report to the GM, the GM reports to the
4   district, the district reports to the area, and the
5   area is reporting to the big boss.
6       Q.   Okay.  I may be mistaken.  I don't think
7   that I heard you say assistant general manager.
8       A.   Okay.
9       Q.   Unless you just gave me --
10      A.   I didn't, because I don't -- I didn't --
11  well, I was thinking of me as a -- okay.  The crew
12  manager goes to the assistant, the assistant goes
13  to the GM, the GM goes to the District, the
14  District goes to the area, the area goes to the big
15  boss.
16      Q.   How many stores is a GM responsible for?
17      A.   I don't recall.  I don't.
18      Q.   Is it more than one?
19      A.   I think it's just one as a matter of
20  fact, but they be trained -- but I know this one GM
21  she was over like several stores.
22      Q.   Are you an assistant GM right now?
23      A.   No.  I'm a crew manager.
24      Q.   When you interviewed for the assistant



Page 29

1  GM position, what did they tell you about the
2  position?
3      A.   That I would be the eyes to the GM, and
4  that I would help the GM with everything to make
5  sure that the accounts were running smoothly, and
6  in the GM's absence -- I am the GM in the GM's
7  absence.
8      Q.   Are you responsible for training other
9  employees?
10     A.   Yes.
11     Q.   Tell me about those responsibilities.
12     A.   Everybody is responsible for training
13  everybody.  It's an ongoing training thing.  Just
14  basically if you see somebody that needs help --
15  just every day it's a training at White Castle.
16  Every day it's training.
17          So it was just basically training them
18  how to make the burgers, where everything goes, and
19  how to take the customers' orders, how White Castle
20  wants their cleaning done and so on and so forth.
21     Q.   Are you responsible for training them on
22  how to punch in and punch out?
23     A.   Yes.  When they first get hired, the GM
24  goes to the machine and tells them this is your

Page 30

1  clock out number, and you put your clock out number
2  in, and then hit "in," and then when you getting
3  ready to go, you put your clock out number in and
4  then you press "out."
5      Q.   And you were also part of that training?
6      A.   Uh-huh.
7      Q.   Did you every tell the team members that
8  they were forbidden from working off of the clock?
9      A.   Yeah.
10     Q.   That's what you understand White
11  Castle's policy to be?
12     MR. IRELAND:  Form.  Legal conclusion.  Go
13  ahead.
14  BY MR. CULBERG:
15     Q.   You can answer.
16     A.   I told them that they're not supposed to
17  work on and off the clock without getting paid.
18  Well, we tell them that.  We tell them that.
19     Q.   Is that not the policy?
20     MR. IRELAND:  Form.
21  BY THE WITNESS:
22     A.   It's not the policy when you -- when the
23  GM -- it's totally different.  When you're there
24  they say you're not supposed to do all of that, but

Page 31

1  when you're there in that process, you have to do
2  what the person that's over your place is telling
3  you to do.
4  BY MR. CULBERG:
5      Q.   Are you responsible for disciplining
6  other employees?
7      A.   Well, I never have.  I never have.  I
8  never knew that I was, because I never did.
9      Q.   And you do have the authority to edit
10  time punches?
11     A.   Yes.
12     Q.   Tell me about your daily routine as an
13  assistant general manager.
14     A.   As an assistant general manager, on
15  certain days you have different things to do.  Like
16  you can come in like a Monday and you have to do
17  the dry supply or the frozen orders, make sure
18  there's change in the safes, draw up the armor car
19  money for the armor car, make sure that the shift
20  is running smoothly, make sure that everything is
21  in the building, like all of the products that we
22  need, and make sure that the store is running
23  sufficiently.
24     Q.   Is each day different from the day

Page 32

1  before?
2      A.   Just certain days you have to do dry
3  supply and some days you don't.  Like two days out
4  of the week you have got to do a frozen or a dry
5  supply or like two days out of the week you got to
6  do the armor car.  That's the only difference.
7      Q.   Is every week different from the week
8  before?
9      A.   No, no.
10          (WHEREUPON, a certain document was
11          marked Roberts Deposition Exhibit
12          No. 3, for identification, as of
13          12-16-13.)
14  BY MR. CULBERG:
15     Q.   Ms. Roberts, I have handed you what has
16  been marked as Exhibit 3.  You can take your time
17  to look over that document.
18          Have you seen this document before?
19     A.   Uh-huh.
20     Q.   What is it?
21     A.   It's the position description for
22  assistant general manager.
23     Q.   Does this document accurately reflect
24  what you actually do as an assistant general



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                    33–36

Page 33

1    manager?
2         MR. IRELAND:  Form.
3    BY THE WITNESS:
4         A.    Yes.
5    BY MR. CULBERG:
6         Q.    Is there any way that this document is
7    inaccurate?
8         MR. IRELAND:  Form.
9    BY THE WITNESS:
10        A.    No.
11   BY MR. CULBERG:
12        Q.    Is there anything that you would add to
13   this document?
14        MR. IRELAND:  Form.
15   BY THE WITNESS:
16        A.    Other than stress, no.
17   BY MR. CULBERG:
18        Q.    Stress.  I would like to direct your
19   attention to the second page under the heading of
20   "Responsibility and Decision Making Authority."
21   About halfway down, and I'll just read:  "Any
22   decisions made must not contradict the objectives
23   and philosophy of White Castle or interfere with
24   the procedure/policy structure established in the

Page 34

1    region."
2         Did I read that correctly?
3         A.    Yes.
4         Q.    Is it your understanding that you're
5    responsible for following White Castle policies?
6         MR. IRELAND:  Form.
7    BY THE WITNESS:
8         A.    That's my understanding, but I had to do
9    what I had to do in order to keep my job.
10   BY MR. CULBERG:
11        Q.    Okay.
12        A.    Can I add something to that?  White
13   Castle can say that they go by their policies, but
14   anytime that you come and tell them about what the
15   GM is doing, it's like they are going to go to them
16   and ask them, and then, once again, say, "Well, no
17   I'm not doing this."
18        Just like I just had this problem a
19   minute ago, "No, I'm not doing this."  They don't
20   investigate like they're investigating the
21   customer, or they don't investigate to see if I'm
22   telling the truth or the GM is telling the truth.
23   I mean, you have got Rapid Eye System, because I
24   complained to Stacey plenty of times about my

Page 35

1    overtime and stuff.
2         So if they don't -- if they believe what
3    the GM say, like what's the point of us even
4    telling, because they're going to override us and
5    believe what the GM say, and that's how it is right
6    now today.
7         That's why a lot of people don't say
8    nothing right now today, because they know that
9    White Castle is going to override what we say and
10   believe the GM.  So that's the problem that's going
11   on right now.
12        Q.    Okay.  I am sorry.  I interrupted.  I
13   didn't mean to.
14        I think that I heard you say Rapid Eye
15   System?
16        A.    Uh-huh.
17        Q.    What's Rapid Eye system?
18        A.    It's like when a customer complains,
19   this is what White Castle -- it's a monitor where
20   they can go and hear what you were saying and stuff
21   like that.
22        Q.    You just mentioned the name Stacey, and
23   I want to be clear.  Can you tell me a little bit
24   about the chain of command, for lack of a better

Page 36

1    word, at the Dolton store.
2         MR. IRELAND:  Form.
3    BY MR. CULBERG:
4         Q.    So you have your team members?
5         A.    Uh-huh.
6         Q.    Then is there a crew manager?
7         A.    Yes.  It's a crew manager, then it's her
8    assistant, then it's Stacey.
9         Q.    My understanding is you came in as
10   assistant general manager?
11        A.    Yes.
12        Q.    When you came in as an assistant general
13   manager, who was the crew manager?
14        A.    Who was the crew manager?
15        Q.    Yes.
16        A.    It's more than one crew manager.
17        Q.    Okay.
18        A.    When I came in, it was Jimmy, Gwen,
19   Kattie, and I think Loreisa was just going to be
20   promoted.
21        Q.    Do you remember any last names?
22        A.    Gwendolyn Tolbert, Kattie Loveberry,
23   Jimmy Jenkins and Loreisa Harper and Lorraine
24   Rozelle, but she just came when I got there, too.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
37–40

Page 37

1    Q.   Who was the general manager when you
2 came over?
3    A.   Sylvia, Sylvia Anderson.
4    Q.   Have you ever had any general manager
5 besides Sylvia Anderson?
6    A.   Actually, I worked with Sylvia on 103rd
7 before. I worked with her on 103rd. I had Tyra
8 Robertson and Ken Williams.
9    Q.   Where was Ken Williams?
10    A.   Ken Williams came at 103rd after Sylvia
11 left.
12    Q.   Had Sylvia been your only manager at the
13 Dolton location?
14    A.   Until now.
15    Q.   And who is the general manager?
16    A.   Stacey.
17    Q.   That's Stacey Belton?
18    A.   Yes.
19    Q.   Do you know why Sylvia Anderson left?
20    A.   I heard a lot of things. So I don't
21 want to say. I heard a lot of things.
22    Q.   Do you personally have first-hand
23 knowledge of why Sylvia Anderson left?
24    A.   No, no.

Page 38

1    Q.   Since Sylvia Anderson left and Stacey
2 Belton has taken over, do you believe that White
3 Castle has acted unlawfully towards you?
4    MR. IRELAND: Form. Asked and answered.
5 BY MR. CULBERG:
6    Q.   You can answer.
7    A.   Well, I believe Stacey, because she told
8 me White Castle don't pay overtime.
9    Q.   Stacey told you that White Castle --
10    A.   Stacey told me that White Castle don't
11 pay overtime. That's one of the things that she
12 came in the door telling us.
13    Q.   Do you believe that you have been
14 entitled to overtime since Stacey Belton took over?
15    A.   Yes.
16    Q.   And you have not received it?
17    A.   None of it.
18    Q.   Did you receive any training when you
19 came to the Dolton location?
20    MR. IRELAND: Form.
21 BY THE WITNESS:
22    A.   Training to be an assistant? I trained
23 myself, but -- yes, I trained myself. I learned
24 from looking at people.

Page 39

1 BY MR. CULBERG:
2    Q.   Did you receive any formal training?
3    MR. IRELAND: Form.
4 BY THE WITNESS:
5    A.   I was supposed to. I don't know what
6 happened, because there were three -- basically it
7 was two of us that came over there together, and I
8 felt one of -- the girl was getting trained more
9 than me.
10 BY MR. CULBERG:
11    Q.   Did you receive any formal training?
12    MR. IRELAND: Form.
13 BY THE WITNESS:
14    A.   No. Just went by looking at what they
15 was doing and just did it.
16 BY MR. CULBERG:
17    Q.   Do you know if White Castle has any
18 formal policies about working off of the clock?
19    MR. IRELAND: Form.
20 BY THE WITNESS:
21    A.   I know that you're not supposed --
22 well, they got a big thing, a big blue block up
23 saying that you're not supposed to work past your
24 scheduled time and stuff like that. That's about

Page 40

1 it.
2    (WHEREUPON, a certain document was
3    marked Roberts Deposition Exhibit
4    No. 4, for identification, as of
5    12-16-13.)
6 BY MR. CULBERG:
7    Q.   You have been handed what has been
8 marked as Exhibit 4. You can take your time to
9 look through that document and let me know when you
10 are done.
11    MR. IRELAND: Counsel, it's 43 pages long. Is
12 there anything in particular that you want her to
13 review, or do you want her to read the entire
14 thing?
15    MR. CULBERG: She doesn't need to read the
16 entire thing.
17 BY MR. CULBERG:
18    Q.   Do you recognize this document,
19 Ms. Roberts?
20    A.   Yes. It's a Team Member Handbook.
21    Q.   That's the 2006 Team Member Handbook?
22    A.   I don't know what year it is. I just
23 know it's the Team Member Handbook.
24    MR. IRELAND: Counsel, did you say 2016?



Page 41

1      MR. CULBERG:  2006.
2      MR. IRELAND:  I am sorry.  I misheard.  Are we
3   done with 4?
4      MR. CULBERG:  We will refer back to 4.
5          (WHEREUPON, a certain document was
6          marked Roberts Deposition Exhibit
7          No. 5, for identification, as of
8          12-16-13.)
9   BY MR. CULBERG:
10     Q.  I have now handed you what has been
11  marked as Exhibit 5.  Do you recognize this
12  document?
13     A.  Yes.
14     Q.  What is that?
15     A.  It's the back of the paper that you're
16  supposed to sign about you read everything that's
17  in the book.
18     Q.  And is that, in fact, your signature?
19     A.  Yes.  That's my signature.
20     Q.  Okay.  I will refer your attention to
21  Page 4 of the handbook, which was marked as Exhibit
22  4.  On the bullet point which is the second from
23  the bottom it says, "It is strictly forbidden for
24  any hourly team member to work off the clock.  All

Page 42

1   hourly team members must be clocked in when
2   performing any work duties."
3          Did I read that correctly?
4      A.  Yes.
5      Q.  Did you understand that to be the policy
6   of White Castle?
7      MR. IRELAND:  Form.
8   BY THE WITNESS:
9      A.  It's supposed to be the policy of White
10  Castle.
11  BY MR. CULBERG:
12     Q.  You understand right now that that is
13  the policy of White Castle?
14     A.  Yes.
15     MR. IRELAND:  Form.  Asked and answered,
16  counsel.  She answered the question.
17  BY MR. CULBERG:
18     Q.  I turn your attention now to Page 6.
19  I'm on the third bullet point now, and I will read
20  it, and you can tell me if I read it correctly.
21         "We have an open door policy.  Please be
22  sure to take advantage of it.  If you are having
23  difficulty in any area, talk to your general
24  manager or another member of management as soon as

Page 43

1   possible.  If you feel uncomfortable speaking to
2   someone in your region, please call the team member
3   hotline at 1-800-843-2728."
4          Did I read that correctly?
5      A.  Yes.
6      Q.  Do you understand that to be the policy
7   of White Castle?
8      MR. IRELAND:  Form.
9   BY THE WITNESS:
10     A.  Yes.  I understand it to be the policy
11  of White Castle, but we had this other manager who
12  called the 1-800 hotline, and he had repercussions
13  taken against him for doing that.
14  BY MR. CULBERG:
15     Q.  Who was that?
16     A.  His name was Kenneth, and I don't
17  remember his last name, but he was a manager before
18  I got there, and he had called the 1-800 number on
19  Sylvia, and ever since then, they were trying to
20  get anything to get him out of the building with.
21     Q.  You said there were repercussions
22  against him?
23     A.  Yes.
24     Q.  What happened to him?

Page 44

1      A.  Like anything he did they wrote him up
2   for.  They just was picking on him.  They wouldn't
3   give him days that he was requesting off.  They was
4   just messing with him.  So from that day forward,
5   all of us already knew if you call the 1-800
6   hotline, there's going to be repercussions
7   afterwards.
8      Q.  Did you personally see people, I think
9   you said, messing with Kenneth?
10     A.  I mean, I can only imagine that they was
11  messing with him, because when they was doing stuff
12  -- the stuff that they used to do to Jimmy.  So I
13  already knew what they was doing to Kenneth.
14     Q.  Sorry.  To Jimmy?
15     A.  Yeah.  Right.
16     Q.  Who is Jimmy?
17     A.  Jimmy Jenkins is the other manager that
18  they --
19     Q.  Jimmy Jenkins.  Okay.
20     A.  They that didn't like stuff that he was
21  doing, and they always just talk about him.  They
22  just used to do a whole bunch of stuff.  They're
23  trying to make him do the most work.  I was just
24  trying to stay in my zone so I won't have to



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                   45–48

Page 45

1   receive anything.
2       Q.   So it's your testimony that you have
3   never called the team member hotline?
4       A.   Never.
5            (WHEREUPON, a certain document was
6            marked Roberts Deposition Exhibit
7            No. 6, for identification, as of
8            12-16-13.)
9   BY MR. CULBERG:
10      Q.   You have just been handed what has been
11  marked as Exhibit 6, but before we look at that, I
12  would actually like to refer back to Exhibit 4 one
13  more time.
14      A.   Uh-huh.
15      Q.   And I will direct your attention to Page
16  14 of that, and there is a subheading titled,
17  "Reporting of Violations of Business Ethics,
18  Conduct and The Law."  You can take your time to
19  read that section.
20           Is it your understanding that you have
21  an obligation to report situations that you believe
22  are illegal?
23      MR. IRELAND:  Form.
24

Page 46

1   BY THE WITNESS:
2       A.   Well, I never really read this page
3   right here.  So I just really just glanced through
4   it and just signed it.  So I never really read this
5   page.  I never read this page to be exact.
6   BY MR. CULBERG:
7       Q.   Have you read the page now?
8       A.   Yes.
9       Q.   Is it now your understanding --
10      A.   Yes.
11      Q.   Just to make sure that we are clear, is
12  it now your understanding that you have an
13  obligation to report behavior which you believe is
14  illegal?
15      MR. IRELAND:  Form.
16  BY THE WITNESS:
17      A.   Yes.
18  BY MR. CULBERG:
19      Q.   Okay.  We can put that away for now.
20           Now, directing your attention to what
21  has been marked as Exhibit 6, do you recognize this
22  document?
23
24

Page 47

1       A.   It's another Team Member Handbook.
2            (WHEREUPON, a certain document was
3            marked Roberts Deposition Exhibit
4            No. 7, for identification, as of
5            12-16-13.)
6   BY MR. CULBERG:
7       Q.   You have been handed what has been
8   marked as Exhibit 7.  Do you recognize that
9   document?
10      A.   Yeah.  It has my name on it.
11      Q.   This is a Team Member Receipt of White
12  Castle Restaurant Handbook dated May 28, 2011?
13      A.   Yes.
14      Q.   And that's your name?
15      A.   Yes.
16      Q.   Do you remember filling this form out?
17      MR. IRELAND:  Form.
18  BY THE WITNESS:
19      A.   Yeah.  My fingerprint and handprint are
20  on it.
21  BY MR. CULBERG:
22      Q.   Okay.  I will direct your attention to
23  Page 15 of this Handbook which has been marked as
24  Exhibit 6.  Under the heading of "Reporting of

Page 48

1   Violations of Business Ethics, Conduct and the
2   Law," can you take your time to read that section?
3       MR. IRELAND:  I am sorry, counsel, where are
4   we?
5   BY THE WITNESS:
6       A.   Do you want me to read it out loud?
7   BY MR. CULBERG:
8       Q.   You can just read it to yourself.
9       MR. CULBERG:  We are on Page 15, John,
10  Reporting of Violations.
11      MR. IRELAND:  Okay.
12  BY THE WITNESS:
13      A.   I read it.
14  BY MR. CULBERG:
15      Q.   Is it your understanding based on that
16  that it's your obligation to report behavior that
17  you believe violates the law?
18      MR. IRELAND:  Form.
19  BY THE WITNESS:
20      A.   Yes, I'm supposed to report it, but I
21  didn't know to whom that I am supposed to report it
22  to, because the people that I'm reporting it to are
23  the people that's doing it to me.  So --
24  BY MR. CULBERG:

CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                49–52

Page 49

1     Q.   I will turn your attention to Page 28 of
2   the Handbook that has been marked as Exhibit 6.
3     A.   You said 28?
4     Q.   28, yeah.  And do you see on top where
5   it says, "Hours Worked Guideline"?
6     A.   Uh-huh.
7     Q.   Can you take your time to read that
8   section, please?
9     A.   Uh-huh.
10    Q.   Are you done?
11    A.   Yes.
12    Q.   Based on this policy, is it your
13  understanding that White Castle prohibits employees
14  from working off of the clock?
15    MR. IRELAND:  Form.
16  BY THE WITNESS:
17    A.   Yeah, that's my understanding, but I had
18  to do what I had to do.
19  BY MR. CULBERG:
20    Q.   Do you understand from this policy that
21  any person who forces employees to work off of the
22  clock is subject to disciplinary action?
23    MR. IRELAND:  Form.
24

Page 50

1   BY THE WITNESS:
2     A.   Supposedly.
3   BY MR. CULBERG:
4     Q.   Turn your attention to Page 63, please,
5   and I think that I'm one, two, three, four, five
6   bullets down.  It says, "It is strictly forbidden
7   for any hourly team member to work off of the
8   clock.  All hourly team members must be clocked in
9   when performing any work duties."
10        Did I read that correctly?
11    A.   Yes.
12    Q.   On the very next page, Page 64, on the
13  bottom bullet of the page it says, "We have an open
14  door policy.  Please be sure to take advantage of
15  it.  If you are having difficulty in any area, talk
16  to your general manager or another member of
17  management as soon as possible.  If you feel
18  uncomfortable speaking to someone in your region,
19  please call the team member hotline at 800-843-2728
20  or team member services at 866-272-8372."
21        Did I read that correctly?
22    A.   Yes.
23    Q.   Have you ever called either of those
24  numbers?

Page 51

1     MR. IRELAND:  Asked and answered.
2   BY MR. CULBERG:
3     Q.   You can answer.
4     A.   Like I said before, the reason why I
5   didn't call is because of the guy who -- the
6   manager before, and he got in hot water after.  So
7   that's why the team member hotline was a no for me.
8         (WHEREUPON, a certain document was
9         marked Roberts Deposition Exhibit
10        No. 8, for identification, as of
11        12-16-13.)
12  BY MR. CULBERG:
13    Q.   Ms. Roberts, you have been handed what
14  has been marked as Exhibit 8.  Do you recognize
15  this document?
16    A.   Yes.
17    Q.   What is it?
18    A.   Labor Laws and Guidelines.
19    Q.   Down at the bottom of that page is that
20  your signature?
21    A.   Yes.
22    Q.   It looks like it's dated August 6, 2012?
23    A.   Yes.
24    Q.   Did you read this document before you

Page 52

1   signed it?
2     A.   Yes.
3     Q.   And correct me if I'm wrong, but this
4   document restates White Castle's prohibition of
5   off-of-the-clock work?
6     MR. IRELAND:  Form.
7   BY THE WITNESS:
8     A.   Yes, they also say that we're supposed
9   to get paid breaks and stuff like that, but --
10  we're supposed to get 15 minutes between -- if
11  we're working on a paid break, we don't get that
12  either.
13  BY MR. CULBERG:
14    Q.   Besides the document that we have just
15  gone over, were White Castle's policies on
16  off-the-clock work communicated to you in any other
17  way?
18    MR. IRELAND:  Form.
19  BY THE WITNESS:
20    A.   No.  As a matter of fact, when I used to
21  tell like if I'm doing my inventory while I'm on my
22  break, I tell them I'm doing my inventory while I'm
23  on my break, she's like, "Don't tell me."  That's
24  the only thing that she would say is just don't



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013

53–56

Page 53

1 tell her.
2 BY MR. CULBERG:
3    Q.   Don't tell her about what?
4    A.   That I'm doing my inventory on my break
5 off of the clock.  It's not like she said, stop,
6 don't do it.  She says just don't tell me about it.
7    Q.   If your time entries do not reflect your
8 true hours worked, was there a process for you to
9 correct them?
10    MR. IRELAND:  Form.
11 BY THE WITNESS:
12    A.   Can you rephrase it a little bit better?
13 BY MR. CULBERG:
14    Q.   Sure.  If your time entries didn't
15 reflect the actual number of hours that you worked,
16 is there a way for you to correct that record?
17    A.   Let's say, for instance, like you forgot
18 to clock in before you came in, you can fix -- the
19 manager is supposed to fix the time back to what
20 time that you're supposed to clock in from.
21    MR. IRELAND:  Can we take a break?
22    MR. CULBERG:  Sure.
23    MR. IRELAND:  Thanks.
24       (WHEREUPON, a recess was had.)

Page 54

1 BY MR. CULBERG:
2    Q.   As an assistant general manager now, do
3 you have the ability to correct your own time?
4    MR. IRELAND:  Form.
5 BY THE WITNESS:
6    A.   Yes.
7 BY MR. CULBERG:
8    Q.   What's the process for doing that?
9    A.   All you have got to do is go on the
10 computer and go to Daily Time Adjustments, and do
11 it like that.
12    Q.   So on the computer there is a program
13 called Daily Time Adjustments?
14    A.   Uh-huh.
15    Q.   And when you go into that program, what
16 do you have to do?
17    A.   You have to hit the person's name who
18 you are going to adjust the time for, and then
19 highlight their name and their time that you're
20 trying to fix, and then just fix it.
21    Q.   And you have the ability to do that even
22 for your own time?
23    A.   Uh-huh.
24    Q.   Have you ever corrected your own time?

Page 55

1    A.   No.  I would never been getting wrote up
2 for being late.
3    Q.   But, for example, if you believe that
4 you worked off of the clock, would you have the
5 ability to go in and change your time to the actual
6 number of hours worked?
7    A.   Uh-huh.  Yes.
8    MR. IRELAND:  Form.
9 BY MR. CULBERG:
10    Q.   Have you ever done that?
11    A.   No.
12    Q.   Why not?
13    A.   Because then I would have to explain why
14 I did that.  So I just didn't want nobody thinking
15 anything funny.  I just never did.
16    Q.   So there have been times when your time
17 has been inaccurate and you have left it?
18    A.   Uh-huh.
19    MR. IRELAND:  Form.
20 BY MR. CULBERG:
21    Q.   How many times has that happened?
22    MR. IRELAND:  Form.
23 BY THE WITNESS:
24    A.   Are you saying how my time has been

Page 56

1 inaccurate?  Like this only happened lately,
2 because now we can't fix our time.  They have it to
3 where now the assistants and GM.  So now we can't
4 fix it.  That's the only time it has been messed
5 like it is now without it being adjusted, but when
6 I was the assistant, I always clocked in and
7 clocked out on time.  Like when I got there, I
8 clocked in.  When I left, I clocked out.
9 BY MR. CULBERG:
10    Q.   And it's only been recently that it's
11 changed where you cannot edit your own time?
12    A.   Right.  They don't want anybody editing
13 their own time now.  They just had a meeting with
14 the managers like two Sundays ago.
15    Q.   So as of two Sundays ago, you can no
16 longer edit your own time?
17    A.   Yes.
18    Q.   And I thought I heard you say, but
19 correct me if I'm wrong, that before two Sundays
20 ago when you did have the ability to edit your own
21 time, it was always accurate?
22    MR. IRELAND:  Mischaracterizes the prior
23 testimony.
24



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                   57—60

Page 57

1  BY THE WITNESS:
2      A.   What I'm saying is like when I leave,
3  like when my clock out slip -- you can get a clock
4  out slip every week, and it tells you at the bottom
5  of it how many hours that you got.
6  BY MR. CULBERG:
7      Q.   Okay.
8      A.   So when I leave there, and it tells me
9  that I got 40 hours, then when I got my check stub,
10  it's telling me I got 39 point something, that's
11  letting me know right there that somebody didn't
12  change my time.
13      So that's how we know somebody changed
14  our time, because at the end of the week you get a
15  clock out slip that tells you how many hours that
16  you have for the whole week on that.  So at the end
17  somebody had got to change it to make it back to
18  39.
19      Q.   So your time would be accurate when you
20  entered it?
21      A.   When I leave there, my time would be
22  accurate -- once I leave there and clock out, my
23  time would say 40 hours, and then it would have my
24  overtime time over here.  When I get my check stub

Page 58

1  for that week, it don't have 40 hours on there.
2      Q.   Did you have the ability to change other
3  employees' time entries as well as your own?
4      A.   When I was the assistant.
5      Q.   When did you stop becoming -- when did
6  you -- strike that.
7      You were hired in Dolton as an assistant
8  general manager?
9      A.   Yes.
10      Q.   For how long did you remain an assistant
11  general manager?
12      A.   All of the way up to this year in June.
13      Q.   June 2013?
14      A.   Uh-huh.
15      Q.   And then were you demoted?
16      A.   Yeah.
17      Q.   Why?
18      A.   Well, they said that they was -- they
19  demoted -- it was like 80 or 70 of us they demoted.
20  They only had enough room for 15 or 19 people.
21      Q.   Was it your understanding that you had
22  done something wrong?
23      A.   No.  We all went out for interviews, and
24  they picked the ones that they felt were best,

Page 59

1  which turned around to be a smack in their face,
2  because now all of them is quitting in the move.
3  So --
4      Q.   Since June 20, 2013, you have been a
5  crew manager?
6      A.   Uh-huh.  Yes.
7      Q.   Did you ever -- when you were an
8  assistant general manager, did you ever manually
9  change other employees' time entries?
10      A.   Yes, because we was told that we are not
11  supposed to let nobody enter overtime.  So any time
12  that we see a person enter overtime, we was told to
13  change her time.
14      Q.   So any time that you saw an employee had
15  worked over 40 hours a week --
16      A.   We was told to change their time.  We
17  were not supposed to give out overtime.
18      Q.   And you would, in fact, change that
19  time?
20      A.   Yes.
21      Q.   Just so that I can understand, can you
22  try to give me an example of when that happened?
23      A.   Well, when Stacey -- I used to do it
24  when Sylvia was there.  I used to definitely change

Page 60

1  people's time when Sylvia was there because she
2  told us to, and I would tell the person like I
3  don't want to change your time, but -- I tell them,
4  like, you know, that you're reaching overtime.  You
5  know, Sylvia is going to want to change your time.
6  They was like, "I don't care.  You can do it.  I
7  don't care," and all this and that.
8      They used to tell me that they don't
9  care about me changing their time, but I would let
10  them know that I have to change their time, the
11  overtime.  I let them know.
12      When it was Stacey, I didn't change
13  nobody's time with her.  I told them that I wasn't
14  doing it with nobody's time, but I told them that
15  they had to change their own time with her.
16      Q.   About how many times did you change an
17  employee's time so that they would not receive
18  overtime?
19      A.   With Sylvia I only did it like about
20  three times.
21      Q.   I will just ask you not to interrupt.  I
22  know you're not trying to be rude.  It's just so
23  that she can get it down.
24      The question was:  About how many times



CANDICE RENEE ROBERTS                                                December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                          61–64

Page 61

1 did you change an employee's time so they would not
2 receive overtime?
3      A.   Three times with Sylvia.
4      Q.   Three times.  Who told you to do that?
5      A.   Sylvia.  She said that we don't pay
6 overtime.  We don't give out overtime, and I
7 thought that I was helping our store out by not
8 being on the list for giving out overtime, because
9 that's what Sylvia was so worried about us being on
10 the list for giving overtime.
11      Q.   When did she tell you that?
12      A.   She always told us that.  Always don't
13 get us on the list.  Don't get us on the list.  She
14 don't like being on no list.  No list for overtime,
15 no list for missing papers.  No lists.
16      Q.   And by "lists" she meant --
17      A.   They send out an e-mail with a list of
18 Castles on it saying who got overtime, and who did
19 this and who did that.  So she don't want to be on
20 none of the lists.  So she said make sure that
21 nobody get no overtime.
22      Q.   But you knew that she was wrong?
23      A.   I knew that she was, but --
24      MR. IRELAND:  Form.

Page 62

1 BY THE WITNESS:
2      A.   -- I had to keep my job.  I didn't want
3 to -- because Sylvia had clout.  Like she -- the
4 man who was over White Castles in Chicago was like
5 her son's Godfather.  So ain't nobody trying to go
6 up against her.
7 BY MR. CULBERG:
8      Q.   You knew what she was asking you to do
9 was against White Castle policy?
10      MR. IRELAND:  Form.
11 BY THE WITNESS:
12      A.   I said it.  I said this is illegal, and
13 you're not supposed to be doing it, but I'm only a
14 small person in a big thing.  I can only do what
15 they tell me to do for me to keep my job.
16      MR. CULBERG:  Can you read that answer back?
17           (WHEREUPON, the record was read
18            as requested.)
19 BY MR. CULBERG:
20      Q.   Who did you say that to?
21      A.   I told that to Sylvia.  I told that to
22 all of the team members when they was doing it --
23 like when they was complaining about.  I said that
24 I never seen nothing like this before before I

Page 63

1 started working here.  I ain't never seen nothing
2 like this before.
3      Q.   Did you tell that to anyone besides
4 Sylvia Anderson and the team members?
5      MR. IRELAND:  Asked and answered.
6 BY MR. CULBERG:
7      Q.   You can answer.
8      A.   Well, I used to tell this to a GM named
9 Richard.  I used to tell him about the overtime
10 being took.
11      Q.   Who is that?
12      A.   Richard Elie.  I told him.
13      Q.   When you told him, what was his
14 position?
15      A.   He said that she ain't supposed to be
16 doing that, but ain't nobody never go and tell the
17 big people that this is what Sylvia is doing.
18           I mean, everybody knew it.  We
19 complained to different managers, different
20 supervisors.  Everybody knew it, and like they
21 never want to go say anything.
22      Q.   And I just want to make sure that we
23 make a record of everyone who you complained to.
24           So you said you complained to someone

Page 64

1 named Richard Elie?
2      A.   Yes, I told him about how they steel
3 overtime.
4      Q.   When you complained to him, what was his
5 job?
6      A.   What was his job?  He was a GM.
7      Q.   Of?
8      A.   He just became a GM, Council 63, I
9 believe.
10      Q.   Of another store?
11      A.   Yeah.
12      Q.   Right.
13      A.   Because he used to work there at our
14 store with us.
15      Q.   So you complained to Sylvia Anderson
16 herself, you complained to Richard Elie and you
17 complained to --
18      A.   I definitely just complained to Stacey
19 which when I told her that I was getting me a
20 lawyer for the overtime.
21      Q.   That's Stacey Belton?
22      A.   Yeah.
23      Q.   When did you complain to Stacey?
24      A.   And that -- I did that back in I'd say



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                  65—68

Page 65

1  July.
2      Q.   Okay.
3      A.   And also I told her just recently in
4  September.
5      Q.   Besides Sylvia, Richard and Stacey and
6  the team members, was there anyone else that you
7  complained to?
8      A.   No.
9      Q.   You said that it was on three occasions
10 that you edited a team member's hours so that they
11 would go from making overtime to not making
12 overtime; is that correct?
13     A.   Uh-huh.  Yes.
14     Q.   Do you remember when those occasions
15 were?
16     A.   No.  I don't remember.
17     Q.   But you're sure that there were three?
18     A.   Uh-huh.  Because I edited my time
19 before, too.  So I am one of those three people
20 that I did.
21     Q.   So you edited your own time?
22     A.   Uh-huh.
23     Q.   And you edited the time of two other
24 people besides yourself?

Page 66

1      A.   Yeah.
2      Q.   Did you edit your own time on only one
3  occasion?
4      A.   No, just that time to take me out of
5  overtime.
6      Q.   One time?
7      A.   Uh-huh.
8      Q.   Do you remember when that was?
9      A.   I don't recall, because I knew it was
10 back when Sylvia was here.  So I don't recall
11 exactly when it was.
12     Q.   Do you remember what year that it was?
13     A.   2012 definitely.
14     Q.   2012?
15     A.   Yeah.
16     Q.   Just so that we can try to figure it
17 out, do you remember the month or the season, or
18 how close can we get?
19     A.   I don't -- I don't remember the month or
20 the season.  I really don't recall it, but I know
21 that I did it.
22     Q.   Okay.  Do you remember about how many
23 hours that you took off of your own time?
24     A.   Well, we don't get that much in

Page 67

1  overtime.  It would be like .175, or something like
2  that.  We don't be like drastic, like four or five
3  hours.  No.  It would be like .75, and we would
4  just take that to make it to like -- I do it to get
5  in 40.  I get in 40, but somebody -- if somebody
6  else, they do it to 39.99 or 39.98.
7      Q.   And I understand that you're estimating
8  here, but do you think it's fair to say that the
9  amount of hours that you actually worked was
10 between 40 and 41 hours?
11     A.   Right.
12     Q.   Less than one hour?
13     A.   Yes.
14     Q.   You also said that you edited the time
15 of two other team members?
16     A.   Uh-huh.  Yes.
17     Q.   Do you remember who they were?
18     A.   I edited Loreisa Harper's time before.
19     Q.   How many times did you edit her time?
20     A.   Once.  And Ms. Kattie Loveberry.
21     Q.   Kattie Loveberry?
22     A.   Yes.
23     Q.   How many times did you edit Kattie's
24 time?

Page 68

1      A.   Once.
2      Q.   Did Sylvia Anderson tell you go edit
3  Loreisa Harper's time?
4      A.   No.  She just said -- she was just
5  persistent to make sure nobody get overtime.  You
6  all better make sure that you all don't pay
7  overtime.  That's all that she said, you better
8  make sure that you don't pay people overtime.  Make
9  sure that you don't pay out overtime.
10     Q.   After you edited Loreisa Harper's time,
11 did you tell Sylvia Anderson?
12     A.   Yeah.  She knew.
13     Q.   Did you tell her?
14     A.   When Sylvia -- when Sylvia said that we
15 just like add up everybody's hours, and that's how
16 we can tell whose going to be in overtime, but she
17 knew all of the people that was in overtime.
18     Q.   Did she specifically tell you to edit
19 Kattie Loveberry's time?
20     A.   Kattie Loveberry told me specifically to
21 edit her own time.
22     Q.   Kattie Loveberry came to you --
23     A.   Yeah.  She told me that she was leaving,
24 and I said that, "You know that you're in



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                   69–72

Page 69

1    overtime." She said, "Girl, you can just change
2    that. You know how we do it," and that's what she
3    said.
4        Q.   Kattie Loveberry was a team member at
5    that time?
6        A.   No. She was an assistant with me. Me
7    and her both were assistants.
8        Q.   You were both assistant general
9    managers?
10       A.   Uh-huh.
11       Q.   Was Loreisa Harper a team member?
12       A.   She was a crew manager.
13       Q.   Did she know that you had edited her
14   time?
15       A.   Yeah. I told her, and she told me that
16   I could, because I was going to let her get the
17   overtime, but she didn't want to get in trouble by
18   Sylvia.
19       Q.   About how much time did you shave off of
20   Kattie Loveberry's time?
21       A.   It had to be the point, because, like I
22   said, there was never no hours or two over. So it
23   had to be some point something, like .5 or .10. It
24   was never no -- it was like no hours. I never took

Page 70

1    no hours away from them.
2        Q.   So less than an hour?
3        A.   Right.
4        Q.   The same for Loreisa Harper?
5        A.   Yes.
6        Q.   You believe that you shaved less than an
7    hour off of her time?
8        A.   Right.
9        Q.   Other than the one occasion when you
10   took hours off of your own time, are you aware of
11   anyone else editing your time?
12       A.   Well, just recently somebody edited my
13   time in September, because I took a picture of it
14   on the phone, because I had came to the assistant
15   Jennifer, and told her that Stacey be taking
16   people's time away for the overtime, and Jennifer
17   said, you know, "White Castle do pay overtime."
18       I'm like, "Well, that's not what Stacey
19   said," because I was wondering why she can pay
20   somebody else overtime. I'm like, "How are you
21   going to give them overtime, and Stacey told me
22   that White Castle don't pay overtime?"
23       She's like, "I never heard of that, but
24   White Castle do pay overtime." So when I seen her

Page 71

1    do that, I started taking pictures of my overtime,
2    and seeing the next time that they take it from me,
3    and that's why -- so I took a picture of it, and
4    then they took it.
5        Q.   This was in September?
6        A.   Yes.
7        Q.   So there is this incident in September?
8        A.   Uh-huh.
9        Q.   And how much overtime do you believe
10   that you were entitled to?
11       A.   It was 40.75.
12       Q.   So 45 minutes?
13       A.   Yes. 75, or whatever that is.
14       Q.   So three-fourths of an hour?
15       A.   Uh-huh.
16       Q.   Okay. There was that incident. There
17   was the time in 2012 when you edited your own time?
18       A.   Uh-huh.
19       Q.   Are you aware of any other times when
20   your time was edited?
21       MR. IRELAND: Form.
22   BY THE WITNESS:
23       A.   Back in -- I got like -- I had like
24   different -- like back in January it was edited,

Page 72

1    because I was supposed to have -- like when Stacey
2    first got there, there was a lot of overtime.
3    There was a lot of overtime going on, because she
4    didn't know how to do the scheduling. She had
5    everything overlapping. So when she first got
6    there, she was shaving a lot of overtime off.
7    BY MR. CULBERG:
8        Q.   So the time that you edited your own
9    time was the incident in September 2012?
10       A.   No. The September thing just happened.
11       Q.   Right. And the time back in January?
12       A.   Right.
13       Q.   You said your time was edited?
14       A.   Right.
15       Q.   Besides those three occasions, are there
16   any other incidents that you are aware of?
17       A.   No.
18       MR. IRELAND: Form.
19   BY MR. CULBERG:
20       Q.   And the incident in January, was that
21   also less than an hour of time that way taken away
22   from you?
23       A.   Uh-huh. Yes.
24       Q.   So altogether here, and correct me if



CANDICE RENEE ROBERTS
December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE
73–76

Page 73

1  I'm wrong, we're talking about less than three
2  hours of overtime that you believe that you're
3  entitled to?
4      MR. IRELAND:  Form.
5  BY THE WITNESS:
6      A.   I mean, but -- I guess that depends on
7  how many times that they took it.  I have all of my
8  check stubs.  I can go back and show how they
9  shaved off my hours, but I can't recall every time
10 that they did it, but I know that she did it a lot
11 of times.  Stacey I definitely know it.
12 BY MR. CULBERG:
13     Q.   Sitting here today, aside from those
14 three incidents, are there any other incidents
15 where you can say that you're sure the time was
16 shaved off?
17     MR. IRELAND:  Form.  Mischaracterizes prior
18 testimony.
19 BY THE WITNESS:
20     A.   I know it was January.  I want to say in
21 the summertime, during the summertime, too, because
22 that's when it was real busy, and I definitely want
23 to say during the summertime, too, because I know
24 for sure that we had overtime in the summertime.

Page 74

1  But I can't say -- recall like at this moment what
2  days really it was, but it was more than three
3  times, though.
4  BY MR. CULBERG:
5      Q.   When you were an assistant general
6  manager at the Dolton location, did you ever work
7  off of the clock?
8      A.   To do inventory sometimes.
9      Q.   And to be clear, do you know what I mean
10 when I say "work off of the clock"?
11     A.   Right.  The only time that I worked off
12 of the clock is when I'm supposed to be on break.
13 I clock out for a break, and I do the inventory to
14 catch up.
15     Q.   So you would do the inventory while you
16 were supposed to be on break?
17     A.   Right.
18     Q.   Were there any other times that you
19 worked off of the clock?
20     A.   For the inventory and with inspection
21 times, that's about it.  And recently Stacey had a
22 meeting with me off of the clock, and I didn't too
23 really appreciate that.
24     Q.   Okay.  And, again, this is just your

Page 75

1  chance to tell me everything that you think White
2  Castle did wrong.  So I just need you to really
3  think about everything that you're alleging against
4  them.  So --
5      MR. IRELAND:  Form.
6  BY MR. CULBERG:
7      Q.   You were doing inventory while you were
8  supposed to be on break?
9      A.   Uh-huh.
10     Q.   During inspection times you believe that
11 you were working off of the clock?
12     A.   Uh-huh.
13     Q.   And you had one meeting with Stacey
14 Belton?
15     A.   Off of the clock.
16     MR. IRELAND:  Form.
17 BY MR. CULBERG:
18     Q.   Anything else?
19     A.   That's it.
20     Q.   Tell me about doing inventory while you
21 were supposed to be on break?
22     A.   Well, we was busy.  It was the
23 summertime, and we're usually real busy.  So I was
24 just trying to hurry up and get it done.  I was

Page 76

1  just trying to get it done before I left for the
2  day.
3      So I took it upon myself to do it off of
4  the clock, and then they said -- she's like, "What
5  are you doing?"  I said, "Inventory," and they
6  said, "Well, don't tell me that."
7      Q.   And by "she" you mean Sylvia Anderson?
8      A.   Yes.
9      Q.   Did this ever happen with Stacey Belton?
10     A.   With Stacey I don't do inventory,
11 because it's her and her assistant, and I being
12 alone I never do inventory.
13     Q.   How many times a week did you do
14 inventory?
15     A.   With Sylvia I used to do inventory every
16 day, because I used to be the morning shift person.
17     Q.   Would you do inventory everyday while
18 you were on your break?
19     A.   No.  Not all of the time.  Just
20 sometimes like when it's real busy and hectic that
21 you can't get all of your work done, that's the
22 only time that I did it on my break.  Other times
23 it be like mellow, and I can get it done.
24     Q.   And I know that we are just estimating



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                    77—80

Page 77
1  here. About how many times a month do you think
2  that you did inventory while on your break?
3      A.   About once or twice.
4      Q.   Once or twice a month. Again, and I
5  know that we are estimating, about how long would
6  it take you to do inventory?
7      A.   Well, it would take my about 15 minutes.
8  I counted up -- the only thing that I really did
9  was just counted while I was on break, and then as
10  soon as I clocked in, I went on the floor to put it
11  in, because I can't be on the floor putting it in,
12  because then she would have got in trouble, because
13  White Castle would have seen me on the clock on the
14  cameras.
15      Q.   Correct me if I'm wrong. I think you
16  said earlier that you took it upon yourself to do
17  the inventory?
18      MR. IRELAND: Form.
19  BY THE WITNESS:
20      A.   I did it, and she asked me what I was
21  doing and I told her that I was doing inventory,
22  and she said, "Don't tell me."
23  BY MR. CULBERG:
24      Q.   Did that happen every time that you were

Page 78
1  doing inventory?
2      A.   No.
3      Q.   Were there ever times when you did
4  inventory during your break when Sylvia Anderson
5  did know that you were doing it?
6      A.   Yeah.
7      Q.   Out of all of the times that you were
8  doing inventory while on your break, did Sylvia --
9      A.   I didn't do it that many times, because
10  I am usually great at getting the inventory done.
11  It was like once or twice. It wasn't like an every
12  month thing that I do inventory on the break, you
13  know. It was not like --
14      Q.   It was not an every month thing?
15      A.   No. It was not like an every month
16  thing. It was just like once or twice, and that
17  was so busy, but it wasn't no every month thing
18  that I did.
19      Q.   So that's once or twice ever that this
20  happened?
21      A.   Right.
22      Q.   Okay. So we are just talking about 30
23  minutes of inventory you did while on your break
24  ever?

Page 79
1      A.   Right. Right.
2      Q.   Okay. You also said, I think, that you
3  performed off the clock work during inspection
4  times. I don't know what inspection times means.
5      A.   Inspection is when White Castle come and
6  they check the whole Castle to see if it's clean.
7  We have to clean the whole Castle up, baseboards,
8  walls, table legs. Just basically cleaning the
9  Castle.
10      Q.   And "the Castle" is what you guys call
11  the stores?
12      A.   Uh-huh.
13      Q.   All right. When did inspections take
14  place during the day?
15      A.   What do you mean?
16      Q.   Morning? Night?
17      A.   It depends on which time they want to
18  come. They never came at night, though, but they
19  come in the morning or the evening time.
20      Q.   Was it while the store was open?
21      A.   Yes. The store is always open.
22      Q.   Okay. It's 24 hours?
23      A.   Yes.
24      Q.   People need their sliders.

Page 80
1          Whose responsibility was it -- strike
2  that.
3          I guess I still don't understand. Would
4  people come in from the outside to do inspections?
5      A.   No. It's your district supervisor. She
6  comes in. Her and the GM walks around with their
7  little note pads and stuff, and they mark off
8  what's clean, tally up some numbers. If you make
9  the numbers, you pass. If you don't, you fail.
10      Q.   And what was your job in relation to
11  this inspection?
12      A.   I had the dining room, I mean, to clean
13  for the inspection. So the dining room is the most
14  important thing doing. You have to like -- you can
15  clean it like a couple of days before, but it's
16  going to get back dirty.
17      Q.   Sure.
18      A.   So we had to come in like the day before
19  and clean it, especially if they don't put you on
20  the shift to do it, because they don't put people
21  on the shift -- I don't know why they don't put
22  people on the shift to clean for inspection, but
23  they don't.
24      Q.   So I'm just trying to understand. So



CANDICE RENEE ROBERTS                             December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                        81–84

Page 81

1 when you say that you're working off the clock for
2 inspections, you are saying preparing for the
3 inspection?
4     A.   Actually, I thought that I was getting
5 paid for it, because when I came, I clocked in.
6 But the next day when you come in, they didn't
7 change their time to the time where they felt that
8 they needed to pay you for.
9         So actually everybody thought that they
10 were getting paid for the cleaning that they was
11 doing, but they really wasn't; their time was
12 getting changed.  Because if I would have known
13 that I wouldn't have gotten paid, I wouldn't have
14 came in for it.
15     Q.   How often were inspections?
16     A.   We have inspections twice a year.
17     Q.   Twice a year.  And do you believe that
18 you were working off of the clock every time there
19 was an inspection?
20     A.   I was working off of the clock probably
21 once or twice doing the inspection.
22     Q.   Once or twice ever?
23     A.   Uh-huh.
24     Q.   Again, I know that we are estimating,

Page 82

1 but about how long do you think that you worked off
2 of the clock for each inspection?
3     A.   I know the last time that I went in for
4 inspection at 7, and they clocked me in at 10.
5     Q.   So three hours?
6     A.   Uh-huh.
7     Q.   So one or two times we're talking --
8     A.   Right.
9     Q.   -- three or six hours?  Is that fair?
10     A.   Yes.  That's fair.
11     Q.   And recently you said that you had one
12 meeting with Stacey Belton that was off of the
13 clock?
14     A.   Uh-huh.
15     Q.   When was that?
16     A.   This was like -- I'm going to say in
17 September, because she wanted to talk to me about
18 my attendance.
19     Q.   How long was that meeting?
20     A.   Like 20 minutes.  She was just telling
21 me that I got to make sure that I be there on time,
22 and how I was letting my team members come in
23 before me.
24     Q.   Besides the inspection time, besides

Page 83

1 that one meeting with Stacey, and besides the
2 inventory, are there any other times that you
3 believe that you worked off of the clock at
4 White Castle?
5     MR. IRELAND:  Form.
6 BY THE WITNESS:
7     A.   No.
8 BY MR. CULBERG:
9     Q.   Did you ever complain about working off
10 of the clock when you were doing inventory?
11     A.   I really never complained, because I was
12 thinking that I was helping out myself.
13     Q.   Okay.
14     A.   You know, she was just saying it's for
15 the -- I thought that I was helping out by making
16 the company look better by doing stuff like that.
17 That's really what I was thinking.
18     Q.   Did you ever complain about working off
19 of the clock with the inspections?
20     A.   Oh, yeah.  All of us did.
21     Q.   Who did you complain to about that?
22     A.   We complained to Sylvia like why don't
23 we never got paid for it, you know, but everybody
24 complained about that.

Page 84

1     Q.   Okay.  And what would Sylvia Anderson
2 say when you complained?
3     A.   She wouldn't say anything.  She told us
4 we'll get paid, and sometimes Sylvia did used to
5 pay us like the next week.  She did used to pay us
6 like the next week.  Not the week that we did the
7 work, but she would pay us the next week for the
8 work that we did the week before.  That's one thing
9 that I can say that she used to do.
10     Q.   So you said there were one or two times
11 that you had to work off of the clock for
12 inspections?
13     A.   Uh-huh.
14     Q.   Both of those times were you paid the
15 next week?
16     A.   Yeah, because I was close to overtime.
17 So that's why she offered to pay us for the next
18 week.
19     Q.   I see.  Do you believe that you are owed
20 any money right now for the time that you worked
21 off of the clock for the inspections?
22     MR. IRELAND:  Form.
23 BY THE WITNESS:
24     A.   No.  I was really just talking about the



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                  85—88

Page 85

1  overtime.  That's my whole concern.
2  BY MR. CULBERG:
3      Q.   And just to be clear, because I don't
4  want to misstate what you're saying, you believe
5  sitting here today that you are not owed any money
6  for working off of the clock with regard to the
7  inspections?
8      A.   Inspections.
9      MR. IRELAND:  Form.  Legal conclusion.
10 BY MR. CULBERG:
11     Q.   Besides yourself, are you aware of any
12 other White Castle employees who performed
13 off-of-the-clock work?
14     A.   Yes.
15     Q.   Who?
16     A.   Well, Hazel Johnson.  She definitely is
17 one of them.  She worked off of the clock.  She has
18 overtime taken for her -- taken from her.  So her.
19     Q.   What's her job?
20     A.   She is a team member.
21     Q.   Does she still work at White Castle?
22     A.   Yes.
23     Q.   Okay.
24     A.   Loreisa Harper she worked off of the

Page 86

1  clock before for inspections, and she had overtime.
2  Roger.
3      Q.   Sorry.  Loreisa Harper, is she a team
4  member?
5      A.   She is a crew manager.
6      Q.   A crew manager.  And you know that she
7  had overtime shaved off because you shaved that off
8  yourself?
9      A.   Yeah.  And Roger Barnes, he had overtime
10 shaved off, but I didn't touch his, because I
11 wasn't an assistant when he became --
12     Q.   And what's his job?
13     A.   He's a crew manager, too.  And Gwendolyn
14 Tolbert, but she says that she got paid her
15 overtime the next week.  So I don't want to put her
16 in there.
17     Q.   What's her job?
18     A.   She is a crew manager.  And definitely
19 Kattie Loveberry.  Definitely.  She is the main one
20 that works overtime and works off the clock.  The
21 main one.
22     Q.   What's her job?
23     A.   She is a crew manager, too, and she
24 would still do that right now today.

Page 87

1      Q.   She works overtime?
2      A.   Yeah.  She works overtime, and works off
3  of the clock.
4      Q.   How do you know that?
5      A.   Because she just tried to get me to
6  change her time a couple of weeks ago, and I told
7  her that -- I said I can't do that.  I don't do
8  that no more, and she said, "Go ahead.  Just do
9  it."  I said, "No, you can do it," and she ended up
10 doing it herself.
11     Q.   When you were an assistant general
12 manager, would she ask you to change her time?
13     A.   She would change her own time and then
14 she would ask me.
15     Q.   Would you ever do it for her?
16     A.   I did it for her once.
17     Q.   So we have Hazel Johnson, Loreisa
18 Harper, Roger Barnes and Kattie Loveberry?
19     A.   And also Treyshon Smith, because I also
20 got a picture of his overtime, too, and he didn't
21 get paid for it.
22     Q.   And when you say that you have a picture
23 of his overtime, what type of picture?
24     A.   In my phone.  It's a picture that I took

Page 88

1  that's in the computer, the White Castle computer,
2  where you can go and see how many hours that you
3  worked for the whole week, and it tells you how
4  many hours that you work.
5      Q.   And to the extent that you have these
6  pictures or that you have been gathering evidence,
7  and your counsel will tell you the same thing, I
8  will just tell you that you're under an obligation
9  to save everything that you have.
10     A.   Okay.
11     Q.   Anything that you have in your
12 possession that you believe is evidence, you are
13 going to need to hold onto that.  Okay?
14     A.   Okay.
15     Q.   We will probably be asking to see it at
16 a later stage in the litigation.
17     A.   Okay.
18     Q.   Okay.  So besides Treyshon Smith, Kattie
19 Loveberry, Roger Barnes, Loreisa Harper and Hazel
20 Johnson, are you aware of anyone else at White
21 Castle who has worked off of the clock, or who is
22 entitled to overtime?
23     A.   Michael Ballard, he's a team member, and
24 right now today I have to tell him, "Mike, you got



CANDICE RENEE ROBERTS                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                  89—92

Page 89

1  to go.  You can't work off of the clock."  Right
2  now today I have to tell him that, and he do it,
3  but he do it on his own cognizance.  I tell him --
4  and I just told him the other day, as a matter of
5  fact, that he couldn't work off of the clock.
6      Q.   Anybody else?
7      A.   Nobody.
8      Q.   Did you ever see Sylvia Anderson tell
9  any of these people that they have to work off of
10  the clock?
11     A.   No.
12     Q.   Did you ever see Stacey Belton tell any
13  of these people that they had to work off of the
14  clock?
15     A.   Well, the only thing that they did was
16  put notes up saying that we do not pay overtime,
17  but Stacey just had a note up -- what's the man --
18  I can't think of his name.  I think that it was
19  John Sheehan or somebody.  I think that it was
20  Phil.  He's over the district.  They had a letter
21  up saying that we don't do overtime, and he came
22  and wrote on the letter, "Well, who said this?
23  This is not true," and all of this and that.  So
24  like Stacey only had a letter up saying that we

Page 90

1  don't pay overtime.
2      Q.   Stacey had a letter up?
3      A.   Yeah, but she's going to say her
4  counterpart, which is Jennifer, did it, put the
5  letter up.
6      Q.   What's Jennifer's last name?
7      A.   Kapps.  She put the letter saying
8  that we don't pay overtime.
9      Q.   Where was this letter?
10     A.   In the office.  Hanging up for everybody
11  -- hanging up for the managers to see.
12     Q.   And as best as you remember, what did
13  that letter say?
14     A.   Just saying that White Castle do not pay
15  overtime, and we have to -- you have to make sure
16  that you get -- make sure that you do what you have
17  got to do to get out of overtime.  Just saying a
18  whole bunch of stuff, and Phil came in and wrote on
19  it.
20     MR. IRELAND:  Counsel, I would like a copy of
21  that letter.
22  BY MR. CULBERG:
23     Q.   And then who is Phil?
24     A.   Phil is over -- he's over Stacey and

Page 91

1  Barbie.  Stacey is the area.
2      Q.   The area manager?
3      A.   Yes.
4      Q.   Do you know Phil's last name?
5      A.   Phil Bansick (phonetic).
6      Q.   Bansick?
7      A.   Yeah.  Don't quote me on that last name.
8  I think it's Bansick.  I want to say it's Phil
9  Bansick, but --
10     Q.   I won't quote you on that.
11     A.   All right.
12     Q.   How many hours per week were you
13  typically scheduled to work as an assistant general
14  manager?
15     MR. IRELAND:  Form.
16  BY THE WITNESS:
17     A.   37.50.  That's what they say the most
18  hours that we supposed to work.  It could be --
19  sometimes it could be 39.50.  It depends if you got
20  managers to give you a note saying that we don't
21  have to take pay breaks.
22  BY MR. CULBERG:
23     Q.   How many hours are you typically
24  scheduled to work as a crew manager in the Dolton

Page 92

1  store?
2      A.   37.50.
3      Q.   So the same thing?
4      A.   Uh-huh.
5          (WHEREUPON, a certain document was
6          marked Roberts Deposition Exhibit
7          No. 9, for identification, as of
8          12-16-13.)
9  BY MR. CULBERG:
10     Q.   Ms. Roberts, you have just been handed
11  what has been marked as Exhibit 9.  Take your time
12  to flip through that.
13     MR. IRELAND:  Counsel, is there a reason why
14  this is such a small print?
15     MR. CULBERG:  Such a small print?
16     MR. IRELAND:  Yeah.
17     MR. CULBERG:  That's -- no, there's no reason
18  why it's such a small print.  That's how we
19  received them.
20     MR. IRELAND:  That's not how I received them.
21  BY MR. CULBERG:
22     Q.   Are you able to read those, Ms. Roberts?
23     A.   Yeah.  I see them.
24     Q.   Okay.



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                 93—96

Page 93

1    A.   Are these the same things for this one?
2    Q.   So what has been marked as Exhibit 9, do
3  you recognize those documents?
4    A.   Yes.
5    Q.   And what are they?
6    A.   Schedules.  Schedules for the workweek.
7         (WHEREUPON, a certain document was
8         marked Roberts Deposition Exhibit
9         No. 10, for identification, as of
10        12-16-13.)
11  BY MR. CULBERG:
12    Q.   Okay.  Do you recognize the document
13  that has been marked as Exhibit 10?
14    A.   They look like a schedule.
15    Q.   Have you ever seen the document that has
16  been marked as Exhibit 10?
17    A.   No.
18    Q.   Okay.  But you have seen the document
19  that has been marked as Exhibit 9?
20    A.   Uh-huh.
21    Q.   Where would those schedules be posted
22  typically?
23    A.   We have it on a book that they put it in
24  now.

Page 94

1    Q.   A book?
2    A.   Yeah.  It's like a little schedule book
3  they put it in now, and then they print out the
4  wallet size for you to take home with you, but it
5  comes in my phone now, too.
6    Q.   It comes to your phone now, too?
7    A.   Uh-huh.
8    Q.   Do you have an ap?
9    A.   It's some kind of thing that they hooked
10  us up with.
11    Q.   Okay.  How far in advance would you get
12  your schedule?
13    A.   It depends.  Sometimes the day before
14  you're supposed to work, or when Sylvia was there,
15  we used to get it on Thursdays, but now we get it
16  when they put it out.
17    Q.   Okay.  And about when do they put it
18  out?
19    A.   Well, I just got my schedule last
20  Friday.  So on Friday, or sometimes it be on
21  Saturday.  We can get it right before you have to
22  work.
23    Q.   So just to make sure that I am getting
24  you right, you will get the schedule on Friday for

Page 95

1  the coming week's work schedule?
2    A.   Sometimes.
3    Q.   Sometimes.  Sometimes it's Saturday?
4    A.   It's a different day with Stacey every
5  week.  We don't have a set day with Stacey, but
6  with Sylvia it was every Thursday.
7    Q.   And did they come out one week in
8  advance?
9    A.   Uh-huh.
10    MR. IRELAND:  Form.
11  BY MR. CULBERG:
12    Q.   I direct your attention to the second
13  page of the group exhibit that I gave you with the
14  schedules that have been marked as Exhibit 9.  Do
15  you see your name on that schedule?
16    A.   Uh-huh.  Yes.
17    Q.   So for your name under Tuesday, March 6,
18  2012, I see some handwriting on that box?
19    A.   Yeah, it says late.
20    Q.   And whose handwriting is that?
21    A.   Sylvia's.
22    Q.   And it looks like it says, "7:00 a.m."
23  and that's crossed off, and then --
24    A.   7:21.

Page 96

1    Q.   Does that mean that you showed up 21
2  minutes late that day?
3    A.   Yes.
4    Q.   Okay.  And if you turn to the next page,
5  under your name for October 12, 2010, do you see
6  that box?
7    A.   Yes.
8    Q.   It looks like it was scheduled for 6:00
9  p.m., and it's crossed off and says 7:30.  Does
10  that --
11    A.   7 to 3.
12    Q.   7 to 3.  I apologize.  Does that mean
13  that you showed up late that day?
14    A.   No.  That means that I switched
15  schedules.
16    Q.   Okay.  How do you know the difference?
17    A.   Because it says 6 p.m. to 11 p.m. and
18  that's 7 to 3 days.  So that's why the D is right
19  there.
20    Q.   And that's Sylvia's handwriting as well?
21    A.   Yeah.  Also you can tell by -- because
22  down by the Lorraine Rozelle she got my 6 to 11,
23  and I took her day.
24    Q.   Is that because the two of you traded?



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013

97–100

Page 97

1    A.   Yes.
2    Q.   Did you need approval to do that?
3    A.   Yes.  Sylvia approved it.
4    Q.   And how would you go about doing that?
5    A.   Well, we just come to her and ask can we
6  switch schedules, and she always wanted me to work
7  mornings anyway.  So she had no problems.
8    Q.   Okay.  Would that happen somewhat
9  regularly?
10    A.   Uh-huh.  Yes.
11    Q.   So when the schedule came out, that
12  wasn't set in stone?
13    A.   No.
14    Q.   And some days you could stay past the
15  end of your scheduled shift, too; is that right?
16    A.   Yes.
17    Q.   If you would turn to the next page, or
18  on the top that says, "Week Ending 10/10/2009."
19  For your name under October 7, 2009, it looks like
20  it was scheduled for 7:00 a.m. to 3:00 p.m., and
21  that you stayed an extra hour; is that right?
22    A.   Yes.
23    Q.   Okay.  I just want to make sure that I'm
24  reading that correctly.  And then the next page,

Page 98

1  just flipping through, where it says September 5,
2  2011, under your name I was confused about that
3  one, because it looked like you were scheduled for
4  eight hours and then you were marked down --
5    A.   That's a paid break.
6    Q.   -- for 8.07?
7    A.   A paid break.
8    Q.   What does that mean?
9    A.   I didn't have another manager, and so I
10  had to get paid for a break.
11    Q.   So you took a break where you were
12  working during it, and they paid you for it?
13    A.   Yes.
14    Q.   Whose handwriting is this?
15    A.   Sylvia's.
16    Q.   I'm a little confused, because I thought
17  that you testified earlier that you were taking
18  breaks with Sylvia Anderson that were not paid?
19    A.   I said when you take a paid break, you
20  supposed to get 20 minutes to sit down and eat no
21  matter what.  You don't get that.  Even though they
22  tell you you're supposed -- like in your handbook
23  that you get, which I can go back to the paper --
24  where is the paper at?  It tells you on here --

Page 99

1  where is this one with the breaks?  It's a little
2  paper that says something about the breaks.
3      But it's a paper that they tell you
4  about a paid break, and you're supposed to have a
5  20-minute break in between.  Right here.  You're
6  supposed to have a 20-minute break in between, but
7  you don't never get that, and that's the law.
8  That's the labor law.
9    Q.   And you're referring to what has been
10  marked as Exhibit 8?
11    A.   Yes.
12    Q.   But it looks like here on September 5th
13  that you were paid; is that correct?
14    A.   Yes, but I say that you take paid
15  breaks, and you don't get your 20 minute sit down,
16  which it states right here that I'm supposed to
17  get.
18    MR. IRELAND:  Counsel, did you indicate what
19  she was referring to?
20    MR. CULBERG:  Sure.  She was referring to
21  Defense Exhibit 8.
22    MR. IRELAND:  Thank you.
23    MR. CULBERG:  I thought that I had that on the
24  record.  I appreciate that.

Page 100

1    MR. IRELAND:  I'm not sure if you did or not.
2  You started and then it was cut off.
3    MR. CULBERG:  No.  The record should be clear.
4    MR. IRELAND:  Thank you.
5  BY MR. CULBERG:
6    Q.   And some days you would leave before
7  your shift was over; is that right?
8    A.   Some.  Very rarely.  Some.
9    Q.   Why would you leave before your shift
10  was over on some days?
11    A.   That's only if they make you leave
12  because they're trying to save hours because
13  they're not making money for the day.
14    Q.   So someone would tell you to go home?
15    A.   Right.
16    Q.   Who would tell you that?
17    A.   Sylvia.
18    Q.   Would you ever work shifts that you were
19  not scheduled to work?
20    A.   Yeah.  I'll take somebody's day.
21    Q.   Why would that happen?
22    A.   Because they had -- they always had a
23  problem with trying to cut your hours around the
24  holiday time.  So in order for me to get all of my



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                 101-104

Page 101

1  hours, I had to take somebody else's day. That's
2  the only time that I take other people's hours, is
3  when I am trying to get some extra hours in for the
4  holidays.
5      Q.   So were there weeks where you followed
6  your schedule exactly?
7      A.   Yeah. It has been a lot of weeks like
8  that. The only time that you will switch is like
9  when another manager had some appointment to take
10  care of, you would switch with them so they can be
11  off for -- have time to do what they have to do.
12  That's the only time that they really let you
13  switch.
14     Q.   Some weeks you would follow your
15  schedule exactly --
16     A.   Right.
17     Q.   -- and some weeks it would change from
18  what was scheduled for a variety of reasons?
19     A.   Right.
20     Q.   Is that true of all employees at White
21  Castle?
22     A.   Yes. Everyone.
23     Q.   You mentioned earlier, I think, and
24  correct me if I'm wrong, that the 37.5 is the

Page 102

1  target number of hours?
2      A.   Uh-huh. Yes.
3      Q.   Is that true for all employees?
4      A.   No, because the part-time team members
5  they don't have -- they don't have to give them 37
6  hours, but full timers they have to get at least --
7  I think they changed it to 35.5 to 37 for the
8  full-time employees, but that's just because of the
9  insurance that they had you had to give full-time
10  employees that many hours.
11     Q.   Do you know what the target hours are
12  for part-time employees?
13     A.   I think 32 at the most.
14     Q.   Are there any employees who are
15  scheduled to work zero to ten hours per week?
16     A.   If they is scheduled to work for zero
17  hours, they would put them on a week leave. That
18  means that there are no hours for the week, but ten
19  hours, yes. We got people working ten hours right
20  now, and we got some part-timers that's working 37
21  hours.
22     Q.   So you have -- there is a range --
23     A.   Yes.
24     Q.   -- for how much the employees are

Page 103

1  working?
2      A.   Right.
3      Q.   Some as low as ten?
4      A.   Right.
5      Q.   And some up to 37.5?
6      A.   Yes.
7      Q.   Okay. And how is it determined which
8  employee is working which amount of hours?
9      A.   Well, I definitely know when I was doing
10  -- when I used to do the schedule, they said that
11  we have to make sure that the full-timers get their
12  hours, and then whatever is left, we give it to the
13  part-timers.
14     Q.   For a part timer -- is it possible that
15  a part timer would work ten hours one week and 30
16  hours the next week?
17     A.   Yes.
18     Q.   That happens?
19     A.   Yes.
20     Q.   For part timers are their number of
21  hours influenced at all by how many hours they
22  volunteer to work?
23     A.   Can you rephrase that?
24     Q.   Sure. That was unclear. I apologize.

Page 104

1      If I am a part-time worker, can I come
2  to my AGM or my GM one week and say I have to study
3  a lot this week, and so I don't want that many
4  hours?
5      A.   Yeah. They work with you if you
6  couldn't make it, yeah.
7      Q.   Were you aware of part-time members
8  working off of the clock?
9      A.   Well, Michael Ballard is a part-time
10  person.
11     Q.   Okay.
12     A.   And he always -- he just -- I think in
13  his mind he just be wanting to help, and he don't
14  understand the fact that it's against the law.
15      So he probably don't know better, but
16  like I'm trying to instill that in his head right
17  now that it's against the law, but he is a
18  part-time worker that works off the clock, though.
19     Q.   Do part-time workers work off the clock
20  any more or less than full-time workers?
21     A.   No. It's about the same.
22     MR. CULBERG: I need a five-minute break, if
23  it's okay with you guys.
24     MR. IRELAND: Sure.



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              105–108

1       (WHEREUPON, a recess was had.)
2  BY MR. CULBERG:
3       Q.   Ms. Roberts, we have already talked
4  about your allegations that White Castle was
5  shaving hours to prevent you from getting overtime
6  and also the off the clock work that you believe
7  was allegedly being performed.
8       A.   Yes.
9       Q.   The complaint in this matter also
10 alleges that White Castle was engaging in rolling
11 hours.  Do you know what is meant by that?
12      A.   No.
13      Q.   My understanding is that it means that
14 employees would work more than 40 hours in a week,
15 and the extra hours were rolled into the next week.
16      A.   Yeah.
17      Q.   Does that make sense?
18      A.   Yes.
19      Q.   Do you believe that occurred?
20      A.   Yeah.
21      Q.   Tell me about that.  Why do you think
22 that happened?
23      A.   Because they'll take your hours away,
24 and then they'll tell you that you can pay yourself

1  next week.  That's something that Sylvia used to
2  do.  Stacey don't roll hours.  Sylvia definitely
3  used to roll hours.
4           She will tell you if you was in
5  overtime, you can pay yourself next week, or if you
6  worked off the clock for an inspection, pay
7  yourself next week, because you was close to
8  overtime this week.  So go ahead and pay yourself
9  the next week.  That's the only reason why she
10 would roll over the hours, if you was close to
11 overtime for that week.
12      Q.   Has it ever happened to you?
13      A.   Just for the inspections.
14      Q.   Okay.  And that only happened once or
15 twice; is that right?
16      A.   Yeah.
17      Q.   Besides the one or two times with the
18 inspections, do you believe that your hours were
19 ever rolled?
20      A.   Probably like one time I got overtime
21 with Sylvia, and one time I got overtime, I paid
22 myself for the next week with her.
23      Q.   So you received overtime?
24      A.   I paid myself for the next week.  She

1  told me that I could pay myself for the next week.
2       Q.   When was that?
3       A.   When was it?  I don't know exactly what
4  day that it was.  I can't recall what date it was.
5  It was so long ago.
6       Q.   But there was one time that happened?
7       A.   Yeah.
8       Q.   Besides the inspection and the one time
9  that you're talking about --
10      A.   That was it.
11      Q.   -- that was all?
12      A.   Yeah.
13      Q.   Did you complain about either of those
14 incidents?
15      A.   I didn't complain, because she paid me
16 the next week.  So there was nothing to complain
17 about.
18      Q.   Did anyone else know about this besides
19 Sylvia?
20      A.   Any -- like the bigger people above her?
21 Well, everybody in the Castle knew, because we knew
22 that's something that we do.
23      Q.   Did you ever roll the hours of any other
24 employees?

1       A.   No.
2       Q.   Are you aware of rolling hours happening
3  in any other location besides the Dolton location?
4       A.   No.
5       Q.   Are you aware of any other employees who
6  had their hours rolled?
7       A.   Like I say, just some people that I
8  named earlier, like Loreisa probably because she
9  was there when Sylvia was there, and Kattie I know
10 for sure.
11      Q.   You said Loreisa is a probably.
12      A.   Yeah, she probably did, because I took
13 her hours when Sylvia was there.  So she probably
14 did pay herself the next week.  When I took her
15 hours, that's when Sylvia was there.  So she
16 probably did pay herself the next week, because I
17 told her that she could.
18      Q.   Do you have any first-hand knowledge of
19 Loreisa's hours being rolled?
20      A.   No, but I do know first-hand knowledge
21 of Kattie's, because I seen her fix that.
22      Q.   How many times have you seen -- and
23 that's Kattie Loveberry?
24      A.   Yes.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
109–112

Page 109

1    Q.   How many times have you seen Kattie
2  Loveberry's hours be rolled?
3    A.   I seen her do it once.
4    Q.   One time?
5    A.   Uh-huh.  Yes.  And Gwendolyn Tolbert,
6  her hours were rolled this year by Stacey.  So said
7  that Stacey paid her her overtime the next -- the
8  week after.
9    Q.   Is that something that Gwendolyn told
10  you or something that you witnessed?
11    A.   That's something that Gwendolyn told me.
12    Q.   Do you have first-hand knowledge of that
13  happening?
14    A.   No.
15    Q.   Other than the two occasions where your
16  hours were rolled and the one time that you saw
17  Kattie Loveberry's hours being rolled, do you have
18  first-hand knowledge of any other employees being
19  rolled?
20    A.   No.  No first-hand knowledge.
21    Q.   Correct me if I'm wrong, I think that
22  you said that the inspection time was about three
23  hours; right?
24    A.   Uh-huh.

Page 110

1    Q.   Do you know approximately how many of
2  Kattie Loveberry's hours were rolled?
3    A.   No.
4    Q.   The other occasion that you mentioned
5  where your hours were rolled, do you remember about
6  how many hours were rolled over?
7    A.   An hour at the most.
8    Q.   An hour at the most.
9        Something else the Complaint mentions,
10  which I believe that you got into back at the
11  beginning of the deposition, is that employees were
12  required to repay shortages?
13    A.   Yes.
14    Q.   Out of their own pocket?
15    A.   Yes.
16    Q.   Tell me about that.
17    A.   Well, on several occasions I have heard
18  Sylvia Anderson out of her mouth -- like when an
19  employee's drawer was short, they count that drawer
20  down, she's like, "Where my money at?" such and
21  such.  "Where my money at?  Give me my money for
22  this drawer.  Give me my money for this drawer,"
23  and as you know, when I was her assistant, like
24  putting the money back in her safe when it was

Page 111

1  short.  That's about it.  She would tell me that I
2  had to put the money back in there.
3        And we put the money back in the regular
4  safe, too.  Like if it was short any dollars, we
5  would take money out of our pocket and put it in
6  there, too.
7    Q.   Help me understand the way the safe
8  system works at the store.
9    A.   Okay.  The safe system you're supposed
10  to count it down every time you get the key.  Like
11  when you get the key from the manager, you're
12  supposed to count it down and make sure all the
13  drawers is 75, make sure the safe was 400, and all
14  of the drawers have $75 in their drawers.
15        So say, for instance, like say I'm short
16  $2 here, $2 there, and then short $10, you would
17  just -- you know, if you count behind the other
18  manager and you stay short, you got to put the
19  money back in there.
20    Q.   Slow it down for me.  So the store has
21  one safe?
22    A.   It's two.
23    Q.   Okay.
24    A.   Sylvia's safe, which only Sylvia can use

Page 112

1  and her assistants, and there is the manager's safe
2  where all of the managers use.
3    Q.   Okay.  And where is Sylvia's safe?
4    A.   Her safe is under our safe.
5    Q.   So there are two safes?
6    A.   Yes.
7    Q.   Just one on top of another?
8    A.   Yes.
9    Q.   Where are they?
10    A.   In the office.
11    Q.   In the office?
12    A.   Yes.
13    Q.   Does everyone have access to the office?
14    A.   All of the managers, yes.  The team
15  members are not supposed to be in the office, but
16  they still be in there.
17    Q.   Okay.  Do they have combinations?
18    A.   It's a key.  It's a key, yeah.
19    Q.   So Sylvia has her own safe?
20    A.   Yes.
21    Q.   And that's just for her use?
22    A.   Her and her assistants, yes.
23    Q.   What's your understanding of the purpose
24  of that safe?



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
113–116

Page 113

1    A.    That safe is like when our safe run out
2  of change and stuff, that's where we go get change
3  from, out of her safe, because once the armor car
4  bring the change, we put it right into Sylvia's
5  safe.
6         So when we need like ones, nickles,
7  dimes and stuff, we go in her safe for that, and
8  then like if we need somebody to sign the HR
9  record, we go in her safe and get the little book
10 for them to sign the HR record.
11   Q.    How much money is kept in her safe?
12   A.    1,200.
13   Q.    $1,200?
14   A.    Uh-huh.
15   Q.    And correct me, because I'm just trying
16 to learn here.  And every night it's supposed to
17 have $1,200 in it?
18   A.    Yes.
19   Q.    What else is in that safe besides money?
20   A.    She have, like I say, the team member
21 book, the book to sign the HR workers; she has the
22 little things for the armor car that you've got to
23 fill out, you know.
24   Q.    The deposit slips?

Page 114

1    A.    Deposit slips.  Aprons, hats, so and so,
2  pens and so forth.
3    Q.    It's a big safe?
4    A.    Yes.
5    Q.    And the only people with access to that
6  safe are the general manager and the assistant
7  general managers?
8    A.    Yes.
9    Q.    That's correct?
10   A.    Yes.
11   Q.    And then underneath that there's another
12 safe?
13   A.    Okay.  Let me --
14   Q.    Please.
15   A.    It's three compartments.  One of them is
16 when the armor car come and they open it up and you
17 get the stuff out for armor car, and then under
18 that is the manager's safe, and then under that one
19 is Sylvia's safe.
20        So the top part is for the armor car.
21 You're going to use that when they come and give
22 you the key to get the deposits out, and the second
23 one is the manager's safe, and the third one is
24 Sylvia's safe.  Her's is at the bottom.

Page 115

1    Q.    Sylvia's is at the bottom with the
2  general manager's safe?
3    A.    Yes.
4    Q.    Above that is the manager's safe?
5    A.    Yes.
6    Q.    And who has access to that?
7    A.    Every manager.
8    Q.    Ever crew manager and --
9    A.    Yes, if you run a shift that day.
10 You're not supposed to give your keys to nobody
11 else if they're not -- if you have enough managers,
12 you're still not supposed to give your keys to
13 them.
14   Q.    What is kept in the crew manager's safe?
15   A.    Like 4 drawers and $400.
16   Q.    What is a drawer?
17   A.    A cash drawer that you have got to count
18 down, and it should be $75 out for the cash drawer.
19   Q.    And 400 extra dollars?
20   A.    Right.
21   Q.    What's kept in the armor car safe?
22   A.    Every deposit slip that you draft.
23 Every deposit that you draft.  Like once you fill
24 out your envelope, after you put the money in and

Page 116

1  after you drop it in the armor car, then when they
2  come we've got to count all of the envelopes up,
3  and make sure that everything is saying what it
4  says on the paper.  Put it in the armor car bag,
5  and give it to them.  They scan it and do whatever.
6    Q.    Which of these safes -- strike that.
7         So tell me what White Castle did that
8  was illegal or improper with regard to the safes?
9    MR. IRELAND:  Form.
10 BY THE WITNESS:
11   A.    It's just the fact that she used to have
12 us pay back in the safe, and from my knowledge
13 you're not supposed to put money back.  If you're
14 short, you're supposed to fill out a report and get
15 wrote up or something for it.  You're not supposed
16 to give money back to your cash drawer.
17 BY MR. CULBERG:
18   Q.    Are we talking about the cash drawer or
19 the safe?
20   A.    The cash drawer, safe, you're not
21 supposed to put money back, period.  When your safe
22 is short, we're supposed to run a safe short -- run
23 a short -- making -- like you're going to make one
24 of the drawers in the safe short, take the money



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                  117–120

Page 117

1  out of the drawer.
2      That's what they want you to do, take
3  the money out of the drawer and put it in the safe
4  money drawer short, and once you do it for the day,
5  you're going to write under there person was not
6  short, safe was short, such and such and such and
7  such and so on and so forth.
8      Q.   So are we talking about two separate
9  things, that people would have to repay the drawers
10  and also repay the safe?
11     A.   I'm getting confused now.
12     Q.   I'm getting confused, too.
13     A.   Okay.  The people -- the team members
14  pay back any drawer if they are short.
15     Q.   Okay.
16     A.   Which they are not supposed to.  They're
17  just supposed to be short.
18     Q.   Let's just stop there for now.  When you
19  were a team member, did you ever have to pay back a
20  drawer shortage?
21     A.   No.  No.
22     Q.   Have you told team members at the Dolton
23  location that they have to pay back drawer
24  shortages?

Page 118

1      A.   No, that's when I got there, they was
2  just giving me their money like that was something
3  that they was doing.  So that's why I took it, like
4  they was doing it already.
5      Q.   So when you came over as an assistant
6  general manager --
7      A.   They was already doing it.
8      Q.   Sorry.  Let me finish.
9          When you came back as an assistant
10  general manager to Dolton, you would see team
11  members hand you money when their drawers were
12  short?
13     A.   Yes.
14     Q.   And you would take that money?
15     A.   And put it in their drawer, yes.
16     Q.   Did you know that that was improper?
17     A.   Yeah, but they said that's what their
18  boss had been doing.
19     Q.   Did you tell anyone about this?
20     A.   Did I tell anyone?
21     Q.   After you took team members' money and
22  put it in their drawers, did you tell anyone that
23  you were doing that?
24     A.   No.

Page 119

1      Q.   Does that still go on?
2      A.   Right now, no.  None of that now.
3      Q.   Why doesn't it go on anymore?
4      A.   Because they cracked down on it.  The
5  truth is getting out.
6      Q.   For how long were team members repaying
7  draw shortages?
8      MR. IRELAND:  Form.
9  BY THE WITNESS:
10     A.   All of my years that I was at the Dolton
11  location.
12  BY MR. CULBERG:
13     Q.   Until?
14     A.   Until Stacey came.
15     Q.   Okay.  Forgive me if I asked this.  Did
16  you personally tell team members that they had to
17  repay drawer shortages?
18     MR. IRELAND:  Form.
19  BY THE WITNESS:
20     A.   No, but I personally was sitting there
21  when Sylvia told them they had to -- where is my
22  money at?  So that was letting me know that that's
23  what they supposedly were doing.
24  BY MR. CULBERG:

Page 120

1      Q.   So you heard Sylvia say, "Where's my
2  money at?"
3      A.   Yes.
4      Q.   And then you understood that to mean
5  that you have to repay the drawer shortage?
6      A.   Yes.
7      Q.   Did this happen every day?
8      A.   When the person was short, yes.
9      Q.   How much money did you see team members
10  repaying into their drawers?
11     A.   I seen somebody give back $10 one time.
12     Q.   Is that the most that you saw?
13     A.   Uh-huh.  Yes.
14         (WHEREUPON, a certain document was
15          marked Roberts Deposition Exhibit
16          No. 11, for identification, as of
17          12-16-13.)
18  BY MR. CULBERG:
19     Q.   Ms. Roberts, you have been handed what
20  has been marked as Exhibit 11.  Do you recognize
21  this document?
22     A.   Yes.
23     Q.   Take your time to look it over.
24     A.   I read it.



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                   121–124

Page 121

1    Q.   What is this document?
2    A.   Cash handling procedures.
3    Q.   Have you seen it before?
4    A.   Yes.
5    Q.   When have you seen it before?
6    A.   When we were filling out for the
7  handbook, they gave us this to sign.
8    Q.   If you could turn to the second page of
9  that document. Is that your signature on the
10 bottom of the page?
11   A.   Yes.
12   Q.   Do you understand from this document
13 that it's improper for team members to repay their
14 own drawer shortages?
15   MR. IRELAND:  Form.
16 BY THE WITNESS:
17   A.   Yes.
18 BY MR. CULBERG:
19   Q.   Even understanding this, you took their
20 money when they handed you money to repay their
21 drawers?
22   MR. IRELAND:  Form.
23 BY THE WITNESS:
24   A.   I did what I had to do to keep my job.

Page 122

1  Yes, I did. I took their money and I put it in
2  their drawer, yes.
3  BY MR. CULBERG:
4    Q.   What would have happened to you if you
5  didn't take their money?
6    A.   I don't know. I wasn't trying to figure
7  it out. I seen her tell them that they had to put
8  money back in there. So that's what I was doing.
9  But I didn't tell them. They did it. So I just
10 put it back in there.
11   Q.   Did you take team members' money every
12 day?
13   A.   No, because every day somebody was not
14 short.
15   Q.   Every week?
16   A.   Probably every week.
17   Q.   A couple of times every month?
18   A.   Probably.
19   Q.   Are you aware from this document, the
20 cash handling policy, Exhibit 11, that the store
21 policy was to alert the area office before 10 a.m.
22 the following day if there is a cash discrepancy of
23 $10?
24   MR. IRELAND:  Form.

Page 123

1  BY THE WITNESS:
2    A.   Yes.
3    MR. IRELAND:  Mischaracterizes the testimony.
4  Mischaracterizes the document. Calls for a legal
5  conclusion.
6  BY MR. CULBERG:
7    Q.   That was a yes?
8    A.   Yeah.
9    Q.   Are you aware that team members have to
10 be paid for counting down their cash drawers before
11 and after their shifts?
12   A.   Yes.
13   Q.   Are you aware that corrective action
14 could be issued if you failed to follow this cash
15 handling policy?
16   A.   Yes.
17   Q.   Were you ever threatened with discipline
18 if you didn't take the team members' money?
19   A.   Well, the only thing that I seen is when
20 one person -- when Jimmy did try to stand up and do
21 what they wanted him to do, look where it got him.
22 No where. It ain't going to do nothing. No way.
23   Q.   Now, in addition to the drawer shortages
24 that we were just talking to, you were also making

Page 124

1  an allegation, as I understood it, about safe
2  shortages; is that right?
3    A.   Uh-huh.
4    Q.   Can you tell me about that piece of it?
5    A.   Like if you count the -- say, for
6  instance, I didn't count the drawer -- the safe
7  down -- if it's so busy out there, I can't get back
8  there to count the safe down before the other
9  manager leaves.
10   Q.   And which safe are we talking about of
11 the three that we discussed before?
12   A.   The manager's safe.
13   Q.   Okay.
14   A.   It can be short. That's on me now
15 because I didn't count them down after they leave.
16 So we used to have to put -- take money out of our
17 pocket and put it back in there so it won't be
18 short, and Sylvia had asked us, "Where's my money
19 for the safe?"
20       And also for her safe it's the same
21 thing. "Where my money at?" That's what she used
22 to always say to everybody. "Where my money at?
23 Where my money at? Where my money at."
24   Q.   And at the end of every day, because I'm



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
125—128

Page 125

1 still a little confused, what money would be put
2 into the manager's safe, and what money would be
3 put into Sylvia's safe?
4    A.   Whatever was short.  It's not like --
5 for instance, Sylvia's safe could be short like
6 $20, and she going to come to me or the other
7 supervisor, because there's only us two in her
8 safe.
9    Q.   Sure.  And we will get into that in a
10 second.  I'm asking on a normal day with no
11 shortages.
12    A.   With no shortages, we don't have to put
13 nothing in there.  If there ain't anything short,
14 we don't have to do nothing.
15    Q.   So, for example, at the end of every day
16 or every shift, when you take the cash from the
17 drawers, what safe does that go into?
18    A.   The cash from the drawers from the
19 shift, the end of the shift, like once you count
20 that drawer down, you deposit the money, and then
21 the rest of the money would stay in the drawer, the
22 $75, and you put it back in the safe.
23    Q.   Which safe?
24    A.   The crew manager's safe.

Page 126

1    Q.   The crew manager's safe.
2    A.   Uh-huh.
3    Q.   And what money was typically put into
4 Sylvia's safe?
5    A.   Like if her safe was short $20 here and
6 $10 here, she would count it and say that she's
7 short somewhere.  And you would just have to give
8 it back to her, because you were the only person
9 that was in the safe.
10    Q.   And it's your testimony that crew
11 managers were forced to pay money back into the
12 safe?
13    A.   Into the crew manager's safe, yes.
14    Q.   Did you personally see this happen?
15    A.   Yes.
16    Q.   Who did you see put money back into the
17 crew manager's safe?
18    A.   Me, Loreisa, Loveberry put a couple of
19 dollars back in there.  Loveberry put money in
20 Sylvia's safe, too.
21    Q.   What is the most that you ever saw
22 anybody put into the manager's safe?
23    A.   20.
24    Q.   What is the most that you ever put into

Page 127

1 the manager's safe?
2    A.   The manager's safe?  Ten at the most for
3 me, and that was only once, because I forgot to
4 count it out to somebody.
5    Q.   So you put $10 into the manager's safe
6 one time?
7    A.   Yes.
8    Q.   Besides that one time, have you ever put
9 money back into the manager's safe?
10    A.   Not the manager's safe, but I put money
11 back in Sylvia's safe.
12    Q.   What's the most amount of money that you
13 ever put back into Sylvia's safe?
14    A.   I would say $60, because she came to us
15 like three times saying that her money wasn't
16 there.
17    Q.   So there was one day when you put $60
18 in?
19    A.   Yes.  And then like a couple of months
20 went past, and she would come back in and say,
21 "This ain't right," which we already knew that it
22 was right because we accepted it and stamped our
23 initials.
24    Q.   How many times have you put money back

Page 128

1 into Sylvia's safe?
2    A.   Three times.
3    Q.   One time was $60?
4    A.   No.  I'm saying it's $60 all together;
5 20, 20, 20.
6    Q.   So over the course of your whole
7 employment with White Castle, you put $60 back into
8 Sylvia's safe?
9    A.   Yes.
10    Q.   You put $10 into the manager's safe?
11    A.   Yes.
12    Q.   Besides that $70 total, have you ever
13 paid money out of your own pocket to make up for a
14 White Castle shortage?
15    A.   I helped a team member out on their
16 drawer one time.  I gave them some money to put in
17 the safe one time.
18    Q.   Okay.  I'm just trying to find out all
19 of the times.  So one time you helped a team member
20 put money in a cash drawer?
21    A.   Yes.
22    Q.   How much was that?
23    A.   Probably about $5.  It wasn't that much.
24    Q.   Was the drawer $5 short that time?



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              129–132

Page 129

1     A.    Yeah, their money was $5 short.
2     Q.    And you paid for that whole shortage
3   that time?
4     A.    Uh-huh.
5     Q.    Why did you pay for that drawer
6   shortage?
7     A.    Because I didn't want to see them get
8   wrote up, and they were on the verge of being
9   fired.  So --
10    Q.    And I am asking because I think that you
11  testified that a few times a month you would take
12  team members' money for the drawer?
13    A.    Uh-huh.  That one time I did it because
14  if they would have been wrote up, they would have
15  been fired.  So I was just helping them out.
16    Q.    Do you know of any team members that
17  were ever forced to repay a shortage in the safe?
18    A.    No.  They don't have nothing to do with
19  the safe.
20    Q.    So all of the team members could only
21  repay drawer shortages?
22    A.    Right.  That's the only thing.
23    Q.    Did you ever refuse to pay a safe
24  shortage?

Page 130

1     A.    No.
2     Q.    Have you ever seen anybody refuse to pay
3   a safe shortage?
4     A.    No.
5     Q.    Have you ever seen a team member refuse
6   to pay a drawer shortage?
7     A.    I've seen them refuse, and they just was
8   short.  Nothing happened to them, they were just
9   short.
10    Q.    Nothing happened to them?
11    A.    They was just short.
12    Q.    What happens to an employee if their
13  drawer is short?
14    MR. IRELAND:  Form.
15  BY THE WITNESS:
16    A.    They either -- like if he got wrote up
17  once or twice for it, he gets suspended.  It
18  depends on how many times that you have been wrote
19  up for it, and then after the suspension, they get
20  fired.
21  BY MR. CULBERG:
22    Q.    Aside from the one time that you
23  mentioned where you paid a drawer shortage and the
24  three times that you mentioned where you repaid

Page 131

1   safe shortages three or four times, were you ever
2   forced to pay any other business expense while
3   working at White Castle?
4     A.    No.
5     Q.    Do you know of any other employees who
6   were required to pay for business expenses?
7     A.    No.
8     Q.    You have a claim in this lawsuit that
9   White Castle -- strike that.
10          You have a claim in this lawsuit that
11  White House re -- strike that.
12          You have a claim in this lawsuit that
13  White Castle retaliated against you; is that right?
14    A.    That they retaliated against me?  I
15  don't know what that means.  What did they do to
16  me?
17    Q.    I am asking you.  I mean, it's the
18  lawsuit that you filed.  Do you believe that White
19  Castle has ever retaliated against you in any way?
20    A.    I just -- well, recently I felt that
21  way.
22    Q.    Okay.  Tell me about that.
23    A.    Just every time I request something off,
24  I can never get it.  Like I requested to go on

Page 132

1   vacation.  I didn't never get it, but when I called
2   the boss over my boss, she just believed the boss
3   -- let me start over.
4     Q.    Sure.
5     A.    Okay.
6     Q.    And take your time.
7     A.    The only thing that I feel like is when
8   I request something off, I don't ever get it, and
9   then when I come to her about it, she says, "Oh, we
10  don't have to follow the request.  It's just a
11  request."
12    Q.    When you say -- sorry to interrupt.
13  When you say "her," who are you referring to?
14    A.    Stacey says that she don't have to
15  follow requests.  It's just a request.  You know,
16  that she don't have to give it to me, but then when
17  I turn around and call off on the days that I'm
18  requesting, then you want to write me up because I
19  called off on the days that I requested off.
20          And like I said, just recently I
21  requested to be on vacation, not this week but last
22  week, and she didn't give it to me.  So she didn't
23  give it to me, and I was like, "Well, how can I get
24  it?"  She's like, "Well, I'm not going to be there.



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                133–136

Page 133

1  I'll come back on such and such date." I'm like,
2  "That don't got nothing to do with me. That's my
3  vacation. If I want my vacation, I should be able
4  to take it."
5        So I ended up calling off, and she
6  suspended me. So I'm like how do I get suspended
7  over something that I supposed to be on vacation
8  for? But then she -- I just don't understand how
9  I'm getting wrote up for something if I was trying
10 to request it off, because evidently if I am
11 requesting something off, I need it off because I
12 am going to do something that day. I even told her
13 that I was going to my cousin's wedding for my
14 vacation, and she still didn't give it to me.
15       She told me the day before I was
16 supposed to go on vacation that she couldn't give
17 it to me, and that she been trying to call me. How
18 you been trying to call me? You call me when you
19 want to talk to me about the shake machine, but
20 I've been trying to call you.
21       And she just always -- I feel like she
22 be picking on me, but she say that she don't,
23 because she say that I'm one of her best managers,
24 but it don't feel that way.

Page 134

1     Q.  Let me make sure that I have the story
2  right, and correct me where I am wrong. I am just
3  trying to get it right.
4        That you requested vacation for last
5  week to go to your cousin's wedding?
6     A.  Yes.
7     Q.  That she denied that request?
8     A.  Yes.
9     Q.  That you then called off those days that
10 you made --
11    A.  I called off one day.
12    Q.  -- one day that you made that request
13 for --
14    A.  Yes.
15    Q.  -- and then you were written up; is that
16 right?
17    A.  I was suspended.
18    Q.  You were suspended?
19    A.  Yes.
20    Q.  Why do you believe that -- and correct
21 me if I am wrong. You said that you thought that
22 Stacey was picking on you?
23    A.  Yes.
24    Q.  Why do you think that she's picking on

Page 135

1  you?
2     A.  Because every time I put a request in, I
3  don't ever get it. Just like -- she tell me it's
4  an optional request, but if I'm requesting off and
5  you got this other manager who's requesting off,
6  and every time she requests off, she gets it, she
7  override me like I'm nothing.
8        Like no, you can't get yours, and when I
9  had like two deaths in my family, I couldn't even
10 get the days off to go -- you know what I'm saying,
11 to grieve. She tell me that I can't tell them off
12 because Kattie is off.
13       Like who says that? Like if somebody's
14 family member just died, you will give them the day
15 off.
16       And it's just been a lot, and I feel
17 like I was treated wrong when I got suspended for
18 females coming in there trying to fight me,
19 throwing stuff behind the counter at me, and I got
20 suspended for it.
21       The police even asked me, like, "Did
22 they even watch the tape?" I said, "Yeah, they
23 watched it," and I'm not going to lie to you,
24 that's what really sparked up this thing right

Page 136

1  here.
2     Q.  So let's take these one at a time. So
3  the first story that you're talking about was the
4  vacation?
5     A.  Yes.
6     Q.  What do you think Stacey Belton's reason
7  was for picking on you?
8     MR. IRELAND:  Form.
9  BY MR. CULBERG:
10    Q.  If you know.
11    A.  I really don't understand what her
12 reasons were. The only thing that I can see is
13 because of this. That's the only thing.
14    Q.  What do you mean by "this"?
15    A.  The lawsuit. That's the only thing that
16 I can see.
17    Q.  So you think that because you filed the
18 lawsuit, she denied your vacation request?
19    A.  Uh-huh. She knew that I was on the edge
20 of getting suspended anyway if I do another call
21 off. So she knew that I was going to call off
22 because she knew that's what I do when she doesn't
23 give me my request. She knew that I was going to
24 call off. So that's what she wanted me to do.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
137–140

Page 137

1    Q.    Besides denying the vacation request,
2    are there any other ways that Stacey Belton has
3    retaliated against you for this lawsuit?
4       MR. IRELAND:  Form.  Asked and answered.
5    BY THE WITNESS:
6       Q.    Okay.
7       MR. IRELAND:  Counsel, I thought that we were
8    taking them one at a time?
9    BY MR. CULBERG:
10      Q.    You also mentioned a story about a
11   suspended female -- sorry, that females came in who
12   were trying to fight you; is that right?
13      A.    Well, they was trying to fight one of
14   the team members behind the door.  They threw all
15   of the stuff that was on the front counter at us,
16   and, I mean, I lost my cool.  I might have been
17   cussing.  I was cussing.  I am not going to lie
18   about it.
19      Q.    So some women came in?
20      A.    Yes.
21      Q.    Did you know them?
22      A.    No.  They was in the drive through at
23   first, and something happened between them and the
24   girl in the drive through, and then they came in

Page 138

1    saying that she F'd on my food.
2       So I told them that I will replace it
3    for them.  So I was replacing their food, and in
4    the midsts of me replacing it, the girl -- the team
5    member kept walking past the front register.  I
6    guess that she was messing -- I don't know what she
7    was doing, but Stacey said that it looked like she
8    was messing with them or whatever she was doing.  I
9    don't know what she was doing, but the next thing I
10   knew was one of the -- the female who wasn't even
11   here said to give us our money back.
12      So I'm like, "Okay.  No problem.  I'm
13   going to give you your money back," and she like
14   just kept saying "low budget White Castle girls,"
15   and all this and that, and the next thing I know is
16   a couple of more females came in, and they all just
17   started picking up stuff -- coming under the
18   counter and picking up stuff and throwing it at us,
19   and I called the police, and they crashed into a
20   down pole and stuff like that, but then I got
21   suspended for it, but I don't understand why I got
22   suspended, when they were the ones throwing stuff
23   at me.
24      Q.    It sounds scary.

Page 139

1       A.    It was scary.
2       Q.    Do you think that you were suspended
3    because you filed this lawsuit?
4       MR. IRELAND:  Form.
5    BY THE WITNESS:
6       A.    I think that I was suspended for
7    cussing.
8    BY MR. CULBERG:
9       Q.    Now, you have been reprimanded several
10   times for performance problems; correct?
11      MR. IRELAND:  Form.
12   BY THE WITNESS:
13      A.    For late.
14   BY MR. CULBERG:
15      Q.    For lateness?
16      A.    Yeah.
17      Q.    How often are you late?
18      A.    I'm late.  I ain't the on timest person.
19   I be late.  But then once I see that I got a
20   reprimand, I be on time.  Then I be late again once
21   the month is over with.  I have a boyfriend that
22   has got multiple sclerosis.  So my time is all
23   messed up.  So I have to help him out, and so I'm
24   late.

Page 140

1          (WHEREUPON, a certain document was
2           marked Roberts Deposition Exhibit
3           No. 12, for identification, as of
4           12-16-13.)
5    BY MR. CULBERG:
6       Q.    You have been handed Group Exhibit 12.
7    Take your time to flip through these, and let me
8    know if you know what these are.
9       MR. IRELAND:  Objection to any of these
10   unrelated to wages.  Go ahead.
11   BY MR. CULBERG:
12      Q.    Do you recognize these documents?
13      A.    Yeah.
14      Q.    Okay.  And what are they?
15      A.    Well, this one is a late.  This one is
16   cash discrepancies, cash discrepancies.
17      Q.    It might be easier to do it just one at
18   a time.
19      A.    Okay.
20      Q.    This first page, which at the bottom is
21   marked WC-0000683, what is this document?
22      A.    The first page is a poor attendance and
23   punctuality.
24      Q.    And that's your signature on the bottom?



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
141–144

Page 141

1    A.    Yes.
2    Q.    And that's dated February 6, 2004?
3    A.    Yes.
4    Q.    The second page, which is marked
5  WC-0000684, what is this document?
6    A.    Cash discrepancy.  Cash shortage.
7    Q.    And it says, "Candice cash drawer was
8  short $10.43."  Is that right?
9    A.    Yes.
10   Q.    Is that your signature on the bottom?
11   A.    Yes.
12   Q.    And that's dated it looks like March
13  either 23rd or 25th, 2004?
14   A.    Yes.
15   Q.    The next page, which is marked
16  WC-0000685, what's this document?
17   A.    Failure -- cash drawer.  Failure to not
18  count safe.  Safe discrepancy.
19   Q.    And was this document when you were at
20  the Dolton location?
21   A.    No.
22   Q.    This is when you were still at 103rd?
23   A.    Yes.
24   Q.    That's your signature on the bottom?

Page 142

1    A.    Yes.
2    Q.    And it's dated December 1, 2006?
3    A.    Yes.
4    Q.    The next page, which is marked
5  WC-0000686, what is this document?
6    A.    A cash drawer shortage.
7    Q.    And that's your signature on the bottom?
8    A.    Yes.
9    Q.    And it's dated July 6, 2007?
10   A.    Yes.
11   Q.    The next page, which is marked
12  WC-0000687, do you recognize this document?
13   A.    Yes.  It's attendance.
14   Q.    And that's for one unexcused absence?
15   A.    Yes.
16   Q.    And that's your signature?
17   A.    Yes.
18   Q.    And that's also dated July 6, 2007; is
19  that correct?
20   A.    Yes.
21   Q.    The next page is WC-0000688.  Do you
22  recognize this document?
23   A.    Yes.
24   Q.    What is it?

Page 143

1    A.    It's a failure to complete a task.
2    Q.    Do you remember what that task was?
3    A.    It was probably cleaning something, and
4  I didn't have enough time in the day to do it.
5  That's pretty much it.
6    Q.    And that's your signature?
7    A.    Yes.
8    Q.    And it's dated November 11, 2007?
9    A.    Yes.
10   Q.    Okay.  The next page is marked
11  WC-30000689.  Do you recognize this document?
12   A.    Yes.
13   Q.    What is it?
14   A.    It's a failure of company and state
15  labor laws.
16   Q.    And it says, "Candice did not follow the
17  labor law concerning breaks and allowed a team
18  member to work six hours without a break."  Is that
19  right?
20   A.    Yes.
21   Q.    Is that when you were at the Dolton
22  location?
23   A.    No.  It was 58.
24   Q.    58 being 103rd Street?

Page 144

1    A.    Uh-huh.  Yes.
2    Q.    So I'm confused about this one.
3    A.    I am confused, too.
4    Q.    Because my understanding is that you
5  were a team member at 103rd; right?
6    A.    I was a manager at the end, a manager
7  for a little while.
8    Q.    So you were able to direct team members'
9  work?
10   A.    Right.
11   Q.    Do you remember this incident?
12   A.    No.
13   Q.    But it does appear that you were
14  reprimanded for letting a team member work without
15  a break?
16   A.    Yes.
17   Q.    And that's your signature on the bottom?
18   A.    Yes.
19   Q.    It looks like it's dated April 1st,
20  2008?
21   A.    Uh-huh.
22   Q.    Correct?
23   A.    Yes.
24   Q.    The next document is Bates labelled



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
145–148

1 WC-0000690. Now, this says, "Castle No. 67." Is
2 that right?
3    A. Yes.
4    Q. So now we are in the Dolton location?
5    A. Yes.
6    Q. What does this document say?
7    A. This right here is when all of us got
8 wrote up for poor Castle sanitation.
9    Q. So everybody in the store got written
10 up?
11    A. Yes.
12    Q. That's your signature at the bottom?
13    A. Yes.
14    Q. And that's Sylvia Anderson's signature?
15    A. Yes.
16    Q. And it's dated August 13, 2008?
17    A. Uh-huh.
18    Q. That's a yes?
19    A. Yes.
20    Q. Thanks. The next page, which is Bates
21 labeled WC-0000691, what is this document?
22    A. Violation of attendance and punctuality.
23    Q. And it says, "Candice has called off
24 and/or been late several times in a six-month

1 period."
2    A. Yes.
3    Q. That's your signature?
4    A. Yes.
5    Q. It's dated July 24, 2010?
6    A. Yes.
7    Q. Did you think that this reprimand was
8 fair?
9    MR. IRELAND: Form.
10 BY THE WITNESS:
11    A. Was it fair for me being late?
12 BY MR. CULBERG:
13    Q. Had you, in fact, called off several
14 times in a six-month period?
15    A. Yeah.
16    Q. Okay. The next page is WC-0000692.
17 What is this document?
18    A. Violation of the Chicago Area Attendance
19 and Punctuality Policy. Candice has been late or
20 called off, unexcused, several times within the
21 past six-month period."
22    Q. Did you understand that statement to be
23 accurate?
24    A. Yeah.

1    Q. Okay. And that's your signature at the
2 bottom?
3    A. Yes.
4    Q. September 22, 2011?
5    A. Yes.
6    Q. The next document is WC-0000693.
7    A. There's sure a lot of reprimands and no
8 suspensions.
9    Q. What do you mean by that?
10    A. I have been reprimanded a lot, but no
11 suspensions.
12    Q. And what is this document?
13    A. "A violation of Chicago Attendance and
14 Punctuality Policy. Candice has called off
15 unexcused or been late several times in a six-month
16 period."
17    Q. And that was an accurate statement?
18    A. Yes.
19    Q. That's your signature?
20    A. Yes.
21    Q. And it's dated November 22, 2011?
22    A. Yes.
23    Q. Okay. The next document is labelled
24 WC-0000694. Do you recognize this document?

1    A. Oh, yes.
2    Q. What is it?
3    A. A violation of gossiping, and I don't
4 know how I was gossiping when I was talking about
5 myself.
6    Q. So what happened in that time?
7    A. Oh, a team member walked off the floor
8 on me, and I was talking to my counterpart, which
9 is Kattie Loveberry. We both were assistants. So
10 I don't understand how I got wrote up for telling
11 her what happened, but, yeah, I got wrote up for
12 that.
13    Q. Okay. And that's your signature?
14    A. Yeah.
15    Q. And that's dated July 20th, 2012?
16    A. Yes.
17    Q. The next document is labelled
18 WC-30000695. Do you recognize this document?
19    A. Yes.
20    Q. What does this say?
21    A. "Violation of the Team Member Handbook
22 as it relates to the Attendance and Punctuality
23 Policy. Candice has been late three more times
24 since given verbal warning 6/20/12."



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                149–152

Page 149

1    Q.    And that statement is correct?
2    A.    Yeah.
3    Q.    And that's your signature on the bottom?
4    A.    Yes.
5    Q.    And it's dated July 29, 2012?
6    A.    Yes.
7    Q.    The next document is labelled
8    WC-0000696.  Do you recognize this document?
9    A.    Yes.
10   Q.    What is this?
11   A.    "Attendance and Punctuality Guidelines
12   as listed in the Restaurant Division Team Member H.
13   Candice has had one late and one unexcused call off
14   since last warning on 7-28-12."
15   Q.    And that's correct?
16   A.    Yes.
17   Q.    That's your signature at the bottom?
18   A.    Yes.
19   Q.    And it's dated January 12, 2013?
20   A.    Yes.
21   Q.    And the last document in this group
22   exhibit is WC-000697.  Do you recognize this?
23   A.    Yes.
24   Q.    And what is this document?

Page 150

1    A.    Attendance and Punctuality.
2    Q.    And it says, "Candice was giving a
3    verbal warning about her attendance on June 23,
4    2013.  Candice has one unexcused absence."
5    A.    Yes.
6    Q.    That's accurate?
7    A.    Yes.
8    Q.    And that's your signature on the bottom?
9    A.    Yes.
10   Q.    And it's dated October 2, 2013?
11   A.    Yes.
12   Q.    That's correct?
13   A.    Yes.
14        MR. IRELAND:  A repeating standing objection
15   to anything in this exhibit unrelated to the issues
16   in the lawsuit.
17        (WHEREUPON, a certain document was
18        marked Roberts Deposition Exhibit
19        No. 13, for identification, as of
20        12-16-13.)
21   BY MR. CULBERG:
22   Q.    Ms. Roberts, you have been handed what
23   has been marked as Group Exhibit 13.  I assume your
24   counsel will renew his standing objection to these

Page 151

1    documents.
2        MR. IRELAND:  Yes.
3        MR. CULBERG:  I don't want to put words in
4    your mouth, counsel.
5        MR. IRELAND:  Thank you, counsel.
6    BY MR. CULBERG:
7    Q.    Do you recognize these documents?
8    A.    Yes.  This is a suspension.
9    Q.    This first page, WC-0003103, what's this
10   document?
11   A.    Suspension for unprofessionalism and was
12   using foul language in front of team members.
13   Q.    And is this the same as the incident
14   that we talked about before?
15   A.    Yes.
16   Q.    And that's where the women came in and
17   were causing problems and you were swearing?
18   A.    Yes.
19   Q.    That is your signature on the bottom?
20   A.    Yes.
21   Q.    And that's dated October 14, 2013?
22   A.    Yes.
23   Q.    Okay.  On the second page of this
24   document, and this is the last one of these that we

Page 152

1    will do, I promise, it says, "WC-0003104."  What is
2    this document?
3    A.    It's a suspension paper for unexcused
4    absence.
5    Q.    Let me know if I am reading this
6    correctly.  It says, "Violation of the White Castle
7    Restaurant Division Team Member Handbook.  Candice
8    was reprimand on 9/20/2013.  Candice has an
9    unexcused absence on 12/2/2013."  Is that right?
10   A.    Yes.
11   Q.    Were you, in fact, reprimanded on
12   September 20, 2013?
13   A.    I don't recall it, but, yeah, if that's
14   what they're saying.
15   Q.    Did you have an unexcused absence on
16   December 2, 2013?
17   A.    Yeah.
18   Q.    Is that the day when you were -- tried
19   to schedule your vacation and you were denied?
20   A.    Yes.
21   Q.    You mentioned earlier, I think, when we
22   were talking about the incident with the scheduled
23   vacation that you knew that you were close to
24   having one last unexcused absence; is that right?



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                 153–156

Page 153

1     A.   No.  I said earlier she knew I was going
2  to call off if I didn't get my vacation.  That's
3  why she did it to me.  That's what she did, because
4  she knew -- like this other call off that I got
5  reprimanded for, the last one that was in there,
6  because I requested off, and she didn't give it to
7  me.  So she already knew that I was going to call
8  off.
9     Q.   Explain to me the White Castle
10  attendance policy as you understand it.  Are there
11  a certain number of unexcused absences that you
12  have before you're suspended?
13     A.   Yes.
14     Q.   How many?
15     A.   I think it's like one or two.  One or
16  two.  Two unexcused absences like and a certain
17  amount of lates will make you get suspended.
18     Q.   Did you understand that you were one
19  unexcused absence away from a suspension?
20     A.   No.
21     Q.   You didn't understand that?
22     A.   No, because literally I had just went in
23  the Team Member Attendance thing and put down that
24  I was going to be absent, and it didn't say nothing

Page 154

1  about that I should be suspended.  It tells you
2  what you're supposed to do, and it didn't say
3  nothing about a suspension.
4        So that's why when she gave me the
5  suspension, I said, "Well, when I went in the team
6  member thing, it didn't say I was suspended."  She
7  said, "Oh, no.  Oh, no.  That don't matter."  Okay.
8     Q.   So you thought that the suspension was
9  unfair?
10     A.   Yes.
11     Q.   Did you complain to anyone about the
12  suspension?
13     A.   I complained to Barbie.
14     Q.   Who is Barbie?
15     A.   Barbie is Stacey's boss.  She is the
16  district.
17     Q.   Barbie is the district manager?
18     A.   Uh-huh.
19     Q.   What did you tell her when you
20  complained?
21     A.   I mean, I told her everything.  I told
22  her that I had talked to Stacey.  I put -- well,
23  let me start.  I put my request in the beginning of
24  November.  Yes.  The beginning of November I put my

Page 155

1  request in for my vacation.
2        They never -- they finally get back to
3  me the day before Thanksgiving and tell me that I
4  can't have my vacation.  That's the day that she
5  got back to me.  So I told Barbie that I talked to
6  Stacey on the phone the week before Thanksgiving,
7  and she told me that she was going to see if there
8  was anybody on vacation.  If there was nobody on
9  vacation, she was going to give it to me.
10        I knew there was nobody on vacation,
11  because I went in the vacation book, and nobody was
12  on vacation.
13        So I thought right then that I was going
14  to get it.  She comes the day before Thanksgiving,
15  because I had to work nights with her, "Oh, I can't
16  give you vacation, because I'm going to be off and
17  Kattie is going to be off," but I'm saying to
18  myself that you come back Tuesday and Kattie comes
19  back Wednesday.  So there's like five other
20  managers left in here.  What's that got to do with
21  me?
22        Which Barbie said on the phone was like,
23  "Really, what does that got to do with you?  She
24  still could have gave you your vacation, because

Page 156

1  she had all of them managers."
2        I sat there, and then the lady going to
3  -- the lady, Stacey, going to lie and say that she
4  didn't talk to me on the phone.  So I say, "You all
5  got Rapid Eye, right?"  She's like, "Yeah."  I
6  said, "Okay.  Well, can we watch Rapid Eye to see
7  if me and this lady had this talk, because I
8  remember exactly where I was at when I talked to
9  her.  I was right there by the pop machine in the
10  dining room.  You all can listen out there."
11        I said the lady told me on the phone
12  that she was going to give me my vacation.  I told
13  her that I was going to go to my cousin's wedding,
14  and I had other stuff that I had to take care of
15  that week, too.  She told me that I'm going to look
16  at the vacation book, and if nobody is on vacation,
17  I'm going to give it to you.
18        Now, all of a sudden I couldn't get it?
19  So what do I do?  I say I -- I told her that I had
20  stuff to do that week.  She said, "I'm sorry," and
21  all of this and that, but Kattie is going to be
22  gone.  Kattie going to be gone and I will be gone,
23  but I'm still saying to myself like what do that
24  got to do with me?



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              157—160

Page 157

1        So when the time came that I had to do
2  -- when I had to do it, I called off, because I
3  needed that day off. That's the whole point of me
4  trying to be on vacation, because I knew that she
5  wasn't going to give me the request.
6        So that's why I thought that me trying
7  to think before her, and put my vacation down for
8  me to get it, but that didn't work either.
9    Q.   So you agree that you had an unexcused
10  absence?
11    A.   Yeah.
12    Q.   And you agree that there should have
13  been some punishment for that?
14    MR. IRELAND:  Form.
15  BY THE WITNESS:
16    A.   I don't agree. There should have been
17  no punishment, because I tried to get the day off.
18  So I don't agree that it should have been
19  unexcused. If I requested on my vacation, that's
20  my time. You can't deny me of my vacation. That's
21  my time.
22  BY MR. CULBERG:
23    Q.   You understand that White Castle has a
24  policy that prohibits unexcused absences?

Page 158

1    MR. IRELAND:  Form.
2  BY THE WITNESS:
3    A.   And that's why White Castle got the
4  problem that they got now.
5    MR. IRELAND:  Let's take a break. I would
6  like to talk to my client.
7        (WHEREUPON, a discussion was had off
8        the record between the witness and
9        Mr. Ireland outside the hearing of
10        other counsel and the court
11        reporter.)
12  BY MR. CULBERG:
13    Q.   To be clear, since this incident where
14  you had the unexcused call off when you thought
15  that you should have been on vacation, you are
16  still employed at White Castle?
17    A.   Yes.
18    Q.   You are still employed as a crew
19  manager?
20    A.   Yes.
21    Q.   Has your pay been decreased since that
22  incident?
23
24

Page 159

1    A.   No.
2        (WHEREUPON, a certain document was
3        marked Roberts Deposition Exhibit
4        No. 14, for identification, as of
5        12-16-13.)
6  BY MR. CULBERG:
7    Q.   Ms. Roberts, you have been handed what
8  has been marked as Exhibit 14. Do you recognize
9  this document?
10    A.   No. I have never seen it before.
11    Q.   Okay.
12    A.   I don't even know what this is.
13    Q.   It looks like to me that this is a
14  document that was submitted on September 5, 2004,
15  switching you from part time to full time?
16    A.   2004? Oh, this is right after I got
17  hired then.
18    Q.   Did you start at White Castle as a
19  part=time employee?
20    A.   Yes.
21    Q.   And you became a full-time employee?
22    A.   Yes. I didn't know that I had to fill
23  out paperwork.
24    Q.   Does that look like your signature?

Page 160

1    A.   Yes. I don't remember that. I don't
2  recall this. Sorry.
3        (WHEREUPON, a certain document was
4        marked Roberts Deposition Exhibit
5        No. 15, for identification, as of
6        12-16-13.)
7  BY MR. CULBERG:
8    Q.   You have been handed what has been
9  marked as Exhibit 15. Do you recognize this
10  document?
11    A.   Yes.
12    Q.   What is this?
13    A.   A raise review.
14    Q.   A raise review?
15    A.   Yes.
16    Q.   What's a raise review?
17    A.   They go by how you did all year, grade
18  you on it, a point system, that you did your job
19  and telling you what you need to work on.
20    Q.   Does this appear to be a true and
21  accurate copy of the raise review that you received
22  in September of 2004?
23    A.   Yeah. Yes.
24    Q.   On the final page of this document,



CANDICE RENEE ROBERTS                                December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              161–164

Page 161

1  WC-000788, it looks to me like your rate of pay was
2  changed from $6.75 to $6.99; is that right?
3      A.   Yes.
4           (WHEREUPON, a certain document was
5           marked Roberts Deposition Exhibit
6           No. 16, for identification, as of
7           12-16-13.)
8  BY MR. CULBERG:
9      Q.   Now, you have been handed what has been
10 marked as Exhibit 16.  Do you recognize this
11 document?
12     A.   Yes.  It's a raise review.
13     Q.   Does this appear to be a true and
14 accurate copy of the raise review that you received
15 on September 9, 2005?
16     A.   Yes.
17     Q.   And the final page, Bates labelled
18 WC-000829, is that your signature?
19     A.   Yes.
20     Q.   And it looks to me like your rate of pay
21 was raised from $6.99 to $7.41; is that correct?
22
23
24

Page 162

1      A.   Yes.
2           (WHEREUPON, a certain document was
3           marked Roberts Deposition Exhibit
4           No. 17, for identification, as of
5           12-16-13.)
6  BY MR. CULBERG:
7      Q.   Okay.  You have been handed what has
8  been marked as Exhibit 17.  Do you recognize this
9  document?
10     A.   Yes.
11     Q.   What is it?
12     A.   A request for promotion.
13     Q.   Do you remember seeing this document
14 before?
15     A.   They -- I didn't see it.  They just put
16 it in my packet.
17     Q.   Okay.  It looks to me like this is the
18 document promoting you from team member to crew
19 manager at Castle No. 58.  Does that look right?
20     A.   Yes.
21     Q.   And this is dated October 7, 2005.  To
22 the best of your memory is that when you were
23 promoted to crew manager?
24     A.   To the best of my ability, yes.

Page 163

1      Q.   Okay.
2           (WHEREUPON, a certain document was
3           marked Roberts Deposition Exhibit
4           No. 18, for identification, as of
5           12-16-13.)
6  BY MR. CULBERG:
7      Q.   You have been handed what has been
8  marked as Exhibit 18.  Do you recognize this
9  document?
10     A.   Yes.
11     Q.   What is it?
12     A.   A raise review.
13     Q.   Does this appear to be a true and
14 accurate copy of the raise review that you received
15 on September 10, 2006?
16     A.   Yes.
17     Q.   On the final page, labelled WC-0000797,
18 is that your signature near the top of the page?
19     A.   Yes.
20     Q.   And it appears as if your rate of pay
21 had been raised from $9.06 to $9.23, and that as of
22 this raise review you would now be making $9.78.
23 Am I understanding that correctly?
24     A.   Yes.

Page 164

1      Q.   Okay.
2           (WHEREUPON, a certain document was
3           marked Roberts Deposition Exhibit
4           No. 19, for identification, as of
5           12-16-13.)
6  BY MR. CULBERG:
7      Q.   You have been handed what has been
8  marked as Exhibit 19.  Do you recognize this
9  document?
10     A.   Yes.
11     Q.   And what is it?
12     A.   A raise review.
13     Q.   Does this appear to be a true and
14 accurate copy of the raise review that you received
15 on September 1, 2007?
16     A.   Yes.
17     Q.   If you turn to the last page,
18 WC-0000839, is that your signature on the top of
19 the page?
20     A.   Yes.
21     Q.   And it appears to me as if your rate of
22 pay had been raised from $9.78 to $10.09, and now
23 again to $10.59.  Did I read that correctly?
24     A.   Yes.



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                165–168

Page 165
1    Q.   There are a lot of these.  You have been
2  working here for a long time.
3              (WHEREUPON, a certain document was
4              marked Roberts Deposition Exhibit
5              No. 20, for identification, as of
6              12-16-13.)
7  BY MR. CULBERG:
8    Q.   You have been handed what has been
9  marked as Exhibit 20.  Do you recognize this
10 document?
11   A.   Yes.
12   Q.   What is it?
13   A.   A raise review.
14   Q.   Does it appear to be a true and accurate
15 copy of the raise review that you received on June
16 7, 2008?
17   A.   Yes.
18   Q.   If you turn to the last page,
19 WC-0000850, is that your signature on the top of
20 the page?
21   A.   Yes.
22   Q.   And it appears that your rate of pay has
23 been raised from $10.59 to $10.99; is that right?
24   A.   Yes.

Page 166
1    Q.   And just so that we are clear about
2  something, all of these documents that we have
3  referred to as raise reviews, the front page of
4  them says, "Performance Appraisal, Planning and
5  Development Form," is that right?
6    A.   Yes.
7    Q.   And raise review we are using to mean
8  the same thing as a Performance Appraisal, Planning
9  and Development Form?
10   A.   Yes.
11   Q.   Okay.
12             (WHEREUPON, a certain document was
13             marked Roberts Deposition Exhibit
14             No. 21, for identification, as of
15             12-16-13.)
16 BY MR. CULBERG:
17   Q.   You have been handed what has been
18 marked as Exhibit 21.  Do you recognize this
19 document?
20   A.   Yes.
21   Q.   And what is it?
22   A.   A promotion form.
23   Q.   And what -- it looks like you were being
24 promoted from crew manager to assistant general

Page 167
1  manager?
2    A.   Yes.
3    Q.   And this is in Castle 67?
4    A.   Yes.
5    Q.   That's the Dolton location?
6    A.   Yes.
7    Q.   Your signature is not on this document,
8  but it's dated June 12, 2008.  Is that when you
9  remember being promoted to assistant general
10 manager?
11   A.   Yes.
12   Q.   And is that when you were transferred to
13 the Dolton location?
14   A.   I was transferred like a week after
15 that.
16   Q.   Okay.
17             (WHEREUPON, a certain document was
18             marked Roberts Deposition Exhibit
19             No. 22, for identification, as of
20             12-16-13.)
21 BY MR. CULBERG:
22   Q.   You have been handed what has been
23 marked as Exhibit 22.
24   A.   Yes.

Page 168
1    Q.   Do you recognize that document?
2    A.   Yes.
3    Q.   What is it?
4    A.   It's a performance appraisal and raise
5  review.
6    Q.   We can keep just saying raise review.
7  It's easier.  I like that shorthand.
8         Does this appear to be a true and
9  accurate copy of the raise review that you received
10 on August 27, 2008?
11   A.   Yes.
12   Q.   And on the final page of this document,
13 WC-0000858, is that your signature?
14   A.   Yes.
15   Q.   And it appears from this document that
16 your rate of pay had been raised from $12.42 to
17 $12.58 and would now be $12.67; is that correct?
18   A.   Yes.
19             (WHEREUPON, a certain document was
20             marked Roberts Deposition Exhibit
21             No. 23, for identification, as of
22             12-16-13.)
23 BY MR. CULBERG:
24   Q.   Okay.  You have now been handed what has

CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
169–172

Page 169

1  been marked as Exhibit 23.  Do you recognize this
2  document?
3      A.   Yes.
4      Q.   What is it?
5      A.   A raise review.
6      Q.   Does this appear to be a true and an
7  accurate copy of the raise review that you received
8  on September 5, 2009?
9      A.   Yes.
10     Q.   And on the final page, WC-0000706, is
11 that your signature?
12     A.   Yes.
13     Q.   And if you turn to on that document the
14 page labelled WC-0000703, is that your signature
15 near the top of the page?
16     A.   Yes.
17     Q.   It looks as if your rate of pay was
18 raised from $12.67 to $13.18; is that correct?
19     A.   Yes.
20         (WHEREUPON, a certain document was
21         marked Roberts Deposition Exhibit
22         No. 24, for identification, as of
23         12-16-13.)
24 BY MR. CULBERG:

Page 170

1      Q.   You have been handed what has been
2  marked as Exhibit 24.  Do you recognize this
3  document?
4      A.   Yes.
5      Q.   And what is it?
6      A.   A raise review.
7      Q.   Does this appear to be a true and an
8  accurate copy of the raise review that you received
9  on December 8, 2010?
10     A.   Yes.
11     Q.   If you turn to the final page of this
12 document, WC-0000721, is that your signature on top
13 of the page?
14     A.   Yes.
15     Q.   It appears as if your rate of pay has
16 been raised from $13.18 to $13.91; is that correct?
17     A.   Yes.
18         (WHEREUPON, a certain document was
19         marked Roberts Deposition Exhibit
20         No. 25, for identification, as of
21         12-16-13.)
22 BY MR. CULBERG:
23     Q.   You have been handed what has been
24 marked as Exhibit 25.  Do you recognize this

Page 171

1  document?
2      A.   Yes.
3      Q.   What is it?
4      A.   A raise review.
5      Q.   Does it appear to be a true and accurate
6  copy of the raise review that you received on
7  August 26, 2011?
8      A.   Yes.
9      Q.   If you turn to Page WC-0000734, which is
10 the final page of this document, is that your
11 signature on the top?
12     A.   Yes.
13     Q.   It appears as if your rate of pay has
14 been raised from $13.71 to $13.98; is that correct?
15     A.   Yes.
16         (WHEREUPON, a certain document was
17         marked Roberts Deposition Exhibit
18         No. 26, for identification, as of
19         12-16-13.)
20 BY MR. CULBERG:
21     Q.   You have been handed what has been
22 marked as Exhibit 26.  Do you recognize this
23 document?
24     A.   Yes.

Page 172

1      Q.   What is it?
2      A.   A raise review.
3      Q.   If you turn to the page that's been
4  marked WC-0000742, is that your signature on the
5  page?
6      A.   Yes.
7      Q.   And does this appear to be a true and
8  accurate copy of the raise review that you received
9  on August 30, 2012?
10     A.   Yes.
11     Q.   It appears as if your pay has been
12 raised from $13.98 to $14.26; is that correct?
13     A.   Yes.
14         (WHEREUPON, a certain document was
15         marked Roberts Deposition Exhibit
16         No. 27, for identification, as of
17         12-16-13.)
18 BY MR. CULBERG:
19     Q.   You have been handed what has been
20 marked as Exhibit 27.  Do you recognize this
21 document?
22     A.   Yes.
23     Q.   What is this?
24     A.   A reclassification.



CANDICE RENEE ROBERTS                                      December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                    173–176

Page 173

1    Q.   What does that mean?
2    A.   This is when they promoted me from
3  assistant to a crew manager.
4    Q.   Okay.  And you understood that to be a
5  demotion?
6    A.   Yes.
7    Q.   Where it says, "No. 1 reason," it says,
8  "Organizational Restructure."  Is that right?
9    A.   Uh-huh.  Yes.
10   Q.   Did you understand that's why you were
11 being demoted?
12   A.   I don't understand what that means.
13   Q.   Why did you understand that you were
14 being demoted?
15   MR. IRELAND:  Asked and answered.
16 BY THE WITNESS:
17   A.   I was understanding that I was being
18 demoted because maybe I didn't answer the questions
19 right in the interview.
20 BY MR. CULBERG:
21   Q.   All right.
22   A.   Or maybe I didn't have a car, because
23 they need assistants to have a car.  I don't know.
24   Q.   Do you think that the demotion had

Page 174

1  anything to do with this lawsuit?
2    A.   I didn't have the lawsuit when this
3  demotion came.
4    Q.   Is that your signature on the bottom of
5  the page?
6    A.   Yes.
7    Q.   And that's dated June 20, 2013?
8    A.   Yes.
9    Q.   Is that when you remember being
10 reclassified?
11   A.   Yes.
12      (WHEREUPON, a certain document was
13      marked Roberts Deposition Exhibit
14      No. 28, for identification, as of
15      12-16-13.)
16 BY MR. CULBERG:
17   Q.   You have been handed what has been
18 marked as Exhibit 28.  Do you recognize this
19 document?
20   A.   A raise review.
21   Q.   Does it appear to be a true and accurate
22 copy of the raise review that you received on June
23 20, 2013?
24   A.   Yes.

Page 175

1    Q.   If you turn to Page WC-0000761, which is
2  the last page of this document, is that your
3  signature?
4    A.   Yes.
5    Q.   It appears as if your rate of pay was
6  increased from $14.26, and it was increased
7  21 cents.  So that would raise us to $14.47.  Is
8  that correct?
9    A.   Yes.
10   Q.   Is that your current rate of pay?
11   A.   No.  I just had a raise.
12   Q.   What is your current rate of pay?
13   A.   14.65.
14   Q.   When was that raise?
15   A.   October 11th.
16   Q.   When you were hired at 103rd Street, did
17 you receive any sort of orientation or training?
18   MR. IRELAND:  Form.
19 BY THE WITNESS:
20   A.   Yes.  I went to orientation, or I did
21 like a couple of days they showed me where
22 everything was at.  Stuff like that.
23 BY MR. CULBERG:
24   Q.   Tell me more about the orientation.

Page 176

1  What did they tell you?
2    A.   In the orientation you had to watch
3  movies.  There is a hamburger movie, a safety
4  movie.  It's like five movies that we had to watch,
5  and then they let you work on the floor for a
6  little while to get you to get the feel for it, and
7  they showed you where everything was at and where
8  they put everything at.
9       (WHEREUPON, a certain document was
10      marked Roberts Deposition Exhibit
11      No. 29, for identification, as of
12      12-16-13.)
13 BY MR. CULBERG:
14   Q.   You have been handed what has been
15 marked as Exhibit 29.  Do you recognize that
16 document?
17   A.   Yes.
18   Q.   What is that?
19   A.   An orientation form.
20   Q.   And is that your signature on the
21 bottom?
22   A.   Yes.
23   Q.   And it's dated October 11, 2003?
24   A.   Yes.



CANDICE RENEE ROBERTS                               December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                            177–180

Page 177

1    Q.   So it looks like there were seven
2  different items in the orientation that you had to
3  check off; is that right?
4    A.   Uh-huh.  Yes.
5    Q.   The first is the orientation video?
6    A.   Yes.
7    Q.   What do you remember about the
8  orientation video?
9    A.   They was just telling you what White
10 Castle's goals are, and how to make the burgers and
11 stuff like that.
12   Q.   Aside from orientations, did you receive
13 any other types of training at White Castle?
14   MR. IRELAND:  Form.
15 BY THE WITNESS:
16   A.   Orientation like on-hands training of
17 making the burgers, them showing me how to make the
18 burgers.
19 BY MR. CULBERG:
20   Q.   Do you have any kind of safety training?
21   A.   Yeah.  We had to watch a safety video.
22   Q.   Okay.  Did you receive any training on
23 White Castle policies?
24   MR. IRELAND:  Form.

Page 178

1  BY THE WITNESS:
2    A.   Yes.  There is a video that they have
3  for White Castle policy.  No harassment and stuff
4  like that, and they got videos for everyone.
5  BY MR. CULBERG:
6    Q.   Do you remember any other policies
7  besides harassment that you learned about in
8  orientation?
9    MR. IRELAND:  Form.
10 BY THE WITNESS:
11   A.   I learned a lot of stuff, but I don't
12 recall that.
13 BY MR. CULBERG:
14   Q.   It's a long time ago?
15   A.   Yes.
16   Q.   Did you receive training on cash
17 handling at orientation?
18   A.   Yes, at orientation they told me that
19 nobody to sell off my drawer.  That's my drawer.
20 I'm accountable for it, and stuff like that, yes.
21   Q.   Did you receive any training on
22 off-of-the-clock work?
23   A.   No.
24   Q.   When you became a crew manager, did you

Page 179

1  have any type of new training?
2    A.   Yes.  They -- I had a manager who was
3  showing me how to do the stuff that's in the back
4  like with the computers, how to bank the money in
5  the system, and stuff like that, yes.
6    Q.   What else were you taught when you
7  became a crew manager?
8    A.   I was taught that I am supposed to walk
9  around to make sure that all of the safety and
10 hazardous things are -- there is nothing out of
11 whack pretty much.  Just a bunch of stuff.  I had
12 to run a shift.  Stuff like that.
13   Q.   Did you receive any additional training
14 on White Castle policies?
15   MR. IRELAND:  Form.
16 BY THE WITNESS:
17   A.   The only thing that we really watched
18 was movies and the little papers that they had you
19 sign.
20 BY MR. CULBERG:
21   Q.   When you became an assistant general
22 manager, did you receive any training on White
23 Castle policies?
24   A.   White Castle policies?

Page 180

1    MR. IRELAND:  Form.
2  BY THE WITNESS:
3    A.   I had seen the books that they gave us
4  for me to sign, yes.
5  BY MR. CULBERG:
6    Q.   "Books" meaning?
7    A.   Like the Team Member Handbook and stuff
8  like that, and I can pretty much just going by from
9  what I was seeing other people do.
10   Q.   When you became an assistant general
11 manager, did you review any books that we have not
12 gone over today?
13   A.   No.
14   Q.   Everything that you received, you and
15 your assistant general manager, is something that
16 we have already discussed today?
17   A.   Right.
18   Q.   When you became assistant general
19 manager, did you receive any training on White
20 Castle's policies besides what were in the books
21 that we discussed today?
22   MR. IRELAND:  Form.
23 BY THE WITNESS:
24   A.   No.  No special training.  No.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
181–184

Page 181

1  BY MR. CULBERG:
2      Q.  Who is Jimmy Jenkins?
3      A.  An ex-co-worker.
4      Q.  When did you work with him?
5      A.  2012.  So when I first got over there
6  to 2012.  I don't know the exact date that I got
7  over there.  When I first got promoted to 2012.
8      Q.  Is your testimony that when you started
9  at the Dolton location, Jimmy Jenkins was already
10  working there?
11      A.  Uh-huh.  Yes.
12      Q.  What was his position there?
13      A.  He was a crew manager.
14      Q.  He was a crew manager at Dolton, and you
15  were hired as an assistant general manager?
16      A.  Yes.
17      Q.  And I'm correct in understanding that
18  when you started at Dolton you were, therefore,
19  above Jimmy Jenkins?
20      A.  Yes.
21      Q.  When did Jimmy Jenkins leave White
22  Castle?
23      MR. IRELAND:  Form.
24

Page 182

1  BY THE WITNESS:
2      A.  I don't know exactly what day, but I
3  just know one day he was on the schedule, and he
4  was gone.
5  BY MR. CULBERG:
6      Q.  From when you started at White Castle
7  until Jimmy Jenkins was no longer employed by White
8  Castle, was he always a crew manager?
9      A.  Yes.
10      Q.  Was he a good employee?
11      A.  Yes.
12      Q.  Tell me about him as an employee.
13      A.  Jimmy -- he always went out of his way
14  to make sure that -- he made sure that you had
15  stuff stocked up, he made sure that his team
16  members were clean, he made sure his place was
17  clean for the next shift.
18          He just always tried to help you.  He
19  just did his job.  That's one thing that I can say
20  is that he did his job.  He ain't the best manager
21  that we ever had, but he was one of them.
22      Q.  Did you ever have to reprimand Jimmy
23  Jenkins?
24      A.  No.

Page 183

1      Q.  Did you ever see Jimmy Jenkins repay
2  drawer shortages with his own money?
3      A.  Yes.
4      Q.  You personally witnessed that?
5      A.  Yes.  In the time that all of this stuff
6  came about with him getting in trouble, I was on
7  the shift that day when he put the customer's money
8  in the drawer and stuff like that.
9      Q.  And when you say that all of this stuff
10  came about, what are you talking about?
11      A.  As far as him getting suspended, and
12  they was trying to fire him over that customer --
13  taking the customer's change, or whatever that was,
14  when he just put the money in the drawer.  That's
15  the only reason that I stood up and said something
16  about it, because he was going to get fired over
17  something that we was already doing.
18          Like that's what we do if a customer
19  leaves their change and somebody is short, and if
20  the team member don't tell us that the customer
21  leaves the change, we just assume that it goes to
22  the -- do you know what I'm saying?
23          If the person is short the same amount
24  of money that the customer left, we assumed it goes

Page 184

1  to their drawer.  So we just put it on their
2  drawer.
3          So that's why I couldn't just stand by
4  and let him get in trouble for something like that
5  when I know that we was already doing it.
6      Q.  Okay.  Let's start at the beginning.  So
7  what happened in this incident?  Just take me all
8  of the way through it.
9      A.  A customer left their change there.
10      Q.  A customer left their change?
11      A.  Yeah, left his change.
12      Q.  How much change was it?
13      A.  I think it's like $13, or something like
14  that.
15      Q.  And what was Jimmy Jenkins doing at that
16  time?
17      A.  He was on the -- making the burgers.
18  The boy on drive through is the one who -- the
19  customer left their change with, and when he went
20  to go and count his drawer down, he said that he
21  was over.
22      Q.  "He" being?
23      A.  The boy who was on drive through, which
24  is Chris.  He said that his drawer was over such



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              185–188

Page 185

1  and such and all of this and that.  So Jimmy went
2  back trying to figure out what was going on and
3  where the money go, and when he counted down the
4  other person's drawer, the other person was short
5  the money that Chris was left over.  So Jimmy put
6  the money on the person's drawer thinking that it
7  was their money, but it wasn't.
8       So when the customer came back and said,
9  "I didn't get my change back," and then when they
10  looked for it and stuff like that, they seen that
11  Jimmy had -- he went over basically, and so they
12  said that he stole the money because they went
13  over, but in actually he put the money on an
14  employee's drawer, which he told them, in which we
15  did tell them, but then it still didn't matter.
16      Q.   You were working when this happened?
17      A.   Yeah.  We was on nights.
18      Q.   Were you working when the customer left
19  his change?
20      A.   Yes.
21      Q.   And you were working when Jenny Jenkins
22  moved that cash from one drawer to the other
23  drawer?
24      A.   Yes.

Page 186

1       Q.   Did you personally see that happen?
2       A.   I didn't personally see it, but he came
3  up and asked what he should do, and that's when I
4  said if that person is short, then it must go in
5  their drawer.
6       Q.   So when Jimmy Jenkins came to you, what
7  exactly --
8       A.   He told me Chris was over.
9       Q.   Let me finish.
10      (Continuing) -- what exactly did he ask
11  you?
12      A.   He said that Chris was over.  What I
13  should do?  I said, well, wait until you count down
14  everybody else so I could see where it goes.
15  That's what we usually do.  Wait until we count
16  down everybody on the shift, and if somebody else
17  is short, then bam, of course the money go in their
18  drawer.  So that's how we used to do it, but --
19      Q.   Where did you learn how to do that?
20      A.   That's just what we do.  Like if
21  somebody is over and this person is short, you just
22  put the money on their drawer, and balance it out.
23      Q.   And Jimmy Jenkins did exactly what you
24  told him to do?

Page 187

1       A.   Yeah, he balanced it out.  Yeah, and it
2  came down to that it was the customer's change,
3  something that we didn't know, but they tried to
4  make it seem like he put the money in his pocket.
5       Q.   When did the customer come back?
6       A.   They came back the next day, because
7  when I came back to work, that's when everybody was
8  coming up to me saying that they're trying to fire
9  Jimmy, and all of this and that stuff.
10      Q.   Were you there when the customer came
11  back?
12      A.   No.
13      Q.   What is Chris's last name?
14      A.   Hanna.
15      Q.   Chris Hanna?
16      A.   Uh-huh.
17      Q.   And I'm sorry if it sounds like I am
18  repeating myself, but I just want to make sure that
19  we are exactly on the same page.  So Chris Hanna
20  had a drawer overage of --
21      A.   13.
22      Q.   -- $13.61?
23      A.   I don't know how much change, but I just
24  know it was $13.

Page 188

1       Q.   Okay.  About $13 --
2       A.   Right.
3       Q.   -- and change?
4       A.   Yes.
5       Q.   And there was another drawer that was
6  short how much?
7       A.   Another person's drawer was
8  short that $13.
9       Q.   Also about $13.
10      A.   And that's why we thought that it went
11  to his drawer.
12      Q.   So that was a coincidence?
13      A.   Right.
14      Q.   Okay.
15      A.   Right.  He just was short, and we --
16      Q.   Was Jimmy at one of those drawers?
17      A.   No.
18      Q.   Jimmy was managing two people at the --
19      A.   Right.  Jimmy was making burgers, and I
20  was French frying.  So then we'll switch, and he'll
21  make French fries, and I'll make burgers.
22      Q.   What was the employee's name at the
23  other drawer?
24      A.   I can't recall their name.  I just know



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
189—192

Page 189

1 that Chris was the main one, because he was the
2 main one in it.
3     Q.   Was Sylvia Anderson the general manager
4 at this time?
5     A.   Yes.
6     Q.   Was Sylvia Anderson the person who made
7 the decision to fire Jimmy Jenkins?
8     A.   I don't know who made the decision.
9     Q.   Did you tell Sylvia Anderson what
10 happened?
11     A.   Yeah. I told her, and I also told
12 Darien -- I told -- when he called and said did we
13 -- he didn't ask about the situation, but he called
14 and asked have we ever did stuff like that before.
15     He called around to all of us and asked
16 us that, and we all -- well, I don't know who
17 didn't tell him, but I know that I told him that I
18 did do that. We do put money back in drawers and
19 stuff like that.
20     Q.   Sorry. This is Darien?
21     A.   Yes. Darien.
22     Q.   And what is his job?
23     A.   He was our district supervisor at the
24 time.

Page 190

1     Q.   At the time he was the district
2 supervisor?
3     A.   Yeah.
4     Q.   Did you tell Darien that you had
5 instructed Jimmy Jenkins to move the cash from one
6 drawer to the other?
7     A.   No.
8     Q.   Why not?
9     A.   Jimmy was going to do it anyway. It
10 ain't like I was really like, "Do it Jimmy." No.
11 I just said, "Well, if they're short, then it might
12 go to the next person."
13     I wasn't saying like legally take it out
14 and put it in there. I was just saying if somebody
15 else is short, then it might go to them.
16     Q.   I'm confused about what actually
17 happened. Let's do this one more time. So Jimmy
18 Jenkins came to you and said what?
19     A.   He was saying that Chris was over, and I
20 said, "Well, if Chris is over, maybe somebody else
21 is short." We just turned around, and the other
22 boy was short. So --
23     Q.   Did Jimmy tell you that the other guy
24 was short?

Page 191

1     A.   Yes.
2     Q.   And then what did you tell Jimmy?
3     A.   Nothing. He just put the money in. He
4 had already put the money in there.
5     Q.   So you did not tell Jimmy to put the
6 money from one drawer to the other?
7     A.   No. He already did it. He already did
8 that. I told him that if somebody is short, then
9 it must be their money, and that's just how
10 everybody thought in the store. That's how every
11 manager thinks in the store.
12     Q.   Jimmy had already moved the money from
13 one drawer to the other before he came and talked
14 to you?
15     A.   No.
16     Q.   I am trying to -- I'm just trying to get
17 it right. This is our chance to get it right.
18     A.   No. He came in and said that the guy
19 was over. I said, "Well, if he over, somebody else
20 might be short. So we're going to hold that off,
21 and if they're short, then we're going to put it
22 under their name," and the guy was short, and
23 that's what they did, put it under his name.
24     That's what all of us managers do. If

Page 192

1 somebody is short and somebody is over, we all put
2 the money on their name. That's what we all do.
3     Q.   When Jimmy came to you, did he already
4 know that the other employee was short?
5     A.   No. That's why he had it sitting out
6 and waiting to end his shift out.
7     Q.   So let me see if I have it right now.
8     Jimmy Jenkins came to you and said that
9 Chris Hanna is over --
10     A.   Right.
11     Q.   -- by about $13.
12     A.   Right.
13     Q.   But you don't remember the exact amount?
14     A.   Right.
15     Q.   You told Jimmy Jenkins, "Let's wait and
16 see. Maybe someone else is short"?
17     A.   Right. Yes.
18     Q.   And if someone else is short, then we
19 can move it from one to the other; is that right?
20     A.   Right, right.
21     Q.   Okay. Did you talk to Jimmy Jenkins
22 again that night?
23     A.   No, because that night he said that the
24 money -- he said that the money was in the drawer.



CANDICE RENEE ROBERTS                        December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                    193–196

Page 193

1 That was okay when he said that the money was in
2 the drawer. So it did go in that drawer. So we
3 left it like that.
4     Q.    Jimmy did come back and tell you that
5 the money went in --
6     A.    Yeah, he said the money -- well, the
7 dude was short. So we left it like that. We left
8 and didn't think nothing of it, and I come back,
9 and he's going to get fired over the money.
10     Q.    And you left that night knowing that
11 Jimmy Jenkins had moved the money from Chris
12 Hanna's drawer to the other drawer?
13     A.    Yeah.
14     Q.    Did you understand that that was against
15 White Castle's policy?
16     MR. IRELAND: Form.
17 BY THE WITNESS:
18     A.    Everything is against White Castle
19 policy, but we still do it.
20 BY MR. CULBERG:
21     Q.    You understood that this was against
22 White Castle policy but it was what you did anyway?
23     MR. IRELAND: Form. Asked and answered.
24

Page 194

1 BY THE WITNESS:
2     A.    Yeah, that's what we did so we don't
3 have to lose our jobs, yes. But that's what White
4 Castle tells you anyway when you first become a
5 manager that if one person is short, then if the
6 next person is over, then of course it goes to
7 their drawer.
8 BY MR. CULBERG:
9     Q.    Okay. Who told you that?
10     A.    That's what they told you when you
11 become a manager. Like when we was trying to
12 figure out where this money goes, that's what your
13 supervisor say -- like right now today, just a
14 couple of days ago we had this same issue. One
15 person was short but somebody was over. What did
16 Stacey do? Move the money to the next person's
17 drawer. That's what they do.
18         That's what I'm saying. Like this is
19 something that they have been doing. This is
20 something that GMs do. So I'm confused how come
21 White Castle don't know what's going on.
22     Q.    And, again, I'm sorry to repeat myself.
23 You said that's what -- I think that you said
24 that's what they tell us when we become managers?

Page 195

1     A.    Yeah, that's how they showed me. When I
2 was watching them as they're training me, that's
3 what they do. So I do what they do.
4     Q.    And all I'm asking you is when you say
5 that's what they told you, who is the "they"?
6     A.    The person who was training me. I seen
7 them do it. So I do it.
8     Q.    And who was that person?
9     A.    Beverly, Sheila. Whoever was training.
10 Anybody.
11     Q.    Who are Beverly and Sheila?
12     A.    They my old assistants in my other
13 store.
14     Q.    Have you seen any -- start over.
15         Have you seen any team members at the
16 Dolton location moving cash from one drawer to
17 another?
18     A.    No, but I seen them cashing out of each
19 other's drawers.
20     Q.    What does that mean?
21     A.    Like it's not your drawer, but you go up
22 there and you cash out, take money, and put the
23 money in the drawer. Stuff like that. Something
24 that you're not supposed to do.

Page 196

1     Q.    And you're not supposed to do that?
2     A.    Right.
3     Q.    Who have you seen doing that?
4     A.    Everybody, but we just cracked down on
5 it Sunday, because we just had another meeting
6 about that, too. We're not supposed to collect off
7 of nobody's drawer now, but that's what we supposed
8 to have not been doing.
9     Q.    Who had the meeting with you on Sunday?
10     A.    Stacey and Barbie. It was on a
11 conference call that they had with us.
12     Q.    So when you say "everybody," you mean
13 everybody that you worked with you saw do that?
14     A.    Yeah, everybody. Especially if we was
15 -- like, I don't know, we all thought like we was
16 like a close knit family. So we do that. We were
17 selling off each other. Like I didn't care if
18 somebody sell off my drawer, because I knew that
19 person wasn't going to steal off my drawer.
20         So we didn't care. It was like you go
21 in there, and cash it out for them.
22     Q.    By selling off each other's drawers, you
23 mean you were standing behind the cash register?
24     A.    I will be making burgers and I tell



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013

197—200

Page 197

1 somebody to go ahead -- go ahead, and you can cash
2 -- if it's my drawer, I let them cash out on my
3 drawer, because I'm a manager, and it don't matter.
4 I barely have a drawer, but other team members I
5 have seen selling off each other's drawers.
6        That's why we just had the little
7 conference call Sunday because another team member
8 came to Stacey about this.
9    Q.   And, again, you understood that was
10 against White Castle policy?
11    MR. IRELAND:  Form.
12 BY THE WITNESS:
13    A.   Yes.
14    MR. IRELAND:  Let's take a break.
15        (WHEREUPON, a recess was had.)
16 BY MR. CULBERG:
17    Q.   Did you ever witness Jimmy Jenkins
18 working off the clock?
19    A.   For inspection.
20    Q.   You saw him working off the clock during
21 an inspection?
22    A.   Yes.
23    Q.   How many times was that?
24    A.   I know the times that I did it, he was

Page 198

1 working off of the clock when I was there.
2    Q.   And you testified, I believe, that you
3 did it one or two times?
4    A.   Uh-huh.
5    Q.   In those one or two times Jimmy Jenkins
6 was there?
7    A.   Yes.
8    Q.   Are you aware of any other
9 off-of-the-clock work that he has performed?
10    A.   No, because I barely didn't work with
11 him like that.
12    Q.   What do you mean that you barely work
13 with him like that?
14    A.   Like we barely worked the same shifts
15 together.
16    Q.   Okay.  Why was that?
17    A.   Because there's like a lot of different
18 managers.  So one week I'll work with him, one week
19 I'll work with another manager.  Just so on and so
20 forth, or one is when I am just by myself.  A lot
21 of times I just be by myself or on the shift with
22 Sylvia.
23    Q.   Were you ever aware of Jimmy Jenkins'
24 hours being rolled from week to week?

Page 199

1    A.   I was aware of everybody's hours -- we
2 all -- everybody knew that if we got overtime, that
3 she was going to pay us for the next week.
4 Everybody knew that.
5    Q.   Did you ever personally see Jimmy
6 Jenkins' hours being rolled?
7    A.   I didn't see it myself.
8    Q.   Let's just make sure that we get it.
9        Did you ever personally see Jimmy
10 Jenkins' hours being rolled?
11    A.   No.
12    Q.   Did you ever personally shave down Jimmy
13 Jenkins' time so he would not make overtime?
14    A.   No.
15    Q.   Did you ever personally see that happen?
16    A.   No.
17    Q.   Are you aware that Jimmy Jenkins is
18 alleging that he was retaliated against for
19 complaining about Sylvia Anderson forcing him to
20 repay drawer shortages?
21    A.   Yeah.
22    Q.   Do you believe that he was retaliated
23 against?
24    A.   Yes.

Page 200

1    Q.   Why do you believe that?
2    A.   Because he always -- they always made
3 him do all of the work in the store.  Any time that
4 he tried to get a request off, he couldn't get it.
5 It's like she always picked on him.  Mr. Jenkins
6 this, Mr. Jenkins that, Mr. Jenkins you ain't do
7 this, Mr. Jenkins that.  Every time it was
8 Mr. Jenkins something.  Mr. Jenkins didn't do this.
9 Mr. Jenkins didn't do that.  She just always used
10 to mess with him.  He used to not want to work the
11 shift with her.
12    Q.   Just to be clear, when you say "she" --
13    A.   Ms. Sylvia.
14    Q.   Okay.  Why do you believe that her
15 behavior towards him was because of the fact that
16 he complained about her?
17    MR. IRELAND:  Form.
18 BY THE WITNESS:
19    A.   I mean, because I didn't see no other
20 behavior before then.  So that's why I took it that
21 way.
22 BY MR. CULBERG:
23    Q.   Did Sylvia Anderson ever tell you that
24 she was retaliating again Jimmy Jenkins?



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
201–204

Page 201

1    A.    No.
2    Q.    Did you ever hear her say that she was
3  retaliating?
4    A.    No.
5    MR. CULBERG:  Now I need to take five minutes.
6        (WHEREUPON, a recess was had.)
7  BY MR. CULBERG:
8    Q.    Did you have an employment contract with
9  White Castle?
10    MR. IRELAND:  Form.
11  BY THE WITNESS:
12    A.    An employment contract?  I don't recall.
13  BY MR. CULBERG:
14    Q.    Do you know what the minimum wage is
15  right now?
16    MR. IRELAND:  Form.
17  BY THE WITNESS:
18    A.    The minimum wage right now is 7 --
19  which one?  State or federal?  I know one of them
20  is like $7.25 and one of them is $8.25.
21  BY MR. CULBERG:
22    Q.    I think that's exactly right, yeah.  My
23  understanding is the federal is 7.25 and the state
24  is 8.25.  You make over the minimum wage, don't

Page 202

1  you?
2    A.    Yes.
3    Q.    By about $6 --
4    A.    Yes.
5    Q.    -- more than the state minimum wage and
6  $8 dollar more than the federal minimum wage?  No.
7  Strike that all.
8        You make over the minimum wage right
9  now; correct?
10    A.    Yes.
11    Q.    Sorry about my math.  And throughout
12  your employment at the Dolton restaurant, you have
13  always earned at least $1.50 more than the minimum
14  wage; is that right?
15    A.    Yes.
16    Q.    And since you have become a crew manager
17  and assistant manager, you have always earned
18  between $3 and $7 over the minimum wage; is that
19  right?
20    A.    Yes.
21    Q.    Do you understand that you are a named
22  plaintiff in this lawsuit?
23    A.    Yes.
24    Q.    Do you understand that you are

Page 203

1  purporting to represent a class of plaintiffs in
2  this lawsuit?
3    A.    Yes.
4    Q.    What do you understand your class --
5  your obligations to be as a class representative?
6    MR. IRELAND:  Form.
7  BY THE WITNESS:
8    A.    To understand the litigation and to
9  report to the -- report to everybody what I know,
10  and I can't recall the other ones, but I do -- I
11  can't recall them.  I'm sorry.
12  BY MR. CULBERG:
13    Q.    Do you understand that under certain
14  circumstances if you lose the litigation, you could
15  be responsible for the costs of the litigation?
16    MR. IRELAND:  Form.
17  BY THE WITNESS:
18    A.    Yes.
19  BY MR. CULBERG:
20    Q.    And you understand that you could be
21  responsible for the costs of the litigation in your
22  personal capacity?
23    MR. IRELAND:  Form.
24

Page 204

1  BY THE WITNESS:
2    A.    Yes.
3  BY MR. CULBERG:
4    Q.    You understand that this could be very
5  expensive?
6    A.    Yes.
7    MR. IRELAND:  Form.
8  BY MR. CULBERG:
9    Q.    Up to hundreds of thousands of dollars?
10    MR. IRELAND:  Form.
11  BY THE WITNESS:
12    A.    Yes.
13  BY MR. CULBERG:
14    Q.    How do you intend to pay for
15  that?
16    MR. IRELAND:  Counsel, I really don't
17  appreciate you misrepresenting the effect of this
18  lawsuit.
19    MR. CULBERG:  I don't think that I am
20  misrepresenting anything, sir.
21    MR. IRELAND:  Yes, you are.  Yes, you
22  are.
23  BY MR. CULBERG:
24    Q.    You can answer the question.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
205–208

Page 205

1     A.    I don't know how I'm going to pay for
2   it.
3     MR. IRELAND:  Let's take a break.
4          (WHEREUPON, a discussion was had off
5          the record between the witness and
6          Mr. Ireland outside the hearing of
7          other counsel and the court
8          reporter.)
9   BY MR. CULBERG:
10    Q.    Who do you propose to represent in this
11  class?
12    A.    I propose to represent all of the
13  plaintiffs that's in the lawsuit.
14    Q.    Now, your testimony, I believe, was that
15  the only violations that occurred against you were
16  when you were either a crew manager or an assistant
17  general manager; is that right?
18    A.    Assistant general manager.
19    Q.    Just an assistant general manager?
20    A.    Uh-huh.  Yes.
21    Q.    Do you think that crew managers and team
22  members should be in this class?
23    MR. IRELAND:  Form.  Legal conclusion.
24

Page 206

1   BY THE WITNESS:
2     A.    I think everybody who was affected by it
3   should be in it.
4   BY MR. CULBERG:
5     Q.    Affected by what?
6     A.    Them getting time taken away or them not
7   getting paid for whatever they did.
8     Q.    Do you think that the class should be
9   all hourly employees?
10    MR. IRELAND:  Form.
11  BY THE WITNESS:
12    A.    No.  It should be whoever was affected
13  even if they were hourly or they on -- what do you
14  call that -- salary.  Whoever is affected.  They
15  don't even have to work there no more.  If they
16  were affected by it when it happened, you should
17  get what you deserve.
18  BY MR. CULBERG:
19    Q.    Are we just talking about the Dolton
20  store?
21    A.    Well, if it's happening in any other
22  store, I would hope that people would come forth
23  and say something.
24    Q.    Are you aware of any violations --

Page 207

1     A.    I don't go to other stores.
2     Q.    Let me just finish.  Sorry.
3          Are you aware of any violations in any
4   other stores?
5     A.    Not that I know of, because I don't go
6   to other stores.
7     Q.    And it was your testimony that at the
8   store at 103rd, you were aware of no violations?
9     A.    Right.
10    Q.    You mentioned, I think, a meeting that
11  happened this past Sunday which involved something
12  of a rule change; is that right?
13    A.    Yes, it happened like two Sundays ago
14  there was a meeting, because a team member had
15  called to talk to the district.  I guess they had a
16  problem going on, and so they had a meeting with
17  all of the managers on the conference call.  They
18  told us not to sell off anybody's drawer.  They
19  said that a member team came to them and said that
20  we was offering -- that a manager told them that
21  they couldn't pay them for the time that they
22  worked this week, and they'll pay them next week,
23  and told them that that's not acceptable and stuff
24  like that.

Page 208

1          Just telling us what the team members
2   came to them saying that the managers was doing to
3   them, and saying that everybody is supposed to get
4   paid for the time that they worked.
5          When a person stays over, make sure that
6   you pay them for what they stay over for, and don't
7   change nobody's time, and that's when they said
8   that the supervisor and the assistant will be
9   changing time now.
10         Like if you come in and you forget to
11  clock in, just let them know, and they will go back
12  and change your time.  You can't do it yourself.
13    Q.    And this was just two Sundays ago?
14    A.    Yes.
15    Q.    Do you have meetings like this often
16  that announce changes in rules or changes in
17  policies?
18    MR. IRELAND:  Form.
19  BY THE WITNESS:
20    A.    Well, lately since White Castle is
21  changing everything around, they have been having
22  meetings left and right, but not -- it's like -- we
23  had like two conference calls, too, but it wasn't
24  about the hours.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
209–212

Page 209

1      The first one was about what the new
2  procedures that they want done, about the labor
3  deployment that they started and stuff like that.
4  BY MR. CULBERG:
5      Q.   What kind of procedures?
6      A.   It's labor deployment.  They was saying
7  how they're going to have on-call people coming in,
8  and just telling us how to do stuff like that, but
9  this last meeting was due to a team member who
10 called in.
11     Q.   Do you know who called in?
12     A.   Yeah.
13     Q.   Who was it?
14     A.   Linda Mootry.
15     Q.   Who is that?
16     A.   She's a crew member.  She has been there
17 for -- she has been working there for like 20-some
18 years.
19     Q.   What did she call in about?
20     A.   Well, I don't want to say what she
21 called in -- I don't know what she called in for,
22 because I didn't talk to her per se, but they said
23 it's something about her chart work.
24     Q.   Her chart work?

Page 210

1      A.   Yeah.
2      Q.   Did you don't know personally?
3      A.   No, I don't know personally.
4      Q.   At your first store at 103rd were
5  workers there working overtime?
6      A.   No.
7      Q.   Are you aware of any White Castle stores
8  where workers were working overtime?
9      A.   Well, we heard that there was other
10 stores working.  Based on the little paper they
11 sent out, they had the stores that was given out
12 the whole time that tell how much overtime they was
13 giving.  So I don't know like the Council numbers
14 that there were, but --
15     Q.   Remind me of the piece of paper that you
16 got.  What was that?
17     A.   It's like an overtime sheet that they
18 sent in through the e-mails, and they say who had
19 overtime for the week.  Every Castle is in there,
20 and they say who had overtime.  They have like, "67
21 great job.  No overtime."  Do you know what I'm
22 saying?  Stuff like that.
23     Q.   And through that piece of paper or list
24 you are aware of some stores where overtime is

Page 211

1  being worked?
2      A.   Yeah.
3      Q.   But at the store at 103rd there was no
4  overtime?
5      A.   No.
6      Q.   And at the store at Dolton nobody
7  working overtime?
8      A.   We don't get paid for overtime.  We
9  working it, but we don't get paid for it.
10     Q.   Were there any managers or supervisors
11 at Dolton who were not violating policies?
12     MR. IRELAND:  Form.
13 BY THE WITNESS:
14     A.   Well, Roger Barnes just became -- no,
15 because he was still getting overtime.  So no, I
16 don't know no managers that didn't.
17 BY MR. CULBERG:
18     Q.   All of the managers were violating?
19     A.   Yeah.
20     Q.   Which managers -- let's just list them
21 all to make sure that we have them all.
22     A.   Kathy Loveberry, she definitely.  She is
23 still getting violated.  She don't care.  Rogers
24 Barnes, Loreisa Harper, Gwendolyn Tolbert, and

Page 212

1  that's all of the managers.  That's all of the
2  managers right now.
3      Q.   Are there any former managers since you
4  started at Dolton in 2008 who did not violate
5  policies?
6      MR. IRELAND:  Form.
7  BY THE WITNESS:
8      A.   I don't know.  Everybody that I know did
9  something like that.
10 BY MR. CULBERG:
11     Q.   Do you seek to represent both full-time
12 and part-time employees in this class?
13     MR. IRELAND:  Form.
14 BY THE WITNESS:
15     A.   Yes.
16 BY MR. CULBERG:
17     Q.   Did you have the authority to -- strike
18 that.
19     Just to clear up, a lot of the people in
20 the class you purport to represent you had the
21 ability to edit their time; is that correct?
22     MR. IRELAND:  Form.
23 BY THE WITNESS:
24     A.   Yes.



CANDICE RENEE ROBERTS                                December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              213–216

Page 213

1  BY MR. CULBERG:
2     Q.   And you, in fact, did edit their time?
3     A.   No.  I never did Jimmy's.  No.  I only
4  did the two that I told you about, Kattie and
5  Loreisa and myself.
6     Q.   And Kattie and Loreisa --
7     A.   And myself.
8     Q.   -- could be in this class; is that
9  correct?
10    A.   If you want them to be.
11    Q.   I'm asking you.
12    A.   They are not in it that I know of.
13    Q.   Have you spoken with any current or
14  former White Castle employees about this lawsuit?
15    A.   I spoke to one person.  That was Trina.
16    Q.   Trina.  Trina Epps?
17    A.   Uh-huh.
18    Q.   Is it Epps or Epps?
19    A.   I used to call her Epps.  That's what I
20  used to call her at work.
21    Q.   Okay.  We will just call her Trina.
22    A.   Right.
23    Q.   When did you talk to Trina about the
24  lawsuit?

Page 214

1     A.   When she told me that she was doing it,
2  too.
3     Q.   When was that?
4     A.   Like a month ago.
5     Q.   What did she say to you?
6     A.   She said that she had spoken with the
7  lawyer and all of that stuff.  That's pretty much
8  it.
9     Q.   And what did you tell her?
10    A.   That I'm filing a lawsuit, too.  That's
11  it.
12    Q.   That was the whole conversation?
13    A.   And then we jumped on -- because we know
14  each other outside of White Castle.  So we was just
15  talking about one of our friends who just lost a
16  sister.  That was about it.
17    Q.   Besides that one conversation with
18  Trina, have you spoken with her?
19    A.   Well, I was supposed to come to her
20  deposition with her Saturday.  I was trying to get
21  in contact with her, but I couldn't.
22    Q.   Right.  Have you talked with Jimmy
23  Jenkins about this lawsuit?
24    A.   I haven't talked to Jimmy in a while

Page 215

1  until when he found out that I was in it.  That's
2  the only thing.
3     Q.   So what was that conversation?
4     A.   He just said -- he said, "You finally
5  woke up, too," and that was it.
6     Q.   He called you to say that?
7     A.   No.  He in-boxed me on Facebook.
8     Q.   Do you have a Facebook account?
9     A.   Yes.
10    Q.   Have you done any posting about this
11  lawsuit?
12    A.   No.  I don't even post.  I just inbox.
13    Q.   Do you have Twitter?
14    A.   Yeah, I got Twitter, but I don't use it.
15    Q.   Okay.  Have you ever posted anything or
16  tweeted anything about this lawsuit?
17    A.   No.  I got Instagram, too.
18    Q.   Have you ever posted any pictures about
19  this lawsuit?
20    A.   No.
21    Q.   All right.  Any messages?
22    A.   As a matter of fact, me and Sylvia are
23  still Facebook friends right now today.
24    Q.   Do you know where Sylvia is now?

Page 216

1     A.   Yeah.  I think she is at 50 something,
2  57, or something like that.
3     Q.   At a White Castle store?
4     A.   Uh-huh.
5     Q.   And that's in Chicago?
6     A.   Yes.
7     Q.   Are you aware of whether she is
8  violating any White Castle practices at her new
9  location?
10    A.   Not that I know of.  I know that she
11  have a hard time, because don't nobody come to work
12  down there.
13    Q.   Okay.
14    A.   She called over there and asked us to
15  come over there and work.  That's about it.
16    Q.   She called you to ask you to go work
17  there?
18    A.   Uh-huh.
19    Q.   Have you told her that you are
20  participating in this lawsuit?
21    A.   Well, I'm quite sure that she knows
22  that, because she don't talk to me no more.
23    Q.   But have you personally spoken with her
24  about it?



CANDICE RENEE ROBERTS                                December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              217–220

Page 217

1     A.   No.
2     Q.   Besides Jimmy Jenkins and Trina Epps,
3  have you spoken with any current or former White
4  Castle employee about this lawsuit?
5     A.   Yes.
6     Q.   You filed an affidavit in connection
7  with this lawsuit; is that right?
8     A.   Yes.
9     Q.   You listed a number of employees who you
10 believed had been forced to reduce their hours
11 below 40 hours to avoid being paid overtime; is
12 that right?
13    A.   Uh-huh.
14    Q.   And some of this will overlap with what
15 we went over before.  I just want to make sure we
16 get everything out.
17         The first one is Treyshon Smith?
18    A.   Yes.
19    Q.   What violations against him do you
20 personally know about?
21    A.   I know his overtime got cut personally.
22    Q.   How do you know that?
23    A.   I have a picture of his overtime on my
24 phone, and he don't have it, and he never did get

Page 218

1  paid for it.
2     Q.   This was one occasion?
3     A.   Uh-huh.  Yes.
4     Q.   When was that?
5     MR. CULBERG:  I will note for the record that
6  the deponent is looking at her phone.
7  BY THE WITNESS:
8     A.   I know it was September, right after
9  September 7th.
10 BY MR. CULBERG:
11    Q.   September 7th?
12    A.   Right around there, because it happened
13 right after mine.
14    Q.   And why did you take that picture?
15    A.   For proof.
16    Q.   Why did you take that picture?
17    A.   Because he told me -- because I took a
18 picture of mine, and he said to take a picture of
19 mine for proof just in case I'm going to do it,
20 too.
21    Q.   Have you talked to Mr. Smith about this
22 lawsuit?
23    A.   I think that he talks to Jimmy.
24    Q.   Have you talked to Mr. Smith about this

Page 219

1  lawsuit?
2     A.   No.
3     Q.   How much overtime do you believe that he
4  is entitled to because of this -- the September
5  issue?
6     A.   Not that much.  About -- as a matter of
7  fact, it's right here.  It was .47.
8     Q.   And, again, I will remind you of your
9  obligation to hold onto that picture and not delete
10 it.
11    A.   Okay.
12    Q.   Besides that one incident with
13 Mr. Smith, are you aware of any other wage and hour
14 violations against him?
15    A.   No.
16    MR. IRELAND:  Form.
17 BY MR. CULBERG:
18    Q.   That was a no?
19    A.   No, sir.
20    Q.   You also listed the name Jason Hall.  I
21 don't think that we have spoken about him.  Who is
22 Jason Hall?
23    A.   Jason Hall, he's a part-time crew
24 member.  He worked off of the clock a couple of

Page 220

1  times that I seen him do before.
2     Q.   And when was that?
3     A.   This was in the summertime, like about
4  June or somewhere around that time.
5     Q.   June of 2013?
6     A.   Yes.
7     Q.   Is he a current employee?
8     A.   Yes.
9     Q.   He is part time?
10    A.   Yes.
11    Q.   What did you see him doing?
12    A.   Like he was sweeping off of the clock
13 and stuff like that, trying to help on the floor.
14    Q.   Did you tell him not to do that?
15    A.   Yes.
16    Q.   What did he say?
17    A.   He just kept doing it.
18    Q.   Would you say that there was more than
19 two incidents?
20    A.   Probably not.  Probably just -- that's
21 the one time that I seen.  He probably did it more
22 than that time.
23    Q.   But you're personally aware of one,
24 though?



CANDICE RENEE ROBERTS
December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE
221–224

Page 221

1    A.    Yes.
2    Q.    And aside from that one incident where
3  you saw Jason Hall sweeping off of the clock --
4    A.    I mean, he also came to me plenty of
5  times because I think that he's the reason why we
6  had this meeting, because that's what he told me
7  that the manager told him that she would pay him
8  another day.  So he told me that plenty of times.
9  So I just don't want to put that in there, because
10  that's hearsay.  I didn't actually see it.
11        But he came to me plenty of times saying
12  that the manager was making him work without paying
13  him that day.  Like they have him stay over and
14  don't pay him, and stuff like that.
15    Q.    What manager was he talking about?
16    A.    He said Kattie, Kattie Loveberry did it
17  to him, and he always had me go back and check his
18  hours.
19    Q.    What did you do when he told you that
20  about Kattie Loveberry?
21    A.    I told him that he should go and tell
22  his boss, which is Stacey.
23    Q.    Do you know if he did?
24    A.    I don't know.  I think that he probably

Page 222

1  did by now.
2    Q.    So Jason Hall you witnessed him one time
3  working off the clock, and he came to you a few
4  times?
5    A.    Yes, and he told me about Kattie not
6  paying him.
7    Q.    Besides that, is there anything else
8  that you know about Jason Hall?
9    A.    No.
10    Q.    You listed Roger Barnes?
11    A.    Yes.  He's a crew manager, and he worked
12  off of the clock several -- I mean, he got overtime
13  took from him several times, because him and
14  Loreisa was the two main people that was getting
15  overtime these last couple of months.
16    Q.    They were getting overtime?
17    A.    Yeah, they -- it was like they was
18  trying to get the overtime.  That's how I was
19  taking it.
20    Q.    Were they being paid overtime?
21    A.    No.  They was just getting their time
22  changed.
23    Q.    Who was changing their time?
24    A.    Stacey.

Page 223

1    Q.    Did you personally witness them having
2  their time changed?
3    A.    I just know that they say that they
4  didn't get paid their overtime.
5    Q.    They told you that they didn't get paid
6  their overtime?
7    A.    Right.  And I know that they was in
8  overtime when I left, because when we do the hours.
9  So --
10    Q.    Do you know about how many hours each of
11  them is entitled to?
12    A.    No.
13    Q.    Is it more than five?
14    A.    How many times they was getting
15  overtime?  Like probably, because they was like
16  getting overtime almost every week.  So --
17    Q.    What about Gwen Tolbert?
18    A.    Gwen -- well, she's the one that told me
19  that she took her overtime, and she says that she
20  paid herself the next week.  So that's what Gwen
21  definitely do.  She told me that she got paid.
22  She took her overtime, and she paid her own self.
23  That's what she told me.
24    Q.    So she cheated herself out of overtime?

Page 224

1    A.    No.  She said Stacey took her overtime,
2  and she paid her own self the next week, the
3  following week.  She took it upon herself to pay
4  herself.  She said that I wasn't going to wait for
5  her to pay me.
6    Q.    What is Gwen Tolbert's position?
7    A.    She is a crew manager?
8    Q.    Crew managers have the ability to decide
9  who gets paid what?
10    A.    Huh?  No, she said the lady took my
11  time.  So I'm going to pay myself next week, and
12  that's what she did.  She paid -- and she just
13  fixed her time.  When we do that -- we come in at a
14  certain time, and then we fix our time to a time
15  that we wasn't there.  Say I come in at 11, and
16  I'll change my time to 10.  Do you see what I'm
17  saying?
18    Q.    That's how she did it?
19    A.    Yes.
20    Q.    Have you done that?
21    A.    No.
22    Q.    Are you sure?
23    A.    I had Sylvia do it.
24  MR. IRELAND:  Asked and answered.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
225–228

Page 225

1   BY MR. CULBERG:
2       Q.   I'm not trying to be repetitive.  I'm
3   just confused because you were saying "I."  Have
4   you ever changed your time to give yourself more
5   hours than what you actually worked?
6       A.   No.
7       MR. IRELAND:  Asked and answered.
8   BY THE WITNESS:
9       A.   No.
10  BY MR. CULBERG:
11      Q.   I think that I heard you say no, I had
12  Sylvia do it; is that right?
13      A.   No.  Sylvia did it.  That's what the
14  rolling over is, paying me for my hours the next
15  week.  That's the only time that I got paid for
16  something.
17      Q.   Did you ask Sylvia to do it?
18      A.   No.  She do it because she knew that she
19  took my time.
20      Q.   The last person that you listed was
21  Trina Epps.  You said that you were friends with
22  Trina outside of work?
23      A.   We are associates outside of work.  We
24  don't hang, like go over each other's house, no.

Page 226

1       Q.   Fair enough.  Did you meet at work?
2       A.   Yes.
3       Q.   As far as you know, what claims does
4   Trina Epps have?
5       A.   The only thing that I ever seen Epps do
6   was put money back in the drawer.
7       Q.   How much money did you see her put in
8   the drawer?
9       A.   It was about like five or ten -- five or
10  $10.  That's the only thing that I seen her do on
11  my shift rather.
12      Q.   You never seen her time get shaved down?
13      A.   No.
14      Q.   You never seen her hours rolled?
15      A.   No.
16      Q.   She no longer works at White Castle; is
17  that correct?
18      A.   No.
19      Q.   Aside from these six people that we just
20  listed, Mr. Smith, Mr. Hall, Mr. Barnes,
21  Ms. Harper, Ms. Tolbert and Ms. Epps, are you aware
22  personally of any other employees who have claims
23  against White Castle under this suit?
24      A.   No.  Did you have Ms. Hayes or Johnson

Page 227

1   on there?
2       Q.   I don't have a Ms. Johnson on there.
3       A.   Well, that's the one that we definitely
4   need, because she --
5       Q.   Okay.  Hazel Johnson?
6       A.   Hazel Johnson.
7       Q.   Tell me about Hazel Johnson.
8       A.   They keep taking her -- they have her
9   stay over and -- well, one time --
10      Q.   Sorry.  What is her job?
11      A.   She is a crew member.
12      Q.   Current?
13      A.   Yes.  It was me, the assistant and Hazel
14  working, and she was close to overtime.  I asked
15  the assistant, I said, "Do you want me to send her
16  home so she won't be in overtime?"  She said, "No,
17  no.  We can't afford to send her home," but when
18  Hazel turned around and get her check, she didn't
19  get paid for no overtime, but she worked a lot of
20  overtime that week, but she didn't get paid for it.
21      Q.   And you personally saw that?
22      A.   I personally saw that, and she
23  personally kept coming to me and saying it, you
24  know.

Page 228

1       Q.   Is there anybody else?
2       A.   That's it.  Ms. Hazel.  That's all.
3       Q.   Take a minute to think about it.
4       A.   I told you about Loveberry, right?
5       Q.   We talked about Kattie Loveberry.
6       A.   That's it.
7       Q.   And just to make sure, we've have talked
8   about everything with Kattie Loveberry?
9       A.   Right.  Her overtime definitely, and me
10  and her putting money back in Sylvia's safe.
11      Q.   How much money did you see her put back
12  in Sylvia's safe?
13      A.   I don't know how much she put back in
14  there, but I know that she had to put back money,
15  too.
16      Q.   She put back what?
17      A.   I said I don't know how much she put
18  back, but I know that she had to put back, too,
19  because me and her always used to complain about
20  it.
21      Q.   Okay.  Do you know Laquita Brown?
22      A.   Yes.  I used to work with her.
23      Q.   Do you know anything about any claims
24  that she might have against White Castle?



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              229–232

Page 229

1     A.    No.
2     Q.    In connection with this lawsuit have you
3   tape recorded any conversations?
4     A.    No.
5     Q.    Have you videotaped any communications?
6     A.    No.
7     Q.    We talked earlier about current and
8   former White Castle employees.  Besides your
9   attorney, and I don't want to hear anything about
10  your conversations with him, have you spoken with
11  anyone else about this lawsuit?
12    A.    No.
13    Q.    Not friends or relatives?
14    A.    My mama knows.
15    Q.    Your mom knows?
16    A.    My mama, my auntie who told me that I
17  should get the lawyer.  That's about it.
18    Q.    I won't ask you about your conversations
19  with your mom.  Is there anyone else?
20    A.    Just my mama and my auntie.  No, that's
21  about it.
22    Q.    Do you keep a diary?
23    A.    No.
24    Q.    Do you have a blog?

Page 230

1     A.    No.
2     Q.    Is there any place where you might have
3   written about the events in this lawsuit?
4     A.    No.  Nothing to write about.
5     Q.    You didn't write any e-mails to friends
6   about what was going on to you?
7     A.    No.
8     Q.    No letters?
9     A.    No.
10    Q.    Are you aware of whether any of the
11  other people that we just talked about keep any
12  diaries?
13    A.    Not that I know of.
14    Q.    There's just a few more documents that I
15  want to go through.
16            (WHEREUPON, a certain document was
17            marked Roberts Deposition Exhibit
18            No. 30, for identification, as of
19            12-16-13.)
20  BY MR. CULBERG:
21    Q.    You have been handed what has been
22  marked at Exhibit 30.  Do you recognize this?
23    A.    Chicago Region Leader Cash Handling
24  Procedure.

Page 231

1     Q.    Is that your signature on the bottom of
2   the page?
3     A.    Yes.
4     Q.    And it's dated May 23, 2008?
5     A.    Yes.
6            (WHEREUPON, a certain document was
7            marked Roberts Deposition Exhibit
8            No. 31, for identification, as of
9            12-16-13.)
10  BY MR. CULBERG:
11    Q.    You have been handed what has been
12  marked as Exhibit 31.  Do you recognize this
13  document?
14    A.    A copy of my job record.
15    Q.    And what's a job record?
16    A.    It's everything that they -- like they
17  date what you're doing in the store.  Like if you
18  save hours, like if you're short, if you work past
19  your time.  It's stuff like that.
20    Q.    Does this appear to be -- well, if you
21  turn to the second page, which is WC-0000790, in
22  that bottom right corner is that your signature?
23    A.    Yes.
24    Q.    And it's dated January 22, 2004?

Page 232

1     A.    It looks like a 0, but I don't know.  I
2   want to say it's January 2nd.
3     Q.    Okay.  That's fair.  It's a little
4   smudged.  Does this -- and you can take your time
5   to look through this, but does this appear to you
6   to be a true and accurate copy of the job record
7   report that you received on that day?
8     MR. IRELAND:  Form.
9   BY THE WITNESS:
10    A.    Yes.
11  BY MR. CULBERG:
12    Q.    Is there anything in here with which you
13  disagree?
14    MR. IRELAND:  Form.
15  BY THE WITNESS:
16    A.    Let me see.
17  BY MR. CULBERG:
18    Q.    And take your time.
19    A.    It looks good.  It looks right to me,
20  yes.
21            (WHEREUPON, a certain document was
22            marked Roberts Deposition Exhibit
23            No. 32, for identification, as of
24            12-16-13.)

CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
233–236

Page 233

1 BY MR. CULBERG:
2    Q.  You have been handed what has been
3 marked as Exhibit 32. If you turn to the second
4 page, which is WC-00 -- first, have you seen this
5 document before?
6    A.  Yes.
7    Q.  What is this?
8    MR. IRELAND: Form. Foundation.
9 BY THE WITNESS:
10    A.  It's my job record.
11 BY MR. CULBERG:
12    Q.  And on the bottom right corner of the
13 second page, which is marked WC-0000831, is that
14 your signature?
15    A.  Yes.
16    Q.  And it looks to me like it's dated
17 November 2, 2004; is that right?
18    A.  Yes.
19    Q.  And does this appear to be a true and
20 accurate copy of the employee performance record
21 that you received on that date?
22    MR. IRELAND: Form. Foundation.
23 BY THE WITNESS:
24    A.  Yes.

Page 234

1 BY MR. CULBERG:
2    Q.  Is there anything in that document with
3 which you disagree?
4    MR. IRELAND: Form. Foundation.
5 BY THE WITNESS:
6    A.  No.
7       (WHEREUPON, a certain document was
8       marked Roberts Deposition Exhibit
9       No. 33, for identification, as of
10       12-16-13.)
11 BY MR. CULBERG:
12    Q.  You have been handed what has been
13 marked as Exhibit 33. Do you recognize this
14 document?
15    A.  Yes.
16    Q.  What is it?
17    A.  A job record.
18    Q.  Does this appear to be -- well, if you
19 turn to the second page, which is WC-0000799, is
20 that your signature on the bottom right and bottom
21 left?
22    A.  Yes.
23    Q.  It looks like it's dated September 14,
24 2005. Is that right?

Page 235

1    A.  Yes.
2    Q.  Does this appear to be a true and
3 accurate copy of the employee performance record
4 that you received on that date?
5    MR. IRELAND: Form. Foundation.
6 BY THE WITNESS:
7    A.  Yes.
8    MR. CULBERG: Can I ask what the foundation
9 objection is?
10    MR. IRELAND: She didn't write this.
11    MR. CULBERG: Okay.
12    MR. IRELAND: She didn't. If you want to show
13 it to the person who wrote this, they have
14 foundation.
15 BY MR. CULBERG:
16    Q.  Does this appear to be a true and
17 accurate copy of the document that you received on
18 September 14, 2005?
19    MR. IRELAND: Form and foundation. Asked and
20 answered.
21 BY THE WITNESS:
22    A.  Yes.
23 BY MR. CULBERG:
24    Q.  Is there anything in this document with

Page 236

1 which you disagree?
2    MR. IRELAND: Form and foundation. Scope.
3 BY THE WITNESS:
4    A.  No.
5 BY MR. CULBERG:
6    Q.  Sorry. That was a no?
7    A.  No.
8       (WHEREUPON, a certain document was
9       marked Roberts Deposition Exhibit
10       No. 34, for identification, as of
11       12-16-13.)
12 BY MR. CULBERG:
13    Q.  Okay. You have been handed what has
14 been marked as Exhibit 34. Do you recognize this
15 document?
16    MR. IRELAND: Form. Foundation.
17 BY THE WITNESS:
18    A.  Yes.
19 BY MR. CULBERG:
20    Q.  What is it?
21    MR. IRELAND: Form. Foundation.
22 BY THE WITNESS:
23    A.  It's a job record.
24 BY MR. CULBERG:



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
237–240

Page 237

1      Q.   On the second page of the document,
2  which is labelled WC-0000841, does that appear to
3  be your signature on the bottom right and bottom
4  left corners?
5      A.   Yes.
6      Q.   And that looks like it's dated 1/7/07 or
7  1/17/07?
8      A.   Yes.
9      Q.   Does this appear to be a true and
10  accurate copy of the document that you received on
11  that day?
12      A.   Yes.
13      MR. IRELAND:  Form and foundation.
14  BY MR. CULBERG:
15      Q.   Is there anything in this document with
16  which you disagree?
17      MR. IRELAND:  Form.  Foundation.  Scope.
18  BY THE WITNESS:
19      A.   No.
20          (WHEREUPON, a certain document was
21          marked Roberts Deposition Exhibit
22          No. 35, for identification, as of
23          12-16-13.)
24  BY MR. CULBERG:

Page 238

1      Q.   You have been handed what has been
2  marked as Exhibit No. 35.  Do you recognize this
3  document?
4      A.   Yes.
5      Q.   What is it?
6      MR. IRELAND:  Form.  Foundation.
7  BY THE WITNESS:
8      A.   A job record.
9  BY MR. CULBERG:
10      Q.   Sorry.  It's a job record?
11      A.   Yes.
12      Q.   If you turn to the second page of the
13  document, WC-0000843, is that your signature on the
14  bottom?
15      A.   Yes.
16      Q.   And does this appear to be a true and
17  accurate copy of the employee performance record
18  that you received?
19      MR. IRELAND:  Form and foundation.
20  BY THE WITNESS:
21      A.   Yes.
22          (WHEREUPON, a certain document was
23          marked Roberts Deposition Exhibit
24          No. 36, for identification, as of

Page 239

1          12-16-13.)
2  BY MR. CULBERG:
3      Q.   You have been handed what has been
4  marked as Exhibit 36.  Do you recognize this
5  document?
6      A.   Yes.
7      Q.   And what is it?
8      A.   A job record.
9      Q.   On the second page, which is Bates
10  labelled WC-0000723, is that your signature?
11      A.   Yes.
12      Q.   And does this appear to be a true and
13  accurate copy of the job record that you received?
14      MR. IRELAND:  Form and foundation.
15  BY THE WITNESS:
16      A.   Yes.
17  BY MR. CULBERG:
18      Q.   Is there anything on this document with
19  which you disagree?
20      MR. IRELAND:  Form.  Foundation.  Scope.
21  BY THE WITNESS:
22      A.   No.
23  BY MR. CULBERG:
24      Q.   Just a few more of these.

Page 240

1          (WHEREUPON, a certain document was
2          marked Roberts Deposition Exhibit
3          No. 37, for identification, as of
4          12-16-13.)
5  BY MR. CULBERG:
6      Q.   You have been handed what has been
7  marked as Defense Exhibit 38.  Do you recognize
8  this document?  I apologize.
9          You have been handed what has been
10  marked as Defense Exhibit 37.  Do you recognize
11  this document?
12      MR. IRELAND:  Form and foundation.
13  BY THE WITNESS:
14      A.   Yes.
15  BY MR. CULBERG:
16      Q.   And what is it?
17      MR. IRELAND:  Form and foundation.
18  BY THE WITNESS:
19      A.   A job record.
20  BY MR. CULBERG:
21      Q.   And on the second page, which is Bates
22  labelled WC-0000736, is that your signature?
23      A.   Yes.
24      Q.   Is this a true and accurate copy of the

CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
241–244

Page 241

1  job record that you received?
2      MR. IRELAND: Form. Foundation.
3  BY THE WITNESS:
4      A.   Yes.
5  BY MR. CULBERG:
6      Q.   Is there anything on this document with
7  which you disagree?
8      MR. IRELAND: Form. Foundation. Scope.
9  BY THE WITNESS:
10     A.   No.
11          (WHEREUPON, a certain document was
12          marked Roberts Deposition Exhibit
13          No. 38, for identification, as of
14          12-16-13.)
15  BY MR. CULBERG:
16     Q.   Now, you have been handed what has been
17  marked as Defense Exhibit 38. Do you recognize
18  this document?
19     A.   Yes. These are the job records.
20     Q.   And this one looks a little different
21  than the ones that we went over before; is that
22  right?
23     A.   Yes.
24     Q.   Is it just that the form changed?

Page 242

1      A.   Yes.
2      Q.   And on the last page of this document,
3  which is WC-0000746, do you recognize your
4  signature?
5      A.   Yes.
6      Q.   Does this appear to be a true and
7  accurate copy of your year 2012 job record?
8      MR. IRELAND: Form. Foundation.
9  BY THE WITNESS:
10     A.   Yes.
11  BY MR. CULBERG:
12     Q.   Is there anything in this document that
13  you disagree with?
14     MR. IRELAND: Form. Foundation. Scope.
15  BY THE WITNESS:
16     A.   The gossiping part. That's about it.
17  BY MR. CULBERG:
18     Q.   The gossiping part. Can you point out
19  on the document where that is?
20     A.   Right here on the second page. It says,
21  "7/21" (indicating).
22     Q.   Let's see.
23     A.   I just want to say how you're gossiping
24  about yourself?

Page 243

1      Q.   Can you just read to me what part that
2  is?
3      A.   It says: Reprimand for unprofessional
4  behavior. Gossiping on 7/20. Shaved hours.
5      Q.   And to be clear for the record, that's
6  the one, two -- that's the fourth box down on
7  WC-0000744; is that right?
8      A.   Yes.
9          (WHEREUPON, a certain document was
10         marked Roberts Deposition Exhibit
11         No. 39, for identification, as of
12         12-16-13.)
13  BY MR. CULBERG:
14     Q.   You have been handed what has been
15  marked as Defendant's Exhibit 39. Do you recognize
16  that document?
17     A.   Yes.
18     Q.   And what is it?
19     MR. IRELAND: Form. Foundation.
20  BY THE WITNESS:
21     A.   A job record.
22  BY MR. CULBERG:
23     Q.   Does this appear to be a true and
24  accurate copy of the job record that you received

Page 244

1  for year 2013?
2      MR. IRELAND: Form. Foundation.
3  BY THE WITNESS:
4      A.   Yes.
5  BY MR. CULBERG:
6      Q.   And is there anything on this document
7  that you disagree with?
8      MR. IRELAND: Form. Foundation. Scope.
9  BY THE WITNESS:
10     A.   No.
11  BY MR. CULBERG:
12     Q.   Sorry. That was a no?
13     A.   No.
14     Q.   Well, we have talked about a lot of
15  things today, Ms. Roberts, and I just want to make
16  sure that you have had the opportunity to talk
17  about everything that you wanted to talk about that
18  makes up your claims against White Castle.
19     MR. IRELAND: Objection. Form.
20  BY THE WITNESS:
21     A.   Yes.
22  BY MR. CULBERG:
23     Q.   I have that we talked about how your
24  hours were shaved down so you wouldn't receive



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
245–247

Page 245

1 overtime?
2     A.   Yes.
3     Q.   Have you talked about everything here
4 today that you believe makes up your claim about
5 how your hours were shaved down?
6     MR. IRELAND:  Form.
7 BY THE WITNESS:
8     A.   Yes.
9 BY MR. CULBERG:
10     Q.   Is there anything that you have not
11 talked about that you want to put into the record?
12     MR. IRELAND:  Form.
13 BY THE WITNESS:
14     A.   No, sir.
15 BY MR. CULBERG:
16     Q.   Okay.  We have talked about how you
17 believe that you worked off of the clock?
18     MR. IRELAND:  Form.
19 BY THE WITNESS:
20     A.   Yes.
21 BY MR. CULBERG:
22     Q.   You believe that was limited to one or
23 two times with inventory?
24     MR. IRELAND:  Form.

Page 246

1 BY MR. CULBERG:
2     Q.   One or two times with inspection?
3     MR. IRELAND:  Form.
4 BY MR. CULBERG:
5     Q.   And one meeting that you had recently
6 with Stacey?
7     A.   Yes.
8     Q.   Have you put -- have you told me
9 everything that you believe makes up your claims
10 with regard to those incidents?
11     MR. IRELAND:  Form.
12 BY THE WITNESS:
13     A.   Yes.
14 BY MR. CULBERG:
15     Q.   Is there anything else that you want to
16 discuss with those incidents?
17     MR. IRELAND:  Form.
18 BY THE WITNESS:
19     A.   No, sir.
20 BY MR. CULBERG:
21     Q.   Besides those incidents, are there -- is
22 there anything that happened with you at White
23 Castle where you believe that you worked off of the
24 clock?

Page 247

1     MR. IRELAND:  Form.
2 BY THE WITNESS:
3     A.   No.
4 BY MR. CULBERG:
5     Q.   Okay.  We also talked about how you
6 believe that your hours were rolled from one week
7 to the other?
8     A.   Yes.
9     Q.   To be clear, you understand what we mean
10 by "rolled hours"?
11     MR. IRELAND:  Form.
12 BY THE WITNESS:
13     A.   Yes.
14 BY MR. CULBERG:
15     Q.   Is there anything about your rolled
16 hours allegation that we did not talk about today?
17     MR. IRELAND:  Form.
18 BY THE WITNESS:
19     A.   No, sir.
20 BY MR. CULBERG:
21     Q.   Is there anything that you wish to add
22 about your rolled hours allegation?
23     MR. IRELAND:  Form.
24

Page 248

1 BY THE WITNESS:
2     A.   No.
3 BY MR. CULBERG:
4     Q.   We also talked about how you believe -
5 let me make sure that I'm getting it right - that
6 your most recent suspension was retaliation for
7 your filing this lawsuit; is that correct?
8     A.   Yes.
9     Q.   Have we talked about everything related
10 to your retaliation claim?
11     MR. IRELAND:  Form.
12 BY THE WITNESS:
13     A.   Yes.
14 BY MR. CULBERG:
15     Q.   Is there anything that you need to add
16 to the record about the retaliation claim?
17     MR. IRELAND:  Form.
18 BY THE WITNESS:
19     A.   No, sir.
20 BY MR. CULBERG:
21     Q.   Is there any other evidence that you
22 have about your retaliation claim besides your
23 recent suspension?
24     MR. IRELAND:  Form.



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                  249–252

Page 249

1  BY THE WITNESS:
2      A.   No, sir.
3  BY MR. CULBERG:
4      Q.   Do you believe that your testimony today
5  has been complete and accurate?
6      A.   Yes.
7      MR. IRELAND:  Form.
8  BY MR. CULBERG:
9      Q.   Do you have any reason at all at this
10  time to believe that you have testified to anything
11  incorrectly or untruthfully?
12     A.   No, sir.
13     MR. IRELAND:  Form.
14  BY MR. CULBERG:
15     Q.   Do you have any desire to change any of
16  your testimony at this time?
17     A.   No, sir.
18     MR. IRELAND:  Form.
19     MR. CULBERG:  All right.  I'm done.
20     MR. IRELAND:  That's good.  I have a lot of
21  questions.
22              EXAMINATION
23  BY MR. IRELAND:
24     Q.   Counsel just asked you a bunch of

Page 250

1  questions about whether or not you had anything
2  else to add.  Does that include every single fact
3  and every single occurrence that has ever occurred
4  in your 11 years of working at White Castle?
5      A.   Yeah.
6      Q.   Now, I'm going to be jumping around a
7  lot, and I'm going to start out by trying to bring
8  you back to where counsel asked you questions and
9  things were not clarified or followed up upon, and
10  I'm going to attempt to follow up on those.
11         So I apologize for jumping around.  When
12  he asked you about Gwen Tolbert paying herself the
13  next week, was she paid at straight time or time
14  and a half?
15     A.   Straight time.
16     Q.   And that was time that she should have
17  been paid at time and a half; correct?
18     A.   Yes.
19     Q.   When you talked about Jimmy Jenkins and
20  the shortage in September of last year that led to
21  his possible termination, you testified that it was
22  $13 and some change at issue?
23     A.   Uh-huh.  Yes.
24     Q.   Could it have been a different amount?

Page 251

1      A.   It could have, but I was just rounding
2  it off to the 13.
3      Q.   Were you aware if Mr. Jenkins himself
4  paid a portion or all of that shortage?
5      A.   Well, I was told that he paid some of
6  it.
7      Q.   If Sylvia Anderson gives you an order,
8  do you have to follow that order?
9      A.   Yes.
10     Q.   If Sylvia Anderson tells you -- gives
11  you an order, do you consider it an order of White
12  Castle?
13     A.   Yes.
14     Q.   If Sylvia Anderson gives you an order
15  orally that's different from the written policies
16  of White Castle, is Sylvia Anderson's oral order to
17  you the policy of White Castle?
18     A.   Yes, it is.
19     Q.   Counsel asked you whether or not your
20  recent incident related to what he described as
21  your own retaliation claim.  He asked whether or
22  not your pay was decreased.  Do you recall that?
23     A.   Yes.
24     Q.   Your pay wasn't decreased; correct?

Page 252

1      A.   Correct.
2      Q.   And you didn't get demoted; correct?
3      A.   Correct.
4      Q.   Did he ask you whether or not the
5  suspension was paid or unpaid?
6      A.   No.
7      Q.   Was it paid or was it unpaid?
8      A.   Unpaid.
9      Q.   How much time did you lose based upon
10  that suspension?
11     A.   Three days.
12     Q.   Okay.  And during your testimony you
13  talked about your -- withdrawn.
14         Did you complain to Sylvia Anderson in
15  June of 2013 that your pay was being made
16  incorrectly?
17     A.   Yeah.  I talked to her on the phone.  I
18  told her that Stacey was taking my overtime, and I
19  should get me a lawyer, and she told me no, don't
20  do that, because you don't want to get people
21  that's coming at you and all of this and that.
22  She's like just talk to her.  She's basically just
23  talking me down for not getting a lawyer about my
24  overtime.



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
253–256

Page 253

1    Q.   Okay.  And did you subsequently talk to
2  a manager about your overtime or wages in September
3  of 2013?
4    A.   Yes.  I talked to Jennifer Kapps, which
5  was the assistant general manager at the time, and
6  she was the one I seen paying somebody else for
7  overtime, and so that's why me and her had the
8  conversation about overtime.
9    Q.   And you talked a little bit about the
10  suspension in September of 2013 related to people
11  throwing things at you.
12    A.   Yes.
13    Q.   Okay.  Do you believe that that
14  suspension was motivated by your complaints about
15  your wages?
16    A.   The ten days that I got suspended for,
17  yeah.  I'm like I never seen nobody get suspended
18  for ten days before.
19    Q.   So when counsel said that the only claim
20  that you had for retaliation was the recent
21  incident which caused you a suspension of several
22  days, he did not include the September ten-day
23  suspension; is that correct?
24    A.   Right.

Page 254

1    Q.   But you had previously testified about
2  that, and that, indeed, was part of your testimony
3  and part of your lawsuit related to your
4  retaliation claim?
5    A.   Yes, yes.
6    Q.   We were talking about your Complaint.
7  Could you pull out No. 4, the Handbook, and turn to
8  Page 14, please.
9      Looking at that first paragraph
10  underneath the bold and underlined Reporting
11  Violations section, it says that -- in the last
12  sentence that if a team member suspects a
13  violation, that the team members -- and I'm
14  paraphrasing, I'm not reading every word -- that
15  the team member is to bring it to the attention of
16  his supervisor, and then it lists a number of
17  people ending with the general counsel.
18      Do you know who the general counsel is?
19    A.   No.
20    Q.   Do you have the general counsel's phone
21  number?
22    A.   No.
23    Q.   Is the general counsel's phone number in
24  this Handbook?

Page 255

1    A.   No.
2    Q.   Is the general counsel's phone number,
3  address, e-mail or anything listed anywhere at the
4  Dolton White Castle location?
5    A.   No.
6    Q.   Who is the assistant vice president?
7    A.   The assistant vice president?
8    Q.   For White Castle.
9    A.   I don't know.  See, I don't even know.
10  I don't know.
11    Q.   I understand.
12    A.   That's a good one.
13    Q.   Is the assistant vice president's phone
14  number listed in this Handbook?
15    A.   No.
16    Q.   Is it something listed at Dolton or at
17  any location that you have seen?
18    A.   No.
19    Q.   Who is the executive director?
20    A.   I don't know.
21    Q.   Do you have the executive director's
22  phone number?
23    A.   No.
24    Q.   Do you have -- has the executive

Page 256

1  director's phone number been listed anywhere that
2  you have ever seen?
3    A.   No.
4    Q.   Now, director of team services, do you
5  know what that is?
6    A.   No.
7    Q.   Do you have any idea how to contact the
8  director of team services?
9    A.   They want me to call the team member
10  hotline.
11    Q.   Is the team member hotline listed there?
12  I mean in this section.
13    A.   No.
14    Q.   Okay.  So according to this, you can
15  call your supervisor or the list of people that you
16  don't have anybody to contact; correct?
17    A.   Right.
18    Q.   Now, the next sentence in the very -- in
19  the next paragraph says that, "The company will
20  promptly investigate alleged violations regarding
21  the standards and take corrective measures if
22  warranted."
23      Do you believe that the company if you
24  had managed to call any of these people or the 800



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              257–260

Page 257
1  number would conduct a prompt investigation?
2       MR. CULBERG:  Objection.  Foundation.
3  BY THE WITNESS:
4       A.   Do I have to answer?
5  BY MR. IRELAND:
6       Q.   Oh, yeah.  Sure.
7       A.   I don't think that they would have took
8  the proper things, because like if they knew what
9  was going on, they had the chance with Jimmy, and
10  there still was nothing being taken care of.
11      Q.   Now, you were working at Dolton when
12  Mr. Jenkins made his initial complaints and filed
13  this initial lawsuit over a year ago; correct?
14      A.   Yes.
15      Q.   Other than I think that you mentioned
16  one phone call from one person on one occasion who
17  asked only about the drawer shortages, have you
18  received any other contact prior to you becoming a
19  member of this lawsuit?
20      A.   The only thing is when Kattie Loveberry
21  came to me and said that her and Sylvia was trying
22  to get in touch with me before Darien called so
23  they could tell me what to say to him, and tell him
24  that no, we don't do that.  So that's about it.

Page 258
1       Q.   So Kattie Loveberry told you that Sylvia
2  wanted you to lie?
3       A.   Right.
4       Q.   So looking back at that first page with
5  that list of people that you don't have the contact
6  for, did any of them ever call you, contact you,
7  have a meeting?
8       A.   No.
9       Q.   Okay.  And looking into the procedures
10  15 and 16 and 17, there is a list of things that
11  White Castle is supposed to do.
12      MR. CULBERG:  We are still on Exhibit 4?
13      MR. IRELAND:  Yes, we are.
14  BY MR. IRELAND:
15      Q.   Okay.  There's a number of things that
16  they are supposed to do.  They're supposed to do an
17  initial screening, a preliminary review, formal
18  investigation, and team member interviews,
19  confirming interviews, decisions.  Are you aware of
20  White Castle doing any of those things at Dolton?
21      A.   No, sir.
22      Q.   Were you aware if Mr. Jenkins called the
23  800 number?
24      A.   Yes.

Page 259
1       Q.   And did he call the 800 number and
2  initiate any of those investigation requirements as
3  listed in the handbook?
4       A.   Yes.  He said he called to tell them how
5  he was being treated differently and how the
6  illegal stuff was going on, and once he called, it
7  just but a bigger bull's eye on his back.
8       Q.   But there wasn't any interviews other
9  than the one that you --
10      A.   The only thing that I seen him do is
11  when he sat down with the district and Sylvia, and
12  they talked about what was going on.  That was it.
13      Q.   And when was that?
14      A.   That was like -- that was right before
15  Jimmy left.  Right before he left our store.
16      Q.   You were present on that day?
17      A.   I was on the shift that day.
18      Q.   Where were you assigned?
19      A.   I was in the back making the burgers,
20  and they were sitting in the dining room at the
21  little booth.
22      Q.   So while you were making burgers, you
23  couldn't actually hear what they said?
24      A.   No.

Page 260
1       Q.   Did anybody tell you what they said?
2       A.   No.  Jimmy just came in there and he was
3  like -- he told us that he was being transferred.
4  That was about it.
5       Q.   Okay.
6       A.   And we was told not to talk to him no
7  more.
8       Q.   Who told you not to talk to Jimmy?
9       A.   Sylvia said that we couldn't talk to
10  Jimmy.
11      Q.   And why did she say that you couldn't
12  talk to Jimmy?
13      A.   She didn't say.  She just said that it
14  would be best if nobody talked to him, to keep the
15  nonsense down.
16      Q.   So she didn't tell you why.  She just
17  said don't?
18      A.   Right.  She just said it's to keep the
19  nonsense down.
20      Q.   After Jimmy Jenkins was transferred, did
21  Sylvia Anderson ever complain that she was
22  disciplined as a result of this lawsuit?
23      A.   No.
24      Q.   And I think that I asked you about pay



CANDICE RENEE ROBERTS                                   December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                              261–264

Page 261

1  rate for rolling of Gwen, and I think that you have
2  talked some about the time being rolled for other
3  people, including yourself, into the following week
4  or a later pay period.
5        Were any of the people that the time was
6  rolled paid at an overtime rate in a subsequent
7  week that you were aware of?
8     A.  No.
9     Q.  Were you paid at the overtime rate for
10 overtime that was rolled?
11    A.  No.
12    Q.  You were asked about Sylvia Anderson
13 leaving the Dolton location and moving to another
14 location.  Do you recall that generally?
15    A.  Yes.
16    Q.  Okay.  And you said, well, I don't know
17 first hand.  I've heard rumors, and there was no
18 follow-up.
19       What rumors did you hear about Sylvia
20 Anderson leaving Dolton?
21    A.  It was said that she didn't trust none
22 of us no more, because we all are the ones that are
23 going -- when we stood up for Jimmy.  So that's
24 really the only thing.  Like I said, I heard that

Page 262

1  she didn't trust us, and she wanted to just leave.
2     Q.  Okay.  So was it your impression that
3  she didn't trust you and she requested or
4  volunteered to transfer?
5     A.  Yes.  That's what we was thinking,
6  everybody was thinking.
7     Q.  Okay.  And counsel asked you about what
8  Sylvia Anderson is doing now.  Do you remember that
9  generally?
10    A.  Uh-huh.
11    Q.  So do you have any idea if Sylvia
12 Anderson is still rolling time at her new location?
13    A.  I don't know at all, because I haven't
14 been down there at all.
15    Q.  Do you know if she is requiring people
16 to pay drawer shortages?
17    A.  Not that I know of.
18    Q.  Counsel asked you some questions about
19 Exhibit 11, which I'm just going to put in front of
20 you my copy.
21       She asked you -- or he asked you, excuse
22 me, that if you had informed Sylvia Anderson, and I
23 am not quoting him, but I'm trying to get you back
24 to where -- the mindset for the question.  I

Page 263

1  believe it was a question of whether or not you
2  complained or informed Sylvia Anderson about cash
3  discrepancies and payments that were brought to you
4  by -- by crew members.  Do you remember that line
5  of questions?
6     A.  You say did I --
7     Q.  Did you inform her -- let me start just
8  there -- that you told her that they brought in
9  money?
10    A.  She's saying -- yeah, she know, because
11 she seen them giving me money before.  It wasn't
12 like she ain't never seen it.  She was right there.
13 She was always sitting in her chair.
14    Q.  If you had -- I'm not exactly sure of
15 the exact question, but the general gist of the
16 question was whether or not you would have been
17 reprimanded if you had called the 800 number or
18 complained to her or complained to the district
19 manager, and I think that your answer was no, you
20 didn't get reprimanded.  Do you remember that?
21    A.  About complaining to her?
22    Q.  Yes.  Withdraw that.
23       MR. IRELAND:  Let me just take a break for a
24 minute to talk to my client.

Page 264

1        MR. CULBERG:  Sure.
2           (WHEREUPON, a discussion was had off
3           the record between the witness and
4           Mr. Ireland outside the hearing of
5           other counsel and the court
6           reporter.)
7  BY MR. IRELAND:
8     Q.  One last clarification.
9        Now, you worked under Sylvia Anderson
10 for how long approximately?
11    A.  I think I want to say three or four
12 years.
13    Q.  Okay.  Was that all at Dolton?
14    A.  Yes.  That was three or four years at
15 Dolton, and worked with her a year at 103rd.  One
16 year she was over there.
17    Q.  And during that entire time Sylvia
18 Anderson had you preventing overtime and having
19 drawers paid for by employees?
20    A.  Yes.
21    Q.  Now, Sylvia Anderson is no longer your
22 supervisor at Dolton; correct?
23    A.  Correct.
24    Q.  When did Sylvia Anderson leave Dolton



CANDICE RENEE ROBERTS                          December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                      265–268

Page 265

1  approximately?
2      A.    In January of this year.
3      Q.    Okay.  And I know it has been testified
4  to, but what is the new manager's -- general
5  manager's name?
6      A.    Stacey Belton.
7      Q.    Now, Stacey Belton since January of 2013
8  has stopped the payment of employees for drawer
9  shortages; correct?
10     A.    Yes.
11     Q.    But she has not stopped the preventing
12  -- or the not paying of overtime as you have
13  described?
14     A.    Correct.
15     MR. IRELAND:  No further questions.  I am
16  done.
17     THE COURT REPORTER:  Signature?
18     MR. IRELAND:  We will reserve.
19     MR. CULBERG:  We will reserve.
20         (WHEREUPON, the deposition
21          was concluded at 2:03 p.m.)
22
23
24

Page 266

1  STATE OF ILLINOIS   )
2                      ) SS:
3  COUNTY OF DU PAGE   )
4
5          I, NANCY A. GUIDOLIN, CSR No. 84-2531, a
6  Notary Public within and for the County of DuPage,
7  State of Illinois, and a Certified Shorthand
8  Reporter of said state, do hereby certify:
9          That previous to the commencement of the
10  examination of the witness, the witness was duly
11  sworn to testify the whole truth concerning the
12  matters herein;
13          That the foregoing deposition transcript
14  was reported stenographically by me, was thereafter
15  reduced to typewriting under my personal direction
16  and constitutes a true record of the testimony
17  given and the proceedings had;
18          That the said deposition was taken
19  before me at the time and place specified;
20          That I am not a relative or employee or
21  attorney or counsel, nor a relative or employee of
22  such attorney or counsel for any of the parties
23  hereto, nor interested directly or indirectly in
24  the outcome of this action.

Page 267

1          IN WITNESS WHEREOF, I do hereunto set my
2  hand of office at Chicago, Illinois, this 18th day
3  of December, 2013.
4
5
6
7
8              Notary Public,
9              DuPage County, Illinois.
10
11
12  NANCY A. GUIDOLIN, CSR No. 84-2531
13
14
15
16
17
18
19
20
21
22
23
24

Page 268

1                  I N D E X
2  WITNESS                            EXAMINATION
3  CANDICE RENEE ROBERTS
4      By Mr. Culberg                      3
5      By Mr. Ireland                    249
6
7
8              E X H I B I T S
9  NUMBER                         MARKED FOR ID
10  ROBERTS DEPOSITION EXHIBIT
11      EXHIBIT NO. 1                     12
12      EXHIBIT NO. 2                     15
13      EXHIBIT NO. 3                     32
14      EXHIBIT NO. 4                     40
15      EXHIBIT NO. 5                     41
16      EXHIBIT NO. 6                     45
17      EXHIBIT NO. 7                     47
18      EXHIBIT NO. 8                     51
19      EXHIBIT NO. 9                     92
20      EXHIBIT NO. 10                    93
21      EXHIBIT NO. 11                   120
22      EXHIBIT NO. 12                   140
23      EXHIBIT NO. 13                   150
24      EXHIBIT NO. 14                   159



CANDICE RENEE ROBERTS
JENKINS, ET AL. -vs- WHITE CASTLE

December 16, 2013
269–272

| | Page 269 |
|---|---|
| 1 | E X H I B I T S (Continued) |
| 2 | NUMBER                              MARKED FOR ID |
| 3 | ROBERTS DEPOSITION EXHIBIT |
| 4 | EXHIBIT NO. 15                 160 |
| 5 | EXHIBIT NO. 16                 161 |
| 6 | EXHIBIT NO. 17                 162 |
| 7 | EXHIBIT NO. 18                 163 |
| 8 | EXHIBIT NO. 19                 164 |
| 9 | EXHIBIT NO. 20                 165 |
| 10 | EXHIBIT NO. 21                 166 |
| 11 | EXHIBIT NO. 22                 167 |
| 12 | EXHIBIT NO. 23                 168 |
| 13 | EXHIBIT NO. 24                 169 |
| 14 | EXHIBIT NO. 25                 170 |
| 15 | EXHIBIT NO. 26                 171 |
| 16 | EXHIBIT NO. 27                 172 |
| 17 | EXHIBIT NO. 28                 174 |
| 18 | EXHIBIT NO. 29                 176 |
| 19 | EXHIBIT NO. 30                 230 |
| 20 | EXHIBIT NO. 31                 231 |
| 21 | EXHIBIT NO. 32                 232 |
| 22 | EXHIBIT NO. 33                 234 |
| 23 | EXHIBIT NO. 34                 236 |
| 24 | EXHIBIT NO. 35                 237 |

| | Page 271 |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | |
| 3 | |
| 4 | Our Assignment No. 54670 |
| 5 | Case Caption: Jimmy Jenkins and Candice R. Roberts |
| 6 | vs. White Castle Management Company |
| 7 | |
| 8 | DECLARATION UNDER PENALTY OF PERJURY |
| 9 | I declare under penalty of perjury that I |
| 10 | have read the entire transcript of my Deposition |
| 11 | taken in the captioned matter or the same has been |
| 12 | read to me, and the same is true and accurate, save |
| 13 | and except for changes and/or corrections, if any, |
| 14 | as indicated by me on the DEPOSITION ERRATA SHEET |
| 15 | hereof, with the understanding that I offer these |
| 16 | changes as if still under oath. |
| 17 | |
| 18 | Signed on the _____day of |
| 19 | _____, 2013. |
| 20 | |
| 21 | |
| 22 | _____ |
| 23 | CANDICE RENEE ROBERTS |
| 24 | |

| | Page 270 |
|---|---|
| 1 | E X H I B I T S (Continued) |
| 2 | NUMBER                              MARKED FOR ID |
| 3 | ROBERTS DEPOSITION EXHIBIT |
| 4 | EXHIBIT NO. 36                 238 |
| 5 | EXHIBIT NO. 37                 240 |
| 6 | EXHIBIT NO. 38                 241 |
| 7 | EXHIBIT NO. 39                 243 |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 272 |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | Page No. ____ Line No. ____ Change to: _____ |
| 3 | _____ |
| 4 | Reason for change:_____ |
| 5 | Page No. ____ Line No. ____ Change to: _____ |
| 6 | _____ |
| 7 | Reason for change:_____ |
| 8 | Page No. ____ Line No. ____ Change to: _____ |
| 9 | _____ |
| 10 | Reason for change:_____ |
| 11 | Page No. ____ Line No. ____ Change to: _____ |
| 12 | _____ |
| 13 | Reason for change:_____ |
| 14 | Page No. ____ Line No. ____ Change to: _____ |
| 15 | _____ |
| 16 | Reason for change:_____ |
| 17 | Page No. ____ Line No. ____ Change to: _____ |
| 18 | _____ |
| 19 | Reason for change:_____ |
| 20 | Page No. ____ Line No. ____ Change to: _____ |
| 21 | _____ |
| 22 | Reason for change:_____ |
| 23 | Page No. ____ Line No. ____ Change to: _____ |
| 24 | _____ |



CANDICE RENEE ROBERTS                                    December 16, 2013
JENKINS, ET AL. -vs- WHITE CASTLE                                     273

                                                      Page 273
1   Reason for change:_____
2   Page No. ____ Line No. ____ Change to: _____
3   _____
4   Reason for change:_____
5   Page No. ____ Line No. ____ Change to: _____
6   _____
7   Reason for change:_____
8   Page No. ____ Line No. ____ Change to: _____
9   _____
10  Reason for change:_____
11  Page No. ____ Line No. ____ Change to: _____
12  _____
13  Reason for change:_____
14  Page No. ____ Line No. ____ Change to: _____
15  _____
16  Reason for change:_____
17  Page No. ____ Line No. ____ Change to: _____
18  _____
19  Reason for change:_____
20  Page No. ____ Line No. ____ Change to: _____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24          CANDICE RENEE ROBERTS

