## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JIMMY JENKINS and CANDICE R. ROBERTS, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 12-cv-7273 |
| v. | ) ) | Judge Joan B. Gottschall |
| WHITE CASTLE MANAGEMENT COMPANY d/b/a WHITE CASTLE SYSTEM, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION & ORDER

Plaintiffs Jimmy Jenkins ("Jenkins") and Candice R. Roberts ("Roberts") (collectively, "Plaintiffs") bring this suit against White Castle Management Company d/b/a White Castle System, Inc. ("White Castle" or "Defendant"), alleging that White Castle violated the Fair Labor Standards Act, 29 U.S.C. §§ 201, 207, and 216(b) ("FLSA"), the Illinois Minimum Wage Act ("IMWA"), 820 ILCS 105/1 *et seq.* ("IMWL"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA").[1] Jenkins also alleges a separate state law claim for spoliation. Before the court is White Castle's motion for summary judgment [ECF No. 179] and Plaintiffs' motion for partial summary judgment [ECF No. 182]. Both motions are presented pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons discussed below,

---

[1] In their Second Amended Complaint ("SAC"), Plaintiffs alleged claims of *quantum meruit* and unjust enrichment. [SAC, Counts IV and V, pp. 24-25, ECF No. 164.] However, in their response to White Castle's motion for summary judgment, Plaintiffs state only that they "agree on this one point" that "the *quantum meruit* and unjust enrichment claims stand or fall on the FLSA, IMWL and IWPCA claims." [Pls. Resp. to Def. MSJ, p. 27, ECF No. 192.] Because Plaintiffs have not responded to White Castle's arguments that the *quantum meruit* and unjust enrichment claims must be dismissed, the court will grant White Castle's motion as to those claims. *Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motor Express*, 181F. 3d 799, 808 (7th Cir. 1999) (failure to meaningfully respond to a motion for summary judgment constitutes waiver).

White Castle's motion for summary judgment is granted in part and denied in part and Plaintiffs' motion for partial summary judgment is denied.

## I.    BACKGOUND

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn and all factual disputes resolved in favor of the nonmovant. *Turner v. J.V.D.B. & Associates, Inc.*, 330 F.3d 991, 994-95 (7th Cir. 2003); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003); *Abrams v. Walker*, 307 F.3d 650, 653-54 (7th Cir. 2002). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001); *Wollin v. Gondert*, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which the nonmovant will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Binz v. Brandt Construction Co.*, 301 F.3d 529, 532 (7th Cir. 2002); *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002). Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 236 (7th Cir.), *cert. denied*, 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v. Carey Canada, Inc.*, 950 F.2d 481, 485 (7th Cir. 1991); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 476-77 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).

Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing L.R. 56.1(a)(3)). Under Local Rule 56.1(b)(3), the nonmoving party then must submit a "concise response" to each statement of fact, "including, in

the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs," with citations to the record, that require the denial of summary judgment. *See* L.R. 56.1 (b)(3)(C); *see also Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

On January 15, 2015, this court granted Plaintiffs' motion for leave to file additional facts. [1/15/16 Order, ECF No. 188.] The granted Plaintiffs leave to file up to 100 additional facts, per Plaintiff, to respond to White Castle's statement of facts. [*Id.*] However, the court noted that it would strike portions of Plaintiffs' Rule 56.1 submissions if it believes that they are excessive. [*Id.*] Plaintiffs failed to heed the court's warning and submitted 199 statements of additional facts, a number of which include multiple incoherent sentences. Although White Castle has not filed a motion to strike, the court is capable of determining which facts are relevant to the present motion and disregarding extraneous or improper factual statements. *Hanover Ins. Co. v. Northern Building. Co.*, 891 F.Supp.2d 1019, 1025 (N.D. Ill. 2012). Accordingly, the court will consider only those facts that comport with the local rules. With that in mind, the court turns to the facts of this case. Except where noted, the following facts are undisputed and therefore taken as true for both parties' summary judgment motions.

White Castle is a corporation organized under the laws of the State of Delaware and does business in the State of Illinois. [Def. 56.1 Statement of Facts ("SOF") ¶ 1, ECF No. 181.] It owns and operates restaurants throughout the United States, including the restaurant at issue in this case, located at 1400 E. Sibley Boulevard in Dolton, Illinois (the "Dolton location"). [*Id.*] The employment hierarchy of White Castle is as follows, in ascending order of seniority: Team

Member, Crew Manager, Assistant General Manager, General Manager, and District Manager. [Pls. Statement of Additional Facts ("SOAF") ¶ 1, ECF No. 193.]

White Castle maintains a cash-handling policy in its Handbook, which has been provided to all Dolton location employees, including Roberts and Jenkins. [Def. SOF ¶ 11.] The White Castle cash-handling policy states that it is improper for Team Members to repay their own drawer shortages. [*Id.* ¶ 12.]

Jenkins began his employment at the Dolton location on October 24, 2006. [Def. SOF ¶ 2.] Jenkins held the position of Crew Manager at the Dalton location until he transferred to another White Castle location on September 22, 2012. [*Id.*] Roberts began her employment at the Dolton location on July 5, 2008 as an Assistant General Manager, a position she held until June 20, 2013 when she was demoted and became a Crew Manager. [*Id.* ¶ 3.] Roberts held the position of Crew Manager until she was terminated on December 23, 2013. [*Id.*] During the relevant time period, the General Manager of the Dolton location was Sylvia Anderson ("Anderson") and the District Manager was Darrin Cotton ("Cotton"). [Pls. SOAF ¶¶ 3-4.] White Castle contends that its employees at the Dolton location are employed at-will and have no employment contract or agreement with White Castle. [Def. SOF ¶ 6.] Moreover, White Castle's Team Member Handbook provides the following:

> The Company, at its sole discretion, can and may unilaterally change, delete or modify any provision contained in this manual. Nothing in this manual is intended to serve as an employment contract or a guarantee of employment for any period of time. Either the company or the Team Member may change the employment relationship at any time with or without cause.

[*Id.*, Ex. A4 (Team Member Handbook).] Accordingly, it is White Castle's position that it does not guarantee any employee a given wage rate and can change its employees' wage rates at any time. [*Id.* ¶ 9.]

4

Roberts was typically scheduled to work 37.5 hours per week as an Assistant General Manager at the restaurant. [Def. SOF ¶ 27.] She also typically worked 37.5 hours a week when she was demoted to Crew Manager at the restaurant. [*Id.*] In October 2010, Plaintiffs Roberts earned $13.71 per hour. In August 2011, her wage rate increased to $13.98 per hour. In August 2012, her wage rate increased to $14.26 per hour. In June 2013, her wage rate increased to $14.47 per hour. [*Id.* ¶ 30.]

As a Crew Manager at White Castle's Dolton location, Jenkins estimated that he worked 35 to 37 hours per week. [*Id.* ¶ 28; Pls. SOAF, Ex. 18.] In September 2009, Plaintiff Jenkins earned $10.42 per hour. In April of 2010, his wage rate increased to $10.84 per hour. In March 2011, his wage rate increased to $11.15 per hour. In April 2012, his wage rate increased to $11.26 per hour. [Def. SOF ¶ 29.]

Plaintiffs allege that they and other employees of the White Castle in Dolton were compelled to pay for shortages at work, including cash drawer shortages and safe shortages. [Pls. SOAF ¶¶ 2-3.] In addition, Plaintiffs allege that White Castle committed a number of wage law violations such as forcing its employees at the Dolton location to work off the clock, "rolling time," and shaving time. [*Id.* ¶ 4.] Plaintiffs explain that "rolling time" is the practice of deducting hours from one week and rolling them into the next week. [Def. SOF ¶¶ 23-24.] This is done in order to avoid paying overtime in a given week. Plaintiffs acknowledge that the practices described above do not comport with White Castle's official polices found in their Team Member Handbook. [Def. SOF ¶¶ 11, 12, 14-16.] Plaintiffs, however, allege that these policies and procedures were imposed at the Dolton location by Anderson. [*Id.* ¶ 3.]

Jenkins alleges that his "off the clock" work claims "were typically overtime work which [he] is aware that he did not get paid because he did not receive overtime pay during those

weeks." [Pls. SOAF ¶ 43.] At the time of his deposition, Jenkins could specifically identify only "one instance of owed overtime work." [*Id.*] On one occasion, Jenkins believes he was paid for 39.64 hours of work but should have been paid for 40.1, 40.2, or 40.3 hours of work. [*Id.*] As far as the court can discern, Jenkins alleges that he was ordered by Anderson, on a number of occasions, to "punch out" and continue working, thereby causing Jenkins to lose out on wages and possible overtime. [*Id.* ¶ 44.] On average, Jenkins estimates that he worked approximately 80 minutes "off the clock" per week. [*Id.* ¶ 45.] Because he worked many weeks at or near 40 hours [Pls. SOAF, Ex. 18 (Jenkins Payroll Records), ECF No. 193], Jenkins argues that he may have lost out on overtime compensation. [*Id.* ¶ 47.] Moreover, White Castle had a practice of sending out accolades via email for stores that did not pay overtime. [*Id.* ¶ 52.] Jenkins has not submitted any documentary evidence establishing that Anderson (a) forced Jenkins to work "off the clock" or (b) changed Jenkins' time records to reduce his hours. Instead, Jenkins voices his "doubts that his Job Records are accurate because Anderson never kept accurate records." [*Id.* ¶ 68.]

Roberts claims that she is owed compensation for work completed but not paid. [*Id.* ¶ 69.] Roberts states that whenever she was close to earning overtime, her hours would be rolled by White Castle so that it could avoid paying her overtime. [*Id.* ¶ 70.] Roberts identifies two specific instance in which she claims she is owed 45 minutes of overtime for work completed in September 2013. [*Id.* ¶ 69.] Roberts also claims that she is owed overtime for work performed in February 2013 for which she was not paid. [*Id.* ¶ 71] Roberts claims that she was ordered to record fewer hours than she worked by Anderson and another General Manager named Staci Belton ("Belton"). [*Id.* ¶¶ 72, 74.] In addition, Roberts alleges that she worked through her breaks, without compensation, on two separate occasions for a total of 30 minutes. [*Id.* ¶ 74.]

However, Roberts does not specify when, exactly, she worked through her breaks. Finally, Roberts claims that she was ordered by Anderson to pay safe shortages on at least three occasions, ranging from $5 to $20. [*Id.* ¶ 78.] Roberts does not specify when she paid the shortages. Like Jenkins, Roberts has not submitted any time records establishing that Anderson (a) forced Roberts to work "off the clock" or (b) changed Roberts' time records to reduce her hours. Rather, Roberts argues that Anderson either changed Roberts' time records or compelled Roberts to do the same. Therefore, a record of these practices does not exist.

Plaintiffs allege that, after bringing to light White Castle's allegedly unfair and illegal wage and overtime compensation practices, they were punished. White Castle, however, argues that Plaintiffs were punished because of violations of company policy, and that Plaintiffs' complaints did not factor into the decision to suspend or terminate them.

On Saturday, August 25, 2012, Jenkins was supervising a shift at the Dolton location. [*Id.* ¶ 31.] A drive –thru customer ordered food costing $1.69 and paid for it with a $20 bill. [*Id.*] The customer, however, was not given any change. Two days later, on August 27, 2012, the customer spoke with Anderson and explained that she did not receive her change when she overpaid for her meal two days prior. [*Id.* ¶ 32.] After watching the surveillance footage, Anderson confirmed the customer's account. [*Id.*] Anderson then checked the cash register balance and confirmed that it was not $18.31 over balance, as it should have been with the inclusion of the customer's change. [*Id.*] Anderson contacted Jenkins, who supervised the shift, and told him that "she was looking for the customer's change" and that either he or the other employee on the shift needed to "get it back to [White] Castle." [*Id.* ¶ 33.] Jenkins responded that "he would bring it to [Anderson]." Jenkins' work history reveals multiple suspensions relating to cash-handling violations. [*Id.* ¶ 34.]

Jenkins alleges that the reason the cash register balance was not $18.31 over balance on August 25, 2012 was because he transferred the excess money to the store safe, which was short $20. [Pl. SOAF ¶¶ 25, 28-29.] Jenkins claims that transferring money from the cash register to the safe in order to balance a short is a permitted policy. [*Id.* ¶¶ 22-24, 33.] However, White Castle's Cash Handling Policy is silent as to that particular practice. [Def. SOF, Ex. A4 (Cash Handling Policy), ECF No. 181.] Nevertheless, Jenkins arrived at the Dolton location after being summoned by Anderson and states that he repaid the customer's change using "his own money." [Pls. SOF ¶ 32.]

On September 1, 2012 at 2:42 p.m., Jenkins called the White Castle Employee Hotline in order to complain about the August 25, 2012 incident. [Pl. SOAF Ex. 15 (Incident Report), ECF No. 193.] Specifically, Jenkins stated that he was compelled by Anderson to cover the shortage from the cash drawer. [*Id.*] Jenkins also stated that Anderson harassed him because of her belief that he stole the customer's change. [*Id.*] Finally, Jenkins reported that Anderson had "allowed him and other personnel to add money to drawers that were short from their person for the past 6 years [*Id.*]," which is a clear violation of White Castle's cash handling policies. [Def. SOF, Ex. A4 ("At no time will a team member be allowed to personally replenish any shortage in the case register or safe."), ECF No. 181.] Reports to the White Castle Employee Hotline are sent immediately to those responsible for responding to them. [Pls. SOAF ¶ 5.] In Jenkins' case, the report was sent immediately to Cotton, the District Manager for the Dolton location. [*Id.*]

On September 4, 2012, three days after contacting the White Castle Employee Hotline, Jenkins met with White Castle Management, including Anderson and Cotton, in a booth in the dining room of the Dolton location to discuss the alleged theft on August 25, 2012 and resulting discipline. [Def. SOF ¶ 35.] During that meeting, White Castle issued Jenkins a 5-day

8

suspension for "failure to follow the Cash Handling Guidelines as listed in the Restaurant Division Team Member Handbook." [*Id.*] Also during that meeting, Jenkins claims that he reiterated his complaints regarding Anderson that he had made three days before to the White Castle Employee Hotline. [Pls. SOAF ¶ 17.] In response to Jenkins' accusations, Anderson stated that Jenkins and other employees at the Dolton location "are responsible for the safe." [*Id.*] It is Jenkins' position that this was an admission by Anderson that he was responsible for repaying drawer and safe shortages. Anderson was reprimanded by Cotton after the September 4 meeting because of the allegation made by Jenkins that team members were required to pay money back into the safe or cash drawer. [*Id.* ¶ 11.]

The Dolton location has an in-store surveillance system that records video images of most of the store using 16 cameras. [Def. SOF ¶ 36.] White Castle claims that the surveillance system records audio through microphones located in two discrete areas of the store. [*Id.*] The microphones are located above the store's cash registers, "about 3 feet apart from each other, so [they] would pick up the same" audio. [*Id.* (citing Anderson Dep., Ex. E, at 211:4-5.).] It is White Castle's position that the surveillance system is not designed to, and does not, record the voices of persons conversing at a reasonable volume in booths in the dining area of the Dolton location. [*Id.* ¶ 37.]

On September 25, 2013, surveillance footage captured Roberts leaving her work area and "yelling 'bitch' at the customers by the door." [Def. SOF ¶ 40.] Upon returning to the restaurant's main dining room, she "started using foul language and threatened to find out where the customer live[d] and go to their house." [*Id.*] Roberts could also be heard saying "[a]bout the customers, that fucking bitch. Oooh, that girl. Ooh." [*Id.*] White Castle management did not terminate Roberts based on this incident after considering her "job records, prior complaints

[and] years of service. [*Id.* ¶ 41.] Instead, White Castle suspended Roberts. Roberts admitted during her deposition that she was suspended "for cussing." [*Id.*]

Roberts joined the instant litigation on October 17, 2013. [FLSA Consent of Candice Roberts, ECF No. 37.] Thus, Roberts' September 2013 suspension occurred before her involvement in the present case. Although Roberts testified in her second deposition on January 7, 2015 that she was suspended for complaining about White Castle's compensation policies, this is directly contradicted by her earlier deposition in December 2013 when she acknowledged that the September 2013 suspension was due to her behavior toward a customer.

On November 30, 2015, approximately seven weeks after her September 25, 2013 incident, a customer complained to White Castle that he "went to the [Dolton] location to speak to a manager, Candace [sic] [Roberts], who yelled profanities at him...and…walked away." [Def. SOF ¶ 38.] White Castle's surveillance footage from the Dolton location for the morning of November 30th revealed Roberts speaking rudely on the phone to a customer, then later yelling at and arguing with a customer for more than five minutes, repeatedly calling him "ignorant." [*Id.* ¶ 39; *see also* Ex. I (11/30/12 Surveillance Footage).] White Castle states that it conducted an internal investigation and decided to terminate Roberts on December 23, 2015, after she returned from a week-long vacation. [*Id.* ¶ 42.]

It is undisputed that the events giving rise to Plaintiffs' adverse employment actions occurred. Plaintiffs argue that they were punished, not because of their alleged violations, but because they chose to bring to light issues regarding White Castle's allegedly illegal compensation practices. As evidence, Plaintiffs cite approximately 80 instances in which White Castle employees at the Dolton location who did not complain of White Castle's compensation

policies were accused by customers of violating a company policy and were not punished or were punished less severely than Plaintiffs.  [Pls. SOAF ¶¶ 104-191.]

## II.     LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  In determining whether a genuine issue of material fact exists, the Court construes the facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505. The existence of a factual dispute alone is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion.  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

## III.     ANALYSIS

### A.     FLSA Retaliation Claims

The FLSA prohibits employers from retaliating against employees who have asserted their FLSA rights.  Specifically, an employer may not discriminate against an employee who has (1) filed a complaint or instituted a proceeding under or related to FLSA[2]; (2) testified or is about

---

[2] In *Kasten v. SaintGobain Performance Plastics Corp.*, the Supreme Court held that an employee's oral complaint is sufficient to satisfy the requirement that the employee have "filed" a complaint.  563 U.S. 1, 14-15 (2011).

to testify in an FLSA proceeding; or (3) served or is about to serve on an industry committee. 29 U.S.C. § 215(a)(3). Retaliation Plaintiffs may survive summary judgment in one of two ways. First, they can point to evidence from which a jury could directly find retaliation. Second, they can use the familiar *McDonnell Douglas* burden-shifting method. *Hernandez v. City Wide Insulation of Madison*, 508 F.Supp.2d 682, 688 (E.D. Wis. 2007).[3]

To establish a *prima facie* case of retaliation under the FLSA, Plaintiffs must show: (1) that they engaged in protected conduct; (2) that they suffered an adverse employment action; and (3) that a causal link existed between their protected conduct and the adverse action. *Kasten v. Saint-Grobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). In order to establish a causal link between the adverse employment action and the protected activity, Plaintiffs may present evidence showing that they were performing their job satisfactorily and that a similarly situated employee who did not engage in the protected activity was not subjected to the adverse employment action. *Stone v. City of Indianapolis Pub. Utils*. Div., 281 F.3d 640, 642–44 (7th Cir. 2002); *see also Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Plaintiffs may also rely on evidence of suspicious or ambiguously retaliatory statements, suspicious timing, or an admission of culpability. But suspicious timing alone will rarely be sufficient in and of itself to create a triable issue. *Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508-09 (7th Cir. 2014); *see also Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012).

---

[3] The Seventh Circuit recently held that district courts should not treat "direct" and "indirect" evidence as if they are subject to different legal standards. *Ortiz v. Werner Enterprises, Inc.*, --- F.3d ---, 2016 WL 4411434, *5 (7th Cir. Aug. 19, 2016). Rather, evidence must be considered as a whole. Further, the Seventh Circuit has held that the oft-used "convincing mosaic" standard all but dead. However, one point of clarification made by the Seventh Circuit in *Ortiz* is helpful here. The burden-shifting framework created by *McDonnell Douglas*, sometimes is referred to as an "indirect" means of proving employment discrimination. *Id.* at *5. The Seventh Circuit noted in its decision in *Ortiz* that its ruling does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as shorthand.

If Plaintiffs establish a *prima facie* case, the burden shifts to White Castle to offer a legitimate reason for the adverse action. *Stone*, 281 F.3d at 644. If White Castle does so, and Plaintiffs do not rebut White Castle's evidence, then White Castle is entitled to summary judgment. *Id.* If there is a genuine dispute of material fact as to whether White Castle's proffered reason is pretextual, then summary judgment is inappropriate. *Id.*

Plaintiffs have clearly satisfied the first two prongs necessary to establish a *prima facie* case of retaliation under the FLSA. First, Plaintiffs engaged in protected conduct when they voiced their complaints regarding White Castle's alleged violations of the FLSA, IMWL, and IWPCA. Second, both Plaintiffs suffered an adverse employment action—Jenkins was suspended and Roberts was terminated. However, White Castle argues that Plaintiffs' respective punishments were in no way related to their protected conduct.

It is well established that suspicious timing, without more, is generally insufficient to support a reasonable inference of retaliation. *Tolene v. T-Mobile, Inc.*, --- F.Supp. 3d ---, 2016 WL 126692, *6 (N.D. Ill., Mar. 31, 2016). As far as Roberts' September 2013 suspension, she admits that it was a result of her remarks to a customer. Furthermore, Roberts' termination on December 23, 2013 occurred more than two months after she joined the litigation on October 17, 2013. *Kidwell*, 679 F.3d at 966 ("these extended time gaps" of two months and five weeks "alone militate against allowing an inference of causation based on suspicious timing.").

Moreover, where a "significant intervening event separates an employees' protected activity from the adverse employment action [s]he receives, a suspicious-timing argument will not prevail." *Id.* (citing *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011). Here, the parties do not dispute that a significant intervening event occurred between

Roberts joining the suit and her termination. Namely, Roberts engaged in a confrontation with a customer that resulted in a complaint filed against her in November 2013.

The timing involved in Jenkins' suspension after his complaints is more dubious. Jenkins complained about White Castle's compensation policies on September 1, 2013 and again on September 4, 2015. It was at this September 4, 2013 meeting that Jenkins was suspended for five days. White Castle argues that Jenkins' suspension was the result of Jenkins' violation of White Castle's cash-handling policies.

Assuming *arguendo* that Plaintiffs have established a *prima facie* case of retaliation, Plaintiffs' claim for retaliation is still unsupported. Once Plaintiffs have succeeded in making a *prima facie* case, the burden of production shifts to White Castle to prove by a preponderance of the evidence that the same action would have occurred in the absence of the protected conduct. *Culver v. Gorman*, 416 F.3d 540, 545 (7th Cir. 2005). The persuasiveness of White Castle's explanation would normally be reserved "for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). Summary judgment should be granted only if White Castle "presents unrebutted evidence that [it] would have taken the adverse employment action against Plaintiff[s] even if [it] had no retaliatory motive." *Stone*, 281 F.3d at 644.

Again, assuming that Plaintiffs have established a *prima facie* case of retaliation, the burden shifts to White Castle to show by a preponderance of the evidence that Plaintiffs would have been punished—suspension for Jenkins and termination for Roberts—absent their complaints regarding White Castle's policies. *Culver*, 416 F.3d at 547. White Castle has provided ample evidence that its actions would have been taken absent Plaintiffs' complaints.

14

Jenkins admitted to having a history of cash-handling violations. It is undisputed that, under Jenkins' management, a customer's change was not returned. Whether Jenkins should or should not have transferred money from the cash register to the safe ignores the point that Jenkins was accused of stealing a customer's money. Moreover, Roberts admitted to engaging in two hostile confrontations with customers in a span of seven weeks. One confrontation involved Roberts calling a customer a "bitch," and both confrontations resulted in complaints made against Roberts and the Dolton location.

An employee's inability to meet his or her employer's legitimate employment expectations, including adherence to policies and refraining from confrontations with customers, is a legitimate reason for an employer to suspend or terminate its employee. In fact, an employer's evaluation of an employee need not be correct; the issue is whether it was honestly believed. *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001). Because it is undisputed that the events giving rise to Plaintiffs' adverse employment actions took place and are documented, White Castle has met its burden in demonstrating that it would have taken the actions it took against Plaintiffs in the absence of their protected conduct.

In an attempt to establish pretext, Plaintiffs offer a rash of similarly situated employees who arguably did not engage in the same protected conduct as Plaintiffs and were treated more favorably. [Pls. SOAF ¶¶ 104-191.] In order to be a proper comparator, a fellow employee need not be identical to retaliation Plaintiffs in all respects, but he or she must be similar in all material respects. *Hernandez*, 508 F.Supp.2d at 695 (citing *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005)). The qualities that are material depend on the facts of the case. *Spath v. Hayes Wheels Int'l-Ind. Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). In most cases, Plaintiffs must identify another employee who was similarly situated with respect to position, performance,

conduct, supervisor, and qualifications. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) ("We consider all relevant factors in making this determination, including whether the similarly situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct."); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). "The important question is therefore whether others similarly situated to the [P]laintiff[s], with respect to important matters characterizing the employment relationship, had been treated one way, and the [P]laintiff[s], having engaged in statutorily protected activity, [were] treated differently." *South v. Ill. E.P.A.*, 495 F.3d 747, 752 (7th Cir. 2007).

Plaintiffs argue that they have presented evidence that similarly situated employees were treated more favorably by White Castle. [Pls. Resp., p. 9, ECF No. 192.] However, Plaintiffs have failed to elucidate how these other employees were similarly situated. For example, Plaintiffs do not identify whether these other employees had similar work histories, whether these employees had prior violations of White Castle policies, whether these employees performed the same work, whether the violations of these employees were similarly serious in nature, or whether these employees had the same supervisor who made the decision whether and to what extent a punishment was necessary. The court will not assume that these comparators were similarly situated in all material aspects. *Taylor-Novotny v. Health Alliance Medical Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014). That is Plaintiffs' burden, and they failed to meet it. *Hernandez*, 508 F.Supp.2d at 696.

**B.    FLSA and IMWL Wage Claims**

The FLSA and IMWL both guarantee employees a minimum wage for all hours worked. *See* 29 U.S.C. § 206(a); 820 ILCS 105/4. It is generally held that the IMWL parallels federal

law, and the Illinois Administrative Code provides that federal FLSA regulations provide

guidance in interpreting the IMWL. *O'Brien*, 2004 WL 609798 at *7 (citing *Haynes v. Tru-

Green Corp.*, 154 Ill. App. 3d 967, 107 Ill. Dec. 792, 507 N.E.2d 945, 951 (4th Dist.), *appeal

denied*, 116 Ill. 2d 573, 113 Ill. Dec. 314, 515 N.E.2d 123 (1987)). The same analysis generally

applies to both the FLSA and IMWL. *Id.*; *Laboy v. Alex Displays, Inc.*, 2003 WL 21209854, *2

(N.D. Ill. May 1, 2003); *Bjornson v. Daido Metal U.S.A., Inc.*, 12 F.Supp.2d 837, 842 (N.D. Ill.

1998.) Accordingly, the court will analyze Plaintiffs' FLSA and IMWL claims together.

### i.    Minimum Wage

White Castle argues that Plaintiffs are not entitled to damages based on a minimum wage

violation because Plaintiffs' average hourly pay for any given workweek always exceeded the

minimum wage. Plaintiffs, however, argue that they have presented sufficient evidence to prove

that they are entitled to judgment and damages on their minimum wage claims.

Plaintiffs' allegations supporting their minimum wage claims closely mirror one another.

Both Plaintiffs argue that: (1) they worked at the restaurant "off the clock" without

compensation; (2) White Castle Management improperly edited their time to reflect fewer hours

worked; and (3) they were forced to cover cash shortages out of pocket, which reduced their

weekly compensation. [SAC, ECF No. 164.] Roberts alleges that during the relevant time

period she performed a total of 50 minutes of work "off the clock," that approximately 1 hour of

time was edited from her work on certain occasions, and that she was required to repay a total of

approximately $75 in cash shortages. [Def. SOF ¶¶ 17, 19, 26, ECF No. 181.] Jenkins alleges

that he worked approximately 60-80 minutes per week "off the clock," that he had to repay

drawer or safe shortages on occasion (though Jenkins cannot recall any specific instances of

doing so and has not presented any evidence that he ever covered safe or drawer shortages out of

his own pocket), and that his time was shaved by up to 25 minutes in any given shift. [*Id.* ¶¶ 18, 21, 22.]

Based on the allegations recited above, and accepting them as true, White Castle argues that at no point were Plaintiffs paid a wage below the minimum wage. White Castle's math is both instructive and supported by the evidence on the record. Jenkins' lowest rate of pay during the relevant time period was $10.42 per hour in 2009. [*Id.* ¶ 29.] The Illinois minimum wage was set at $8.00 per hour at that time. Jenkins testified during his deposition that he worked between 35 and 37 hours per week. [*Id.* ¶ 28.] Thus, if Jenkins worked 35 hours in one week— the least he claimed to work, on average[4]—he would have earned $364.70. If, instead of earning $10.42 per hour, Jenkins had earned the minimum wage, he would have received $280 for 35 hours of work. Assuming Jenkins' allegations are true and all occurred in the same week (*i.e.*, 80 minutes of "off the clock" work, 25 minutes of edited time, and $30 of repaid shortages), his regular rate of pay would still be above the minimum wage (*i.e.*, ($364.70[5] - $30[6]/35 hours[7] + 1.76 hours[8]) = $9.10 per hour).

This analysis is also applicable to Roberts. Roberts' lowest rate of pay during the relevant time period was $13.71 per hour in 2010. [Def. SOF ¶ 30, ECF No. 181.] Roberts claims that she, on average, worked 37.5 hours per week. Accordingly, if Roberts worked an average week, she would earn $514.13. A person working the same number of hours and earning minimum wage would earn $300. Assuming that Roberts' allegations were all true and

---

[4] Jenkins has not identified when, specifically, the FLSA and IMWL violations occurred.

[5] $10.42 per hour x 35 hours.

[6] Hypothetical drawer or safe shortage.

[7] Hours worked in one week.

[8] 25 minutes of edited time (.42 hours) + 80 minutes of "off the clock work" (1.33 hours).

occurred in the same week (*i.e.*, 50 minutes of "off the clock" work, 60 minutes of time edited, and $75 to cover cash shortages), her regular rate of pay would still be above the minimum wage (*i.e.*, ($514.13[9] - $75[10])/(37.5 hours[11] + 1.83 hours[12]) = $11.17 per hour).

Plaintiffs do not challenge White Castle's arithmetic or the underlying assumptions made in the computations. Rather, Plaintiffs argue both in their response to White Castle's motion for summary judgment and in their motion for partial summary judgment that they are entitled to the minimum wage for every hour of work performed. More specifically, Plaintiffs take issue with White Castle's "vague assertions as to what Plaintiffs [sic] work is 'on average.' If Defendant wants to dismiss a claim, Defendant should submit the undisputed evidence, rather than hiding [sic] behind vague claims of what Plaintiffs worked 'on average.'" [Resp. to MSJ, p. 17, ECF No. 192.] Relying on Plaintiffs' own allegations, White Castle has submitted undisputed evidence to dismiss Plaintiffs' minimum wage claims.

The regulations do not require that the minimum wage be computed on a workweek basis rather than on an hour-by-hour basis. There is, however, an emphasis on the workweek as a basic standard. *See* 29 C.F.R. § 776.4(a); *Encotech Const.*, 2004 WL 609798 at *7 (citing *O'Brien v. Town of Agawam*, 350 F.3d 279, 298 (1st Cir. 2003)). *See also* 29 C.F.R. §§ 778.103-.104; 778.322, 778.324 (overtime regulations). Although Department of Labor regulations do not provide that minimum wage is to be computed on a workweek basis, the Department of Labor has issued opinions adopting such a standard. *See Dove v. Coupe*, 759 F.2d 167, 171-72 & n. 8 (D.C. Cir. 1985). Case law has generally applied such a standard as well. *See Id.*; *Hensley v.*

---

[9] $13.71 per hour x 37.5 hours.

[10] Alleged drawer or safe shortage.

[11] Hours worked in one week.

[12] 50 minutes of "off the clock" work (.83 hours) + 60 minutes of time edited (1 hour).

*MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986); *United States v. Klinghoffer Brothers Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960); *Birch v. Kim*, 977 F.Supp. 926, 930-31 (S.D. Ind. 1997); *Cuevas v. Monroe Street City Club, Inc.*, 752 F.Supp. 1405, 1416-17 (N.D. Ill. 1990). *But compare Lamon v. City of Shawnee, Kan.*, 972 F.2d 1145, 1155 (10th Cir. 1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993) (*adopting opinion below*, 75 F.Supp. 1518, 1521 & n. 1 (D. Kan. 1991)). Plaintiffs make no attempt to distinguish these cases, and the court will follow them.

There is no evidence, or even contention, that either Plaintiff received pay for a workweek that averaged below $8.00 per hour. Therefore, White Castle is entitled to summary judgment on Plaintiffs' FLSA and IMWL claims.

### ii. Overtime Pay

The FLSA requires that employees be compensated for overtime "at a rate not less than one and one-half times the regular rate[.]" 29 U.S.C. § 207(a). The "regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee," and excludes certain sums. 29 U.S.C. § 207(e); *see also Amador v. Guardian Installed Services, Inc.*, 575 F.Supp.2d 924, 928-29 (N.D. Ill. 2008). Liability for unpaid overtime compensation under the IMWL is determined by the same standards that govern liability under the FLSA. *See, e.g., Villarreal v. El Chile, Inc.*, 776 F.Supp.2d 778, 784 (N.D. Ill. 2011).

The court denies White Castle's motion for summary judgment as to Plaintiffs' FLSA and IMWL overtime claims. The court acknowledges that Plaintiffs have failed to provide evidence, other than their own testimony, that they were forced to work off the clock, roll hours, or repay register and safe shortages. However, pay records would not reflect off-the-clock work, rolling, shaving, or compelled payments. Although an employee who seeks to collect unpaid

20

overtime must prove that the employer failed to compensate him or her for the work performed, *Brown v. Family Dollar Stores of Indiana*, 534 F.3d 593, 595 (7th Cir. 2008), the remedial nature of the FLSA "militate[s] against making that burden an impossible hurdle for the employee." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).

The evidence submitted by Plaintiffs—payroll records—and their deposition testimony establishes that Plaintiffs consistently worked at or near 40 hours per week. If Plaintiffs engaged in any of the unpaid activities as laid out in their complaint, then it is entirely possible that White Castle improperly withheld overtime pay. In fact, White Castle admits that, during the relevant time period, it complimented stores that did not pay overtime. A reasonable juror could find that White Castle actively engaged in a practice to prevent employees like Plaintiffs form attaining overtime pay. Ultimately, the issue will come down to whether a juror believes Plaintiffs' claims or the testimony of White Castle. This is not within the province of the court. *Brothers Food & Liquor, Inc. v. U.S.*, 626 F.Supp.2d 875, 881 (N.D. Ill. 2009) ("[T]he Court may not make credibility determinations or weigh evidence when ruling on a motion for summary judgment. Such is the function of a trier of fact following a full trial.") (internal citations omitted).

However, Plaintiffs' motion for partial summary judgment as to their FLSA and IMWL overtime claim is also denied. Plaintiffs have not offered evidence that proves that they were entitled to overtime wages. The amounts prayed for by Plaintiffs are based only on deposition testimony and payroll records that Plaintiffs claim were either falsified by White Castle or reflect hours that were voluntarily cut by Plaintiffs at the direction of Anderson. Therefore, not only has liability not been conclusively established at this stage, the amounts at issue have also yet to be proven.

Accordingly, White Castle's motion for summary judgment and Plaintiffs' motion for partial summary judgment are denied as to Plaintiffs' overtime claims.

## C.     IWPCA Claims

The IWPCA provides for a cause of action based on wrongfully held compensation pursuant to a contract or agreement. *Brown v. Club Assist Rd. Serv. U.S., Inc.*, No. 12 CV 5710, 2013 WL 5304100, at *8 (N.D. Ill. Sept. 19, 2013). The IWPCA therefore does not provide an independent right to payment of wages and benefits; instead, it enforces the terms of an existing contract or agreement. *Elder v. Comcast Corp.*, 2012 WL 3835100, *1 (N.D. Ill, Sept. 4, 2012). Accordingly, Plaintiffs suing under the IWPCA must allege that final compensation is due to them under an employment "contract or agreement." *Landers–Scelfo v. Corporate Office Sys., Inc.*, 827 N.E.2d 1051, 1058 (Ill. App. Ct. 2005). Illinois courts have interpreted "agreement" to be broader than a contract and to require only a manifestation of mutual assent. *Brown*, 2013 WL 5304100, at *8 (quoting *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012)). Accordingly, Plaintiffs do not need to plead all the elements of a contract if they can plead facts showing mutual assent to an agreement. *Id.* Moreover, "an employment agreement can be entirely implicit," and "employers and employees can manifest their assent to conditions of employment by conduct alone." *Elder*, 2012 WL 3835100 at *2 (quoting *Landers-Scelfo v. Corporate Office Sys., Inc.*, 827 N.E.2d 1051, 1058-59 (Ill. App. Ct. 2005)).

Plaintiffs allege that they entered into an "Agreement" with White Castle to be "paid for all time worked at a set and agreed rate of pay." [SAC ¶¶ 1-2, ECF No. 164.] Plaintiffs fail to produce a contract or agreement with White Castle. However, the "Hours Worked Guideline" in the White Castle Team Members Handbook ("Handbook") provides that "all hourly team members must be paid for all hours worked." [Def. SOF ¶¶ 15-16, ECF No. 181.] White Castle

argues that this language does not provide for the payment of wages at a set and agreed rate of pay. Moreover, White Castle states that the Handbook includes an express disclaimer clarifying that the Handbook's provisions have no binding effect. The disclaimer states the following:

> The Company (White Castle) at its sole discretion can and may unilaterally change delete or modify any provision contained in this manual. Nothing in this manual is intended to serve as an employment contract or guarantee of employment for any period of time. Either the Company or the team member may change the employment relationship at any time with or without cause.

[Def. SOF ¶ 8, Ex. A4 (Handbook), ECF No. 181.]

Such a disclaimer is effective to preclude the formation of a contract under Illinois law. *Elder*, 2012 WL 3835100 at *2 (citing *Garcia v. Kankakee Cnty. Housing Auth.*, 279 F.3d 532, 536 (7th Cir. 2002) (collecting cases)). Indeed, the majority view in this district is that such a written disclaimer dissolves a claim under the IWPCA. *See, e.g., Brand v. Comcast Corp.*, No. 12 CV 1122, 2013 WL 1499008, at *5 (N.D. Ill. Apr. 11, 2013) (Kim, J.); *Camilotes v. Resurrection Health Care Corp.*, No. 10–cv–366, 2012 WL 2905528, at *6 (N.D. Ill. July 16, 2012) (St.Eve, J.); *Harris v. Seyfarth Shaw LLP*, No. 09 C 3795, 2010 WL 3701322, at *2 (N.D. Ill. Sept. 9, 2010) (Bucklo, J.); *Skelton v. Am. Intercont'l Univ. Online*, 382 F.Supp.2d 1068, 1075 (N.D. Ill.2005) (Kennelly, J.). *But see Wharton v. Comcast Corp.*, 912 F.Supp.2d 655, 662 (N.D. Ill.2012) (Holderman, C.J.) (concluding that disclaimers do not dissolve mutual assent to the employment agreement). As the majority view has reasoned:

> [G]iven the presence of these disclaimers, the handbook's provisions are merely guidelines that leave [the company] with sole discretion to interpret and resolve conflicts about the handbook's meaning, regardless of whether its employees agree or are even consulted about the changes. Accordingly, the handbook does not provide the requisite manifestation of mutual assent to support even the broader interpretation of an agreement that governs in the IWPCA context.

*Brand v. Comcast Corp.*, No. 12 CV 1122, 2012 WL 5845639, at *3 (N.D. Ill. Nov. 19, 2012).

The court finds this reasoning persuasive. The disclaimer in this case explicitly states that "[n]othing in th[e] manual is intended to serve as an employment contract or guarantee of employment for any period of time." [Def. SOF ¶ 8, Ex. A4 (Team Member Handbook), ECF No. 181.] The inclusion of such a disclaimer shows that White Castle never intended to mutually assent to a contract or agreement with its employees, including Plaintiffs. Because Plaintiffs can point to no other agreement or contract in place at the time of their employment that would have established a set wage, White Castle's motion for summary judgment on Plaintiffs' IWPCA claims is granted.

**D.     Spoliation Claim**

Jenkins alleges that, on September 4, 2012, his meeting with White Castle management, including Anderson, at the Dolton White Castle was recorded by surveillance cameras. White Castle produced the video footage that captured the meeting, which took place in a booth on the far side of the restaurant's dining area. However, not all of the audio footage of the meeting was produced. Despite receiving numerous preservation letters from counsel for Jenkins, White Castle was unable to produce audio from one of the two microphones that are located directly above the restaurant's cash registers for the day in question. Jenkins argues that White Castle lost the recording, which captured White Castle management "openly admitt[ing] th[e] [p]ractice of compelled payments," i.e. unpaid time, cash drawer shortage reimbursements, and "shaving" of time. [SAC ¶ 184, ECF No. 164.] In response, White Castle states that while it was unable to produce the audio from one of the two microphones in the cash register area, the microphone would not have captured the audio of the meeting in the dining area. According to White Castle, the surveillance system at the restaurant is not set up to record conversations in the restaurant's dining room area. Moreover, because the two cash register microphones are approximately 3

feet from each other, the loss of audio from one microphone would not materially affect what is recorded.

"Under Illinois law spoliation of evidence is treated as a negligence action." *Duran v. Town of Cicero*, 653 F.3d 632, 644 (7th Cir. 2011) (citing *Boyd v. Travelers Ins. Co.*, 166 Ill.2d 188, 209 Ill.Dec. 727, 652 N.E.2d 267, 270–71 (1995)); *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509-10 (7th Cir. 2007) ("[N]egligent spoliation is not itself an independent tort but rather a type of negligence."). "Accordingly, a plaintiff claiming spoliation of evidence must prove that: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages." *Martin v. Keeley & Sons, Inc.*, 365 Ill.Dec. 656, 979 N.E.2d 22, 27 (Ill. 2012).

White Castle has presented evidence by way of an affidavit that, even *if* a conversation took place between Jenkins and White Castle management regarding White Castle's allegedly illegal wage policies, the microphone in question would not have picked it up.  [Def. SOF ¶ 37, Ex. F (Andrew Gilbertsen Affidavit), ECF No. 181.]  The surveillance system is not designed to, and does not, record the voices of persons conversing at a reasonable volume in booths in the dining area of the White Castle location in question.  [*Id.*]  Rather, the microphones exist in order to record audio at the cash registers.  [*Id.*]  Therefore, the evidence that Jenkins claims was lost never existed in the first place, according to White Castle.  *Duran*, 653 F.3d at 644 ("Illinois does not recognize a spoliation claim based on evidence not yet in existence.")

In response, Jenkins has not presented any evidence to rebut the arguments advanced by White Castle.  In fact, Jenkins does not respond to White Castle's argument in any meaningful

way.  Rather, Jenkins proffers a four-sentence response that concludes with the following sentence: "Thus Defendant is demanding to be rewarded for its failure to preserve after plenary notice."  [Pls. Resp. to MSJ, p. 28, ECF No. 192.]  Because Jenkins failed to present any legal authority or factual evidence to support his argument or claim for spoliation, he has waived his argument.  *Midwest Motor Express*, 181 F.3d at 808 (failure to meaningfully respond to a motion for summary judgment constitutes waiver).  Accordingly, summary judgment is entered on Jenkins' claim for spoliation.

## IV.    CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment [179] is granted in part and denied in part and Plaintiffs' motion for partial summary judgment [182] is denied. The court grants summary judgment in favor of Defendant as to the FLSA retaliation claims, the FLSA and IMWL minimum wage claims, the IWPCA claim and the spoliation claim.  The court denies summary judgment as to Plaintiffs' FLSA and IMWL overtime pay claims.  Status is set for October 12, 2016 at 9:30 a.m.


Date:   September 29, 2016                          _____/s/_____


                                                   Joan B. Gottschall
                                                   United States District Judge


26